UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

WILLIAM STEPHEN DEAN (a/k/a BILLY
DEAN); RORI LEIGH GORDON; GREEN
2009 INC.; ONE55DAY INC.; and LOOK
ENTERTAINMENT, LTD.,

                                        Plaintiffs,

                - versus -

THE TOWN OF HEMPSTEAD; et al.,

                                        Defendants.

MEMORANDUM
AND ORDER

14-cv-04951 (JG) (SMG)

---

A P P E A R A N C E S :

        FAHRINGER & DUBNO
                767 Third Ave., Suite 3600
                New York, NY 10017
        By:     Erica Tamar Dubno
                *Attorney for Plaintiffs*

        BERKMAN, HENOCH, PETERSON, PEDDY & FENCHEL, P.C.
                100 Garden City Plaza
                Garden City, NY 11530
        By:     Peter Sullivan
                Donna A. Napolitano
                *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

        This case is about whether a Long Island town violated the constitutional rights of

two of its small business owners when it refused to grant them the necessary authorizations to

open and run two cabarets.  Plaintiffs Billy Dean and Rori Leigh Gordon, along with the entities

with whom they are affiliated, bring this action against defendants Town of Hempstead (the

"Town"), the Town's Building Inspector, the Town's Supervisor, and the individual members of

the Town's Board of Appeals,[1] pursuant to 42 U.S.C. § 1983, alleging numerous constitutional violations. The plaintiffs seek a judgment declaring that the defendants' denial of their applications for special exception permits, certificates of occupancy, and public assembly licenses for two cabarets violated the First, Fifth, and Fourteenth Amendments to the United States Constitution. They also seek injunctive relief, actual damages, punitive damages, and legal fees pursuant to 42 U.S.C. § 1988. The defendants have moved to dismiss the case pursuant to Rule 12(c) for lack of subject matter jurisdiction. For the reasons set forth below, I grant in part and deny in part the motion to dismiss. I also direct the parties to appear before Magistrate Judge Steven M. Gold, on a date to be set by him, to begin settlement discussions.

## FACTUAL BACKGROUND

A.     *Materials Considered*

The Town brings its jurisdictional challenges pursuant to Fed R. Civ. P. 12(c) rather than Rule 12(b)(1). Courts largely treat the two motions the same. *See U.S. ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.*, 152 F. Supp. 2d 443, 448-49 (S.D.N.Y. 2001) ("A Rule 12(c) motion for judgment on the pleadings based upon a lack of subject matter jurisdiction is treated as a Rule 12(b)(1) motion to dismiss the complaint."); *Cruz v. AAA Carting and Rubbish Removal, Inc.*, 2015 WL 4393204, at *4 (S.D.N.Y. July 16, 2015) (collecting cases). In a motion to dismiss brought under Rule 12(b)(1), a court may consider extra-pleading affidavits and other materials, excepting "conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Central Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).

---

[1]     For readability, at times I refer to the plaintiffs collectively as "Dean," and the defendants collectively as "the Town." The Town's Board of Appeals (the "Board") was formerly known as the Board of Zoning Appeals. Compl. ¶ 30.

As an initial matter, the parties dispute whether I may consider extra-pleading materials when deciding a jurisdictional motion pursuant to Rule 12(c). Dean argues that I cannot consider the defendants' affidavits and exhibits "outside the four corners of the original pleadings" unless I treat the instant motion as one for summary judgment pursuant to Rule 56. *See* Pls.' Br., ECF No. 49, at 12-13. In support of this argument, Dean relies on Rule 12(d), which states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." The Town argues that I may consider materials outside the pleadings for jurisdictional motions brought under Rule 12(c) just as I may for such motions when they are brought pursuant to Rule 12(b)(1). Defs.' Reply Br., ECF No. 51, at 13-14.

Courts in this circuit have found that they may consider materials outside the pleadings when deciding a Rule 12(c) motion to dismiss based on a court's purported lack of jurisdiction, reasoning that—as with Rule 12(b)(1) challenges—a court is duty-bound to determine whether it has the statutory or constitutional power to adjudicate a claim. *See, e.g.*, *U.S. ex rel. Phipps*, 152 F. Supp. 2d at 449 (finding that in a 12(c) motion challenging subject-matter jurisdiction, a court may consider "materials outside the pleadings, such as affidavits, documents and testimony," because a court may properly consider those materials in a Rule 12(b)(1) challenge); *Cruz*, 2015 WL 4393204, at *4 (same); *Destefanis v. Fugate*, 2013 WL 6796425, at *2 (E.D.N.Y. Dec. 19, 2013) (same); *accord Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1010-11 (2d Cir. 1986) ("[A] motion that includes evidentiary matters outside the pleadings[] is properly converted to a Rule 56 motion only when it is made under Rule 12(b)(6): failure to state a claim . . . [but] when, as here, subject matter jurisdiction is challenged under rule 12(b)(1), evidentiary matter may be presented by affidavit or otherwise.").

A Rule 12(b)(1) motion and a Rule 12(c) motion for lack of subject-matter jurisdiction are means to the same end: a determination of whether I have the power to decide the merits of the parties' claims. And so I conclude that in reviewing either motion, I may consider materials extraneous to the pleadings without converting the motion into one brought under Rule 56.[2]

Thus, as with any Rule 12(c) motion, I may consider the following materials: "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation marks omitted). I may also consider materials integral to the complaint, that is, "any statements or documents incorporated in [the complaint] by reference . . . [or documents] where the complaint relies heavily upon its terms and effect," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002), as well as matters of public record, *see Burfeindt v. Postupack*, 509 Fed. Appx. 65, 67 (2d Cir. 2013). In addition, to determine whether I have subject matter jurisdiction, I may consider materials outside the pleadings, including affidavits. *J.S. ex rel. N.S.*, 386 F.3d at 110. The facts derived from these materials are set forth below.

A. *The Parties*

Billy Dean and Rori Leigh Gordon, New York residents, are the president and vice president of plaintiff One55Day Inc. ("One55Day"), a New York corporation with its principal place of business in Hempstead, New York. Compl., ECF No. 1, ¶¶ 24, 28-29.

---

[2]     However, I am mindful that "the standard used to evaluate a Rule 12(b)(1) claim is similar to that for summary judgment" under Rule 56, *see U.S. ex rel. Phipps*, 152 F. Supp. 2d at 449, and thus, in an effort to ensure that the plaintiffs were afforded similar protections to those afforded them in summary judgment motions, I granted the plaintiffs' request for "an opportunity to supplement [their] response to present all material responsive to" a Rule 12(c) motion in which I would consider extra-pleading material. *See* Pls.' Br. at 13 (so requesting); Order, Nov. 30, 2015 (so granting). Accordingly, in the instant motion, I consider the materials filed in the plaintiffs' surresponse, ECF No. 55, as well as those filed by defendants in their surreply, ECF No. 56.

One55Day owns a piece of commercial property located at 3500 Sunrise Highway, Wantagh, New York (the "Wantagh Property" or the "Wantagh Cabaret"). *Id.* ¶ 24. Gordon is the president and Dean the vice president of Look Entertainment, Ltd. ("Look Entertainment") and Green 2009 Inc. ("Green 2009"), New York corporations with principal places of business in Bellmore, New York, and Wantagh, New York, respectively. *Id.* ¶¶ 25-26, 28-29. Green 2009 leases the Wantagh Property from One55Day. *Id.* ¶ 25.

Since 1998, Look Entertainment has leased commercial property located at 1536-38 Newbridge Road, Bellmore, New York (the "Bellmore Property," "Showtime Café," or the "Bellmore Cabaret"). *Id.* ¶ 26. Non-party Great American Realty of Bellmore, LLC owns the Bellmore Property. Am. Answer, ECF Nos. 20-21, ¶ 219 ("Answ.").

The Complaint names as defendants the Town of Hempstead,[3] a municipal corporation organized under New York State law, and the following people in their individual and official capacities: Kate Murray, the Town Supervisor, in charge of overseeing the Town's operations during the relevant time period; John E. Rottkamp, the Commissioner of the Town's Building Department; David P. Weiss, Chairman and member of the Town's Board of Appeals; and Gerald C. Marino,[4] Katuria E. D'Amato, John F. Ragano, Frank A. Mistero, Joseph F. Pellegrini, and Kimberly A. Perry, all members of the Town's Board of Appeals. Compl. ¶¶ 30-39.

B.    *The Town's Laws*

Business owners seeking to construct a building in the Town's business district are generally responsible to two agencies: the Board of Appeals and the Building Department.

---

[3]    Hempstead is made up of 22 villages and 35 hamlets, which include Bellmore and Wantagh. Compl. ¶ 30.

[4]    The Answer alleges that because Marino was appointed to the Board on April 8, 2014, he played no role in the Board's decision-making regarding the plaintiffs prior to that date. Answ. ¶ 218.

The Board has appellate jurisdiction to review orders and decisions made by administrative officials enforcing ordinances and local laws, N.Y. Town Law § 267-a(4) (McKinney 2003) ("Town Law"), as well as original jurisdiction over applications for special exceptions to certain uses so long as the use would not prevent orderly and reasonable use of adjacent properties or other established uses in the district where the proposed use is located, would not affect the Town's safety, health, welfare, comfort, convenience, and order, and would be "in harmony with and promote the general purposes and intent" of the zoning ordinance, Hempstead, N.Y., Building Zone Ordinance § 267(D)(2) ("BZO"). The Board also has the power to grant variances from the Town's zoning ordinances. Town Law § 261 ("Such regulations may provide that a board of appeals may determine and vary their application in harmony with their general purpose and intent."); *id.* § 267-b(2) ("The board of appeals, on appeal from the decision or determination of the administrative official charged with the enforcement of such ordinance or local law, shall have the power to grant use variances.").

The Town's Code charges the Building Department—a separate entity from the Board of Appeals—with administering and enforcing rules regarding places of public assembly and other real property and buildings. Hempstead, N.Y., Town Code § 52-3 ("Town Code"); Compl. ¶ 49. In particular, to construct, substantially alter, or "change the nature of the occupancy" of a building in Hempstead, a business owner must obtain a building permit from the Building Department, and to occupy a building in Hempstead, must obtain a Certificate of Occupancy or Certificate of Completion from the Building Department. *See* Town Code §§ 86-9 (permits), 86-18, (certificates of occupancy), 86-19 (certificates of completion); *see also* Louis Carnovale Aff., ECF No. 43-4, ¶¶ 4, 6, 8, 9. Before being issued a Certificate of Occupancy, a property owner must have first obtained a building permit, and a building inspector must

examine the site and work for which the application was filed.  Town Code §§ 86-18, 86-21.

Upon receiving an application for a certificate of occupancy, the certificate "shall be issued

within a reasonable time."  *Id.* § 86-22.

The Building Department Commissioner also has jurisdiction to grant required

licenses, renewed annually, to operate a "place of public assembly," defined to include cabarets

and restaurants.  Town Code §§ 96-1, 96-2.  The Building Department will not issue a public

assembly permit to applicants who have "outstanding and unresolved occupation and building

permit issues," Ray Schwarz Aff., ECF No. 43-3, ¶ 12, a practice in line with provisions of the

Town's Code that allow the Building Department to issue a public assembly permit only after the

Department is satisfied that an applicant has complied with all laws, ordinances, codes, rules,

regulations, and a finding "that the premises are a safe place in which to conduct, maintain or

operate a place of public assembly and that a proper use has been established for the premises."

Town Code § 96-3(B).

The Town Code defines a "cabaret" as any "room, place or space wherein musical

entertainment, singing, dancing in a designated area or other form of amusement or

entertainment is permitted in conjunction with the sale or service of food or drink to the public."

*Id.* § 96-1(A).  To operate a cabaret in Hempstead, a business owner must apply for and obtain

permission from the Board of Appeals.  BZO § 272(C)(6).  As amended in March 1997, the

statute states that "the grant of any cabaret use by the Board of Zoning Appeals shall be limited

to the specific cabaret use applied for and approved by the Board of Zoning Appeals and no

other cabaret use."  *Id.*  The amended statute also states that it "shall apply to any cabaret use

hereafter or previously granted by the Board of Zoning Appeals."  *Id.*

The Board also has the power to rescind, upon a vote and after a public hearing, any prior approval of cabaret use. Town Law § 267-a(12). The Board may hold a rehearing on any of its orders, decisions, or determinations that have not previously been reheard, and may reverse any earlier decision upon a unanimous vote of members present, "provided the board finds that the rights vested in persons acting in good faith in reliance upon the reheard order, decision or determination will not be prejudiced thereby." *Id*. Appeals to the Board must be decided within 62 days after the required hearing. *Id.* § 267-a(8). If they fail to do so, "an applicant's sole remedy is a mandamus proceeding to compel the board to act." *Id.*, Practice Comm.

The Town's Building Zone Ordinance defines an "adult entertainment cabaret" as a "public or private establishment which presents topless dancers, strippers, male or female impersonators or exotic dancers or other similar entertainments and which establishment is customarily not open to the public generally but excludes any minor by reason of age." BZO § 384. An adult entertainment cabaret cannot be located "within a five-hundred-foot radius of any residence district or any edu-cultural district . . . [or] any school, church or other place of religious worship, park, playground or playing field." *Id.* § 385.

The Building Zone Ordinance also sets forth parking regulations, and it mandates that cabarets have one parking space for each three authorized occupants. *Id.* § 319(A)(7). The Board of Appeals handles applications for parking variances, which it may grant "in any case in which it shall find that compliance herewith is not necessary to prevent traffic congestion or undue on-street parking, or where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of this section." *Id.* § 319(C).

C.    *The Wantagh Property*

In the winter of 2009, One55Day bought the Wantagh Property for $950,000. Compl. ¶ 56.  About a month later—on March 24, 2009—One55Day leased the Wantagh Property to Green 2009 for five years at a cost of $90,000 per year. *Id*. ¶ 57.  Both companies made these arrangements with knowledge of the property's history as a place of entertainment: as early as 1969, the Town granted the property's previous owner a permit to use the Wantagh Property as a cabaret. *Id*. ¶¶ 52, 56-57.  The applicant for the permit issued in 1969 sought approval specifically for a "piano bar," and had told the Board that no "go-go dancing" or other live entertainment would occur at the venue. Answ. ¶¶ 61, 279.  This cabaret, "The Soiree," was open for business for the next 14 years. Compl. ¶ 53.  The Complaint also alleges that other cabarets operated on the Wantagh Property during the 1980s, and that, after a renovation in the 1990s adding a "full service kitchen" to the building, both a cabaret and a restaurant existed on the property "through 2008." *Id*. ¶¶ 53-55.

As it sits today, the Wantagh Property is located in a business district just north of a residential neighborhood. Answ. ¶¶ 260, 265.  It has eleven parking spaces and two buildings: a one-story commercial building and a single-family dwelling. *Id*. ¶¶ 266-67.

On May 8, 2009, the plaintiffs applied for a building permit with the Building Department to "improve [the Wantagh Property's] use as a cabaret while maintaining changes made by a prior owner." Compl. ¶ 58.  The Building Department denied the request because it found that the plaintiffs' proposed use was outside the scope of the 1969 special exception permit. *Id*. ¶ 59; Answ. ¶ 295.  Further, because the Building Department determined that BZO § 272(C)(6), as amended, limited cabaret special exception permits to the express use applied for and granted, it advised the plaintiffs that they needed to seek a new special exception permit

from the Board of Appeals. Answ. ¶ 295.[5] Finally, the Building Department denied the request for a building permit because the proposed use required a variance from on-site parking requirements, which the Board of Appeals—not the Building Department—has jurisdiction to grant. Answ. ¶¶ 60, 271, 295; BZO § 319(C).

1. *The April 14, 2010 Hearing and April 28, 2010 Decision*

On October 12, 2009, the plaintiffs (1) appealed the Building Department's determination that they needed a new special exception permit to operate their proposed cabaret; (2) in the alternative, applied for a new special exception permit; and (3) applied for a parking variance. Compl. ¶ 61; Answ. ¶ 301.

The Board of Appeals held a public hearing on these matters on April 14, 2010. Compl. ¶ 62; *see also* Tr. of Apr. 14, 2010 Proc., Defs.' Ex. M ("Ex. M"). Dean testified at the hearing that he had planned a "variety of activities, interactive dinner theater, dancing, comedian, jugglers, contortionists, [and] sword swallowers" for the Wantagh Cabaret, and stated that there would be stage entertainment, live music, and dancing. Ex. M at 106; Compl. ¶ 62. He did not explicitly testify whether any age limit would exclude minors from the cabaret. Answ. ¶ 314; Ex. M at 118 (testifying, in response to a question whether someone would check identification at the door, that there would be a "reception"). A real estate expert testified that the Wantagh Cabaret's opening would not adversely affect the neighborhood. Compl. ¶ 67; Ex. M at 132-33.

Dean also testified at the hearing about his other property—the Bellmore Property—on which he operates a "dancing and entertainment" business entitled the Showtime Café. Compl. ¶¶ 64-66. According to the Complaint, the Showtime Café "features dancers who

---

[5] The plaintiffs did not apply for or obtain a public assembly permit from the Building Department, which they would need in addition to the cabaret special exception permit to operate a cabaret. *See* Town Code § 96; Schwarz Aff. ¶ 16.

wear pasties and G-strings," but who do not remove their costumes while performing, do not strip, and "offer[] artistic—but not adult" entertainment. *Id.* ¶ 64. At the April 14, 2010 hearing, Dean testified that the Showtime Café had been open for 12 years, and during that time the Town had always renewed its Cabaret permit. *Id.* ¶ 66; Ex. M at 122.

On April 28, 2010, the Board agreed with the Building Department's determination that the plaintiffs could not rely on the 1969 special exception permit, but granted them a temporary special exception permit to operate a cabaret, subject to the following conditions: the cabaret could not feature "topless," "bottomless," or "nude entertainment." Compl. ¶ 68; Answ. ¶ 318. The Board also granted the parking variance. Answ. ¶ 318. The temporary special exception permit became permanent on June 2, 2010, though it stipulated that the Board could reopen the decision if the plaintiffs did not comply with the conditions set forth in the decision. Compl. ¶¶ 69-70; June 2, 2010 Resolution, Defs.' Ex. P.

After this decision, the plaintiffs obtained building permits and began renovating the Wantagh Property to prepare it for opening. Compl. ¶ 71. Specifically, they ordered supplies and raised the building's roof by 25 feet. *Id.* ¶¶ 72-73. During these renovations, the plaintiffs "passed all inspections conducted by the Town and other agencies" and obtained a liquor license from the New York State Liquor Authority. *Id.* ¶¶ 74-75.

2.    *The May 18, 2011 Rehearing and August 25, 2011 Decision*

At some point after getting the special exception permit, the plaintiffs placed an advertisement for the Wantagh Cabaret on the website for the Showtime Café, the business on the Bellmore Property. Compl. ¶ 89; Answ. ¶ 325. This website described "Billy Deans [sic] Entertainment" as "providing Long Island with adult entertainment for years" and the Showtime Café as a "premier strip club." Answ. ¶ 327. The advertisement specific to the Wantagh Cabaret

stated that Dean expected to open a "brand new entertainment concept featuring dinner and shows combining creative and unique acts found only at Billy Deans [sic] brand new unnamed facility . . . . The new location will cater to anniversary, birthday, bachelorette and bachelor parties or groups of friends looking for a new twist for an exciting evening." Compl. ¶ 90. The Wantagh Cabaret advertisement sat adjacent to another advertisement for a "'Men of Color' Male Dance Revue featur[ing] . . . the sexiest black male exotic dancers on Long Island and in New York." Answ. ¶ 327.

This advertisement led to something of an uproar in the Wantagh community. More than 200 residents petitioned the Town to reject the already-approved application for a special exception permit to run the Wantagh Cabaret. Compl. ¶ 76. Before the plaintiffs opened for business, and pursuant to Town Law § 267-a(12), the Board reopened its issuance of the special exception permit and held another hearing on the matter on May 18, 2011. Compl. ¶¶ 77-78; Mar. 30, 2011 Resolution of Reh'g, Defs.' Ex. R; Tr. of May 18, 2011 Proc., Defs.' Ex. T ("Ex. T"). Almost 200 people attended the hearing, including the Town Supervisor (defendant Murray), who spoke at the hearing in opposition to the opening of the Wantagh Cabaret. Compl. ¶ 78, Ex. T at 34-40.

At the rehearing, Dean again testified that he would not be offering adult entertainment at the Wantagh Cabaret, but that the entertainment would be "Las Vegas style," and include dancing, aerial acts, jugglers, Brazilian shows, Hawaiian shows, knife throwers, Coney Island sideshows, and performances similar to those on the television show "America's Got Talent." Compl. ¶ 81; Ex. T, at 140. He testified that he would not permit minors to enter the Wantagh Cabaret. Answ. ¶ 345; Ex. T, at 140.

On August 25, 2011, the Board rescinded its approval of the Wantagh Cabaret's special exception permit but granted the parking variance (albeit limited to the operation of a restaurant only). Compl. ¶ 82; Answ. ¶ 375. Three months later, on November 30, 2011, the Board released Findings of Fact explaining that it had revoked the plaintiffs' permit because the plaintiffs had not established that there would not be "adult entertainment" at the cabaret, and because Dean had not been forthright during the April 14, 2010 hearing about how he intended to use the Wantagh Cabaret.[6] Compl. ¶¶ 86-87, 91; Nov. 30, 2011 Findings of Fact, Defs.' Ex. W ("Ex. W"). The Board found that Dean had not "acted in good faith" and thus did not have vested rights such that the Board's withdrawal of the special exception permit would prejudice the plaintiffs. Answ. ¶ 376; Carnovale Aff. ¶ 38. The Board drew support from Dean's posting of the advertisement on the Showtime Café's website, as well as "Dean's strip club reputation, his original admission that this is his second location the other being the strip club Showtime Café . . . and his utter and overt refusal to describe in detail the entertainment that he will actually offer in Wantagh." Answ. ¶ 372 (internal quotation marks omitted).

3.    *The Denial of the Restaurant Permit*

On August 1, 2012, after the Board denied the plaintiffs a special exception permit to operate the Wantagh Cabaret, the plaintiffs applied to the Town to use the Wantagh Property as a restaurant without live entertainment. Compl. ¶ 101. Building a restaurant is a "permitted use" pursuant to BZO § 196(M). Compl. ¶ 103. To use the property as such, however, Dean still needed to apply for a building permit and certificate of occupancy from the Building Department. Town Code §§ 86-9, 86-18. In its November 2011 Findings of Fact, the Board noted that—because the plaintiffs had sought to operate a restaurant alongside the

---

[6]       The Board's fact-finding is available at http://www.toh.li/board-of-appeals. It is the only "Findings of Fact" listed on the Board's website. *See id.*; *see also* Compl. ¶¶ 96-97.

proposed cabaret—"the premises are not laid out in such a manner as to support a full service restaurant and will not be entitled to a Certificate of Occupancy as so configured." Answ. ¶ 381. Specifically, the Board "observe[d], notably, but without limitation, that there are no windows." Ex. W, at 7396.

The Complaint states that the plaintiffs completed all the work necessary under the applicable building permits for a restaurant and passed its necessary inspections, including passing a Nassau County Fire Marshal inspection, receiving "Electrical Inspection Certificates" after an inspection by the Electrical Inspection Service, Inc. (and a finding that the building complied with New York's Residential and Building Code), and obtaining a letter from the New York State Department of Transportation that it had no objection to an issuance of a Certificate of Occupancy for the Wantagh Property. Compl. ¶¶ 104-07, 123.

On August 17, 2012, a Plan Examiner with the Building Department informed the plaintiffs that the Department had approved the restaurant plan. *Id*. ¶ 108. The Complaint alleges that the folder for the Wantagh restaurant had been marked "approved," but that the "Supervisor of the Plan Examiners for the Building Department subsequently crossed" that word out. *Id*. ¶ 110. On September 12, 2012, the Board of Appeals sent the plaintiffs a letter stating that the plaintiffs had to seek Board approval to use the Wantagh Property as a restaurant. *Id*. ¶ 111. On December 4, 2012, plaintiffs' attorney sent "a letter to the Defendants inquiring as to why the Plaintiffs still had not received a Certificate of Occupancy for the restaurant use." [7] *Id*. ¶ 112. After getting no response, on August 16, 2013—eight months later—plaintiffs' attorney sent a similar letter, but again received no response. [8] *Id*. ¶¶ 113-14. The plaintiffs did not

---

[7]     The Complaint does not specify to which defendant(s) plaintiffs sent the letter. Compl. ¶ 112.
[8]     Again, although the Complaint states this letter was sent to "the Town," it does not specify to which defendant(s) or Town entity the letter was sent. *Id.* ¶ 113.

appeal to the Board or commence a state court mandamus proceeding. Answ. ¶¶ 113-14. After a third inquiry from the plaintiffs, the Town Plan Examiner on February 6, 2014, told the plaintiffs that the restaurant application file was missing and that the initial approval of the restaurant had been deleted from the file in the Town's computer system. Compl. ¶ 115.

Dean filed a second application for a building permit and Certificate of Occupancy to open a restaurant on the Wantagh Property a few days later. *Id.* ¶ 116; Answ. ¶ 386. On February 20, 2014, the restaurant's building permit—but not Certificate of Occupancy—again was marked approved, and the file was forwarded to the Town's Chief Plan Examiner, Carnovale, for approval. Compl. ¶¶ 117-18; Answ. ¶ 387-88. Seven days later, the file was forwarded to the Board of Appeals for administrative review "in light of it[s] earlier controlling determination [the November 2011 Findings of Fact] as to the proposed configuration of the proposed restaurant." Answ. ¶ 389; Compl. ¶ 119. Carnovale stated that the Building Department refers to the Board applications and files for those properties that were "previously . . . the subject of review and a decision by" the Board when "the intent of the [Board] in that decision is not clear." Carnovale Aff. ¶ 14.

Although the Complaint, which was filed on August 20, 2014, alleged that the Board of Appeals had not yet completed its review of the Building Department's referral, *see* Compl. ¶ 121, materials appended to the Answer show that by resolution dated September 17, 2014, the Board recommended that the Building Department deny the application for a certificate of occupancy to operate a restaurant on the Wantagh Property. Answ. ¶ 392; Sept. 17, 2014 Admin. Resolution, Defs.' Ex. BB ("Ex. BB"). The Board reasoned that it had previously informed the plaintiffs in the November 2011 Findings of Fact that the building's lack of windows demonstrated that the premises were not configured to support a full-service restaurant,

and that the instant request was "barred by administrative res judicata" given that the plaintiffs had not submitted revised building plans for the restaurant that would "meet the conditions and . . . alleviate the concerns expressed by the this [sic] Board." Ex. BB, at 2-4.[9]

The plaintiffs did not appeal the recommendation to the Board or commence a proceeding pursuant to C.P.L.R. Art. 78. Answ. ¶ 394. Dean asserts that "there is absolutely no provision in the State or Town Building Codes requiring a cabaret or restaurant to have windows or barring a stage."[10] William S. Dean Aff., ECF No. 55-1, ¶ 20.

4.    *The Later-Discovered Zoning Code Violation*

On July 19, 2011, in the midst of Dean's second hearing before the Board and the Board's denial of the Wantagh special exception permit, the plaintiffs submitted an application for approval of amended plans at the Wantagh Cabaret. *See* Appl. for Approval of Suppl. and/or Am. Plans, Defs.' Ex. L[1]; Carnovale Aff. ¶¶ 36-37. Along with the application, the plaintiffs sent the Building Department a set of revised building plans, which showed that the plaintiffs had "enlarged the size of the exterior front vestibule and moved it forward so that it now encroaches upon the 10 foot front yard set-back in violation of the zoning code." Carnovale Aff. ¶ 37; *see also* Proposed Additions & Alterations to the Hangar, Defs.' Ex. L[2]. Additionally, the revised plans show that that the interior floor space increased, which would affect the parking variance that the Board had previously granted. Carnovale Aff. ¶ 37. A representative of the

---

[9]    The plaintiffs claim they had not previously seen this resolution until the defendants filed it in the Appendix to their Answer in this proceeding. Pls.' Br. at 7-8 n.8. The Answer alleges that on September 18, 2014, the Building Department told the plaintiffs of the September 17, 2014 resolution. Answ. ¶ 393; Planning Dep't Obj., Defs.' Ex. AA.

[10]    I am aware that on February 9, 2016 the Board adopted an amendment to BZO § 302 that would require windows on exterior walls of restaurants. *See* Stated Town Board Meeting at 22-23 (Feb. 9, 2016), *available at* http://www.toh.li/files/tbdocuments/20160209-minutes.pdf. Neither party has suggested whether this adopted amendment should change the outcome of the instant motion.

Building Department, overlooking these two defects, initially approved the application on August 8, 2011. *Id.*

These defects, having gone unnoticed, were still present in the plaintiffs' "as built" survey filed in 2012.[11] *Id.* ¶¶ 48-50. The defendants assert that the plaintiffs need to either remove the protruding front vestibule or seek a variance from the Board to keep it, and need to seek a new parking variance from the Board (or reconfigure the parking field).[12] *Id.* ¶ 51.

Finally, the Hempstead Department of Engineering, after a field inspection conducted on March 22, 2012, found that the plaintiffs needed to post an address on the building and get a licensed architect or engineer to sign a certification to return to the Department of Engineering that the work for the property was constructed in substantial conformance with the site plan that had been approved by that department. *See* Defs.' App. to Rep. Mem., ECF No. 51-1, at 7-9. The Hempstead Department of Highways, in a memo dated March 20, 2012, found that "[u]pon inspection there are issues that need to be corrected before the Department of Highways can sign off on your final survey," including installing concrete sidewalks, replacing a drop curb, replacing a rock walkway with concrete, and removing "pavers" around a tree. *Id.* at 11. The letter states that the plaintiffs needed to obtain permits from the Department of Highways to complete this work. *Id.*

---

[11]   Defendants claim to have never received the "as built" survey prior to the deposition of Carnovale. Carnovale Aff. ¶ 48. This survey, Defs. Ex. CC, is dated January 3, 2012. Emails from February 2012 indicate that a Town employee informed Rottkamp, the Building Commissioner, that she had the final survey. Feb. 22, 2012 Email Chain, Pls.' Ex. 4, ECF No. 55-5. These emails also indicate that a Plan Examiner with the Building Department had "reviewed the final survey and it appears ok." *Id.*

[12]   To remove the vestibule or reconfigure the parking field, the Building Department asserts that any work must be completed under the original building permit that authorized construction on the property. *See* Obj.'n Sheet, Defs.' Ex. EE, at 5. The Building Department has stated that the two-year window to complete construction on the permit has expired, but has advised the plaintiffs to seek an extension of time from the Board to complete construction under the permit. *Id.*

Dean states that he did not learn of the objections raised by the Highways and Engineering Departments until the Town filed them as an exhibit to its reply brief on November 20, 2015. Dean Aff. ¶ 48. Dean contends that he has since sought to "resolve all of the issues," including: on November 25, 2015, obtaining work permits from the Town's Highway Department; on November 30, 2015, having a contractor install new sidewalks, new curb cut, and remove blue stone and pavers; and on December 1, 2015, having an architect inspect the premises and give the plaintiffs a certification to submit to the Engineering Department. *Id.* ¶¶ 49-51. Dean asserts that the plaintiffs "are just waiting for our revised final survey to be completed by the surveyor, showing the new sidewalk, and then the entire application will be submitted to the Town." *Id.* ¶ 51. Finally, Dean states that "[h]ad we been notified of the objections back in 2012, when these issues were identified by the Town, but never communicated to us, they each could have been resolved promptly." *Id.* ¶ 52.

D.      *The Bellmore Property*

1.      *The Cabaret Permit*

The plaintiffs operate another cabaret, the Showtime Café, and have done so for the past 15 years. Compl. ¶ 128. In 1998, the Building Department issued the plaintiffs a building permit. Bld'g Permit No. 9802703, Defs.' Ex. D[1]. The Showtime Café has historically received special exception permits from the Town at five-year intervals, allowing it to operate as a cabaret. Compl. ¶¶ 129-31. These permits prohibit the plaintiffs from offering entertainment with "bottomless," "topless," or "see-through" costumes. *Id.* ¶ 129. Accordingly, "[t]he dancers at Showtime Café cover their breasts with pasties and wear G-strings," and perform "expressive, artistic non-adult dances for customers." *Id.* ¶¶ 132-33. The Town last

granted the plaintiffs a temporary parking variance and cabaret special exception permit in 2007, which expired on March 28, 2012.  *Id.* ¶ 131; Answ. ¶ 236.

A 2009 inspection of the Showtime Café indicated that the plaintiffs had renovated the venue's basement to be used as "additional public assembly space" without the necessary permissions, and accordingly on November 9, 2009, Carnovale, as Chief Building Plan Examiner, sent Dean a letter revoking the 1998 building permit until the basement was no longer in use or until the plaintiffs obtained "variances from the [Board] for the construction and proposed use."  Nov. 9, 2009 Letter, Defs.' Ex. D[3]; Schwarz Aff. ¶ 18; Carnovale Aff. ¶ 20. Subsequently, on June 2, 2010, the plaintiffs filed for a new permit to legalize the use of the basement and first floor of the Showtime Café.  *See* Permit Appl. No. 201005248, Defs.' Ex. F[1] ("Ex. F[1]").  The Building Department reviewed the file and determined that, among other deficiencies, the plaintiffs would need "state code variances . . . [due to] the cellar ceiling height and accessibility."  Bld'g Dept. Obj. Sheet, Defs.' Ex. F[3] ("Ex. F[3]").

Because of low ceilings, the plaintiffs applied to New York State for a variance from State Building Code requirements.  Aug. 16, 2011 Letter, Defs.' Ex. F[4] ("Ex. F[4]").  The applications to New York State remain open and unresolved.  Schwarz Aff. ¶ 19; Carnovale Aff. ¶ 21.  On September 19, 2011, Raymond Schwarz, Supervisor of Inspection Services, wrote to a New York Department of State official—on Building Department letterhead—that, regarding Dean's application to New York State, "[t]here are suspicions and allegations that [the cellar of Deans' establishment] is being used as a 'VIP' lounge," and that "[t]he Town of Hempstead would like to go on record as being opposed to the granting of relief on any of the provisions."[13] Sept. 19, 2011 Letter, Defs.' Ex. F[5].

---

[13]     The letter does not specifically name the "provisions" the Town opposes.

Subsequently, Look Entertainment applied to renew the temporary parking variance and the cabaret special exception permit. Answ. ¶ 238. On March 27, 2012, Murray, the Town Supervisor, wrote a letter to North Bellmore residents informing them of the date and time of the permit renewal hearing, and further informing residents that "[s]ome people have expressed concern that the owners of the property were not complying with the terms of their permit and that possible elicit [sic] activities may be occurring at this location. . . . [even though] investigations by town building department inspectors and independent investigations by law enforcement agencies have not uncovered violations of the law." Compl. ¶¶ 136-38 (internal quotation marks omitted).

The Board of Appeals held a public hearing on the renewal application on May 23, 2012, at which time the plaintiffs also sought a renewal of the variance for off-street parking. *Id*. ¶ 139; Tr. of May 23, 2012 Proc., Defs.' Ex. G. Community members in support of and in opposition to the renewal application appeared at the hearing. Compl. ¶ 141. Murray, through a representative, asked the Board to deny the plaintiffs' application. *Id*. ¶ 142. At the end of the hearing, the Board reserved its decision, and it has yet to grant or deny the application to renew the cabaret permit or the parking variance for the Showtime Café. *Id*. ¶ 144; Answ. ¶ 242. Pursuant to Town Law § 267-a(8), the Board's decision on appeal was due within 62 days after the May 23, 2012 hearing.

The defendants state that their delay in deciding on the special exception permit and parking variance was due to their waiting for an outcome regarding the litigation over the Wantagh property, which was not resolved until May 2014. Defs.' Br., ECF No. 43-6, at 5. The defendants state that it was their understanding that all parties concurred with this reservation of decision pending resolution of the appeals over the Wantagh Property. Regina Aff. ¶ 28. The

plaintiffs did not commence a state court proceeding seeking a writ of mandamus directed to the Board to make a decision on the renewal application.  *Id.*

2.  *The Public Assembly Permit*

The plaintiffs also obtain and renew a permit each year allowing public assembly at the Showtime Café.  Compl. ¶ 145; Town Code § 96.  On September 2, 2011—"in the midst of the public outcry in Wantagh"—this permit expired.  Compl. ¶ 146.  On September 3, 2011, Nassau County Police Officers arrived at the Showtime Café after a Wantagh resident allegedly complained that the cabaret was operating without a public assembly permit.  *Id.* ¶ 147.  The police threatened to issue criminal summonses to the plaintiffs unless Dean closed the Café.  *Id.* Dean shut the cabaret down, but "ultimately" reopened for business, and the Town "eventually" renewed the permit.  *Id.* ¶¶ 148-49.

A year later, the Building Department did not renew the permit, even though it had inspected the building and determined it "OK FOR USE."  *Id.* ¶¶ 150-52.  Similar inspections occurred in 2013 and 2014, but the Town again did not renew the permit, and it has yet to do so.  *Id.* ¶¶ 153-56.  The Building Department cites the absence of a special exception permit and non-completion of outstanding building permit applications for its refusal to renew the public assembly license.  Carnovale Aff. ¶ 22; Schwarz Aff. ¶¶ 12, 20; *see also* Town Code § 96-3(B) (A public assembly license will be issued only if "all other applicable laws, ordinances, codes, rules and regulations pertaining to fire and safety requirements contained therein have been complied with . . . [and] the premises are a safe place in which to conduct, maintain or operate a place of public assembly and . . . a proper use has been established for the premises."); *Id.* § 96-3(E) ("In addition . . . an approved license for a dance hall or cabaret shall

be issued if the Commissioner is satisfied that the applicant is a fit and proper person and that a proper use has been established for the premises.").

Since September 2012, the plaintiffs have operated the Showtime Café without a public assembly permit (or a special exception permit). Compl. ¶ 158. The defendants state that they have allowed them to do so "in a show of good faith." *See, e.g.*, Shwarz Aff. ¶ 25; Carnovale Aff. ¶ 24.

E.      *The Article 78 Proceeding*

On October 10, 2011, about a month and a half after the Board rescinded the permit approval for the Wantagh Cabaret, but before it issued its fact-findings on November 30, 2011 explaining why it did so, Dean challenged the Board's determination in an Article 78 proceeding in the Supreme Court for Nassau County. Compl. ¶ 85. He argued that the rescission of the permit to operate the Wantagh Cabaret was "arbitrary, capricious, unsupported by the record and contrary to the law," and that the Town did not have authority to reopen the hearing. *Id*. In May 2012, the court affirmed the Board's decision. *Id*. ¶ 98. Dean appealed, and in February 2014, the Appellate Division, Second Department affirmed. *Id*. ¶ 99; *Matter of Green 2009, Inc. v. Weiss*, 114 A.D.3d 788 (2d Dept. 2014). In May 2014, the New York Court of Appeals denied leave to appeal. Compl. ¶ 100; *Green 2009, Inc. v. Weiss*, 23 N.Y.3d 903 (2014).

F.      *Procedural Posture*

1.      *The Causes of Action*

The plaintiffs filed their complaint in this Court on August 20, 2014, asserting the following causes of action:

- (1) The defendants, acting under color of law, impermissibly imposed a "prior restraint and interference with expression and entertainment at the Wantagh

22

Property," in violation of the First Amendment, equal protection under the Fourteenth Amendment, and due process under the Fifth Amendment, as well as corresponding provisions of the New York State Constitution, Compl. ¶¶ 163-64;

- (2) the defendants, acting under color of law, have taken and deprived the plaintiffs of their property rights at the Wantagh Property without due process of law, in violation of the Fifth and Fourteenth Amendments, as well as corresponding provisions of the New York State Constitution, *id.* ¶¶ 165-66;

- (3) the defendants, acting under color of law, discriminated against the plaintiffs "based upon who they are and upon erroneous assumptions regarding the form of entertainment offered and to be offered at the Plaintiffs' establishments" when they deprived and continue to deprive the plaintiffs of a cabaret permit, public assembly permit, and off-premises parking variance for the Bellmore Cabaret, in violation of the due process and equal protection clauses of the Fifth and Fourteenth Amendments, as well as corresponding provisions of the New York State Constitution, *id.* ¶¶ 167-69;

- (4) the defendants conspired to "suppress the exhibition of dancing and other entertainment . . . by engaging in a pattern of harassment of the Plaintiffs . . . pursuant to unconstitutional provisions—and unconstitutional application—of the Town of Hempstead Code" in violation of the plaintiffs' rights under the First, Fifth, and Fourteenth Amendments, as well as under corresponding provisions of the New York State Constitution, *id.* ¶¶ 170-78;

- (5) the Town Code's failure to require the Board and Building Department to "timely act on pending applications" violates the plaintiffs' due process rights pursuant to the Fifth and Fourteenth Amendments, as well as corresponding provisions in the New York State Constitution, *id.* ¶¶ 179-85;

- (6) the application of § 267(D)(3) of the Town Building Zone Ordinance, which gives the Board of Appeals the authority to "impose such conditions and safeguards as it may deem appropriate, necessary or desirable to preserve and protect the spirit and objective of this ordinance," as applied to the plaintiffs' condition that they must renew their cabaret permit every five years, as well as on its face, deprives the plaintiffs of their constitutional rights under the First, Fifth, and Fourteenth Amendments, as well as corresponding provisions under the New York State Constitution, *id.* ¶¶ 186-96;

- (7) the defendants have selectively enforced the Town's and state's codes and laws against the plaintiffs, in violation of their equal protection, free expression, and property rights under the First, Fifth, and Fourteenth Amendments, as well as corresponding provisions of the New York State Constitution, *id.* ¶¶ 197-200;

- (8) the Town Code provisions requiring the plaintiffs to seek a special exemption to use their property for a place of public assembly and amusement to be issued by the Board are unconstitutional on their face and as applied to the plaintiffs,[14] *id.* ¶¶ 201-02;

- (9) the plaintiffs should receive compensatory and punitive damages, as well as legal fees, *id.* ¶¶ 203-08;

- (10) the conduct of the individual defendants violated clearly established constitutional rights, and thus they are not entitled to qualified immunity, *id.* ¶¶ 209-12.

The plaintiffs further seek preliminary and permanent injunctions, a declaratory judgment compelling the defendants to issue them a cabaret permit and/or certificate of occupancy for the Wantagh Property, and a cabaret permit, public assembly permit, and off-premises parking variance to operate the Showtime Café. *Id*. at 60-62.

2.    *The Answer and Motion to Dismiss*

The defendants filed their Amended Answer on November 12, 2014, and the instant motion pursuant to Fed. R. Civ. P. 12(c) on September 24, 2015, *see* ECF No. 43. The defendants argue that the plaintiffs' claims are unripe for federal judicial review. They further argue that the plaintiffs have no constitutionally protected property interest in the permits they seek, they lack standing to assert a deprivation of freedoms of expression, their challenge to the special ordinance is time-barred, there has been no selective enforcement, plaintiffs' claims are barred by claim preclusion and res judicata, and that the *Monell* claim must fail. Defs.' Br. at 14-15.

I heard oral argument on the motion to dismiss on December 11, 2015. For the reasons discussed below, I grant the motion in part, deny the motion in part, and direct the parties

---

[14]    The Complaint does not specify any particular provision in the United States or New York State Constitutions under which they are alleging these Town Code provisions are unconstitutional. *See id.*

to appear before Magistrate Judge Gold, on a date to be set by him, to commence settlement discussions.

## DISCUSSION

A.    *The Legal Standard*

As noted above, the same standards govern a motion asserting that a court lacks subject-matter jurisdiction whether it is brought under Rule 12(c) or under Rule 12(b)(1). *Cruz*, 2015 WL 4393204, at *4; *Weisman v. I.R.S.*, 972 F. Supp. 185, 186-87 (S.D.N.Y. 1997). In deciding the motion, I consider the facts alleged in the complaint to be true, but cannot draw inferences in favor of the party asserting jurisdiction. *See Atlantic Mut. Ins. Co. v. Balfour Maclaine Intern. Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992). Further, I must presume that I cannot hear Dean's claims "unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (internal quotation marks omitted). In other words, "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

B.    *The Ripeness of the Plaintiffs' As-Applied Challenges*

A cause of action is not justiciable unless it is ripe; "it must present a real, substantial controversy, not a mere hypothetical question." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (internal quotation marks omitted). The goal is to keep cases out of federal court until a dispute has "generated injury significant enough to satisfy the case or controversy requirement of Article III of the U.S. Constitution." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002); *see generally Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) (discussing the purpose of the ripeness requirement).

Claims involving land use disputes normally—but not always—must satisfy a two-pronged inquiry to be ripe for federal judicial review. *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985). In *Williamson*, the Supreme Court held that a takings dispute is not ripe unless (1) the state regulatory entity has rendered a "final decision regarding the application of the regulations to the property at issue," and (2) the plaintiff has sought compensation by means of available state proceedings. *Id.* at 186, 194.

The Second Circuit has extended the application of the *Williamson* "final decision" requirement to land use disputes involving substantive due process claims, *Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 96-97 (2d Cir. 1992), equal protection and procedural due process claims, *Dougherty*, 282 F.3d at 88-89, and, in some circumstances, First Amendment claims, *compare id.* at 90-91 (carving out an exception to the application of the *Williamson* "final decision" prong to a First Amendment retaliation claim), *with Murphy v. New Milford Zoning Com'n*, 402 F.3d 342, 352 (2d Cir. 2005) (applying the "final decision" prong to zoning challenges based on the First Amendment rights of assembly and free exercise).

The Second Circuit has held that *Williamson* is a prudential rule, not a jurisdictional one, and thus a court "may determine that in some instances, the rule should not apply and [the court] still ha[s] the power to decide the case." *Sherman v. Town of Chester*, 752 F.3d 554, 561 (2d Cir. 2014). The inquiry into when to apply *Williamson's* final decision requirement is grounded in common sense; the question is whether the Town's actions have already inflicted the constitutional injuries the plaintiffs claim, or if further actions better define the scope of these injuries.

Given these guidelines, I must analyze each of Dean's claims to determine whether they are subject to *Williamson*'s ripeness requirement, and if so, whether there has been

a final decision such that the claim is ripe for my review.  Under this analysis and for the reasons explained below, I find that the as-applied challenges brought under the First, Fifth, and Fourteenth Amendments—relating to both the Wantagh and the Bellmore Properties—are not ripe because the plaintiffs have failed to obtain a final decision from the Town, and it would not be futile for the plaintiffs to continue with their applications.  However, the claims alleging that several of the Town's statutes, on their face, violate certain constitutional provisions are not subject to *Williamson* prong-one ripeness, and survive the motion to dismiss.

      1.      *Final Decision as to the Plaintiffs' As-Applied Takings, Equal Protection, and Due Process Claims*

      The plaintiffs' as-applied takings, due process, and equal protection claims arise out of the same factual events: their applications for a cabaret permit and/or a certificate of occupancy to operate a restaurant at the Wantagh Property, and their applications for a cabaret permit, a public assembly permit, and a parking variance to operate the Showtime Café at the Bellmore Property.  In each, the asserted harm stems from the defendants' alleged failure to grant or act upon the plaintiffs' applications.  I therefore apply the same ripeness test to each. *See, e.g.*, *Osborne v. Fernandez*, 2009 WL 884697, at *5 (S.D.N.Y. Mar. 31, 2009) ("The types of injuries claimed by Plaintiffs—delay and bad faith in the processing of their application and loss of desired use of their property—are precisely the types of claimed injuries that require a final decision to become potentially cognizable.").  Because the plaintiffs have failed to obtain a final decision from the Town as to each of the permits and licenses at issue, as explained below, these claims have not met *Williamson's* prong-one "final decision" requirement.[15]

---

[15]      I thus need not address *Williamson*'s second prong as to these claims.  Moreover, the prong-two compensation requirement is "unique to the Takings Clause context."  *Lang v. Town of Tusten, NY*, 2015 WL 5460110, at *4 (S.D.N.Y. Aug. 6, 2015).  "This is so because the prong-two ripeness requirement that a plaintiff seek compensation in state court is . . . derived from the Takings Clause . . . [and] substantive due process claims

Federal courts require applicants to get a final decision as to how an agency intends to regulate the use of an applicant's land to make sure it can fully evaluate the claims at issue. That evaluation ordinarily cannot occur "until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson*, 473 U.S. at 191. In addition to obtaining a decision that clarifies how an agency has applied land use regulations to the property at issue, the final decision requirement aids the court by developing a full factual record of the dispute, avoiding unnecessary constitutional rulings, and honoring principles of federalism—namely, that "land use disputes are uniquely matters of local concern." *Murphy*, 402 F.3d at 348. Requiring a final decision helps define the oft-blurry line separating "those cases in which a plaintiff has suffered a concrete and particularized, actual or imminent injury, and those in which the injury is merely speculative and may never occur, depending on the final administrative resolution." *Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 122 (2d Cir. 2014) (internal quotation marks and citations omitted).

A plaintiff cannot have received a final decision without submitting a plan for development of the property for its intended or another use and seeking available variances or waivers of the requirements at issue. *See, e.g.*, *Williamson*, 473 U.S. at 187, 191 (finding that because the plaintiff in *Williamson* did not apply for a variance, he had not received the necessary "final decision").

---

alleging arbitrary and capricious government conduct, or equal protection claims alleging that similarly situated individuals received different treatment—which are largely unrelated to the Fifth Amendment's proviso that only takings without just compensation infringe that Amendment—are not subject to prong-two ripeness." *Kowalczyk v. Barbarite*, 2012 WL 4490733, at *7 n.5 (S.D.N.Y. Sept. 25, 2012) (internal quotation marks omitted).

a.      *The Wantagh Applications*

With respect to the Wantagh Property, the defendants claim that the plaintiffs have not received final decisions from the Town as to: (1) Dean's application for a special exception permit from the Board to operate a cabaret on the Wantagh Property; and (2) Dean's application for a certificate of occupancy to operate a restaurant on the Wantagh Property.

The defendants argue that the plaintiffs' first application for a special exception permit to operate a cabaret—initially granted after a hearing, and subsequently denied after a rehearing—was not a "meaningful application" because it was denied on the grounds that the plaintiffs "had not submitted a complete truthful application and had misled the Board." Defs.' Br. at 22. The defendants state that "the Plaintiffs have chosen not to reapply, to simply tell the truth, to describe the entertainment to be offered, and explain that their website is 'hype' and not accurate." Defs.' Rep. Br. at 18; *see also* Ex. W, at 7398-99 ("Considering the Applicant's vague, contradictory and misleading statements and representations, the Board cannot, and therefore, declines to determine on this application whether the proposed use meets the legislated requirements for a special exception, and specifically, whether the proposed cabaret warrants approval in accordance with the criteria set forth in section 267(D) of the Building Zone Ordinance.").

The Sixth Circuit has addressed an analogous situation. In *Insomnia Inc. v. City of Memphis, Tenn.*, 278 Fed. Appx. 609 (6th Cir. 2008), the defendants had denied the plaintiffs' application to subdivide their land into three parcels, allegedly "out of hostility to [the plaintiff's] involvement in the adult entertainment industry and a concern that the land would be used for the purposes of adult entertainment." *Id.* at 610. At the same time, the agency instead required the plaintiff to resubmit its application as a planned development "in more specific detail."

*Insomnia, Inc. v. City of Memphis*, 2006 WL 3759895, at *4 (W.D. Tenn. Dec. 19, 2006), *aff'd*, 278 Fed. Appx. 609. *Insomnia* affirmed the district court's finding that the plaintiffs' claims were unripe because the plaintiffs had not yet received "final denial or authorization to proceed with their development plans," and thus the agency's actions "amounted to an interim order." 278 Fed. Appx. at 611-13. In so finding, the Sixth Circuit relied on the defendants' explanation "that if Plaintiffs submit a revised plan for a proposed development, as recommended by the [agency], their plan may either be allowed or denied, and if allowed, Plaintiffs' claims would be rendered moot." *Id.* at 612.

I agree with *Insomnia's* reasoning and conclude that the plaintiffs have not yet received a final decision on their application for a special exception permit. The plaintiffs have not resubmitted a plan to operate a cabaret and thus have not received a determination on the merits that, if favorable, would render their claims moot. Further, there is no indication that the plaintiffs applied to the Board for, or received, a variance. *See* Town Law § 267-b(2) (authorizing the board of appeals to grant use variances); *Williamson*, 473 U.S. at 191 (requiring plaintiffs to apply for a variance to meet the "final decision" requirement); *Dougherty*, 282 F.3d at 89 (finding that because the plaintiff did not seek, or was denied, a variance, he had not received a final decision under *Williamson*).

As for Dean's application for a certificate of occupancy to operate a restaurant on the Wantagh Property, it is true that the plaintiffs admitted in their Complaint that the Town had not reached a final decision on this application. Compl. ¶ 14 ("And, for the last two years the Defendants have refused to process the Plaintiffs' pending application to use the property as a restaurant—despite repeated requests from the Plaintiffs to obtain that customarily granted approval."); *id.* ¶ 121 ("To date, the application [for a certificate of occupancy] still has not been

acted upon.").  But one month after the plaintiffs commenced this action, the Board published an

administrative resolution where it found that the plaintiffs' request for a building permit and

certificate of occupancy had "once before been before this Board . . . [and was] barred by

administrative res judicata."  *See* Ex. BB at 4.[16]  This resolution did not directly affect the

plaintiffs; instead, it referred their request "back to the Building Department with the

recommendation of this Board that it be denied."  *Id.*  However, even if this resolution could be

seen as a definitive rejection of the plaintiffs' application for a certificate of occupancy, the

plaintiffs did not appeal or seek a variance of any subsequent denial by the Building Department.

*See* Town Law § 267-b(2) (authorizing the Board of Appeals to grant use variances); *Goldfine v.

Kelly*, 80 F. Supp. 2d 153, 159 (S.D.N.Y. 2000) ("Even where the plaintiff applies for approval

of a subdivision plan and is rejected, a claim is not ripe until the plaintiff also seeks variances

that would allow it to develop the property.").  Thus, the plaintiffs have not obtained a final

decision as to either of their applications to use the Wantagh Property.

> b.  *The Bellmore Applications*

The plaintiffs have also not received final decisions on Dean's applications

regarding their Bellmore Property applications, specifically: (1) the application for a special

exception permit to operate the Showtime Café as a cabaret; (2) the application for a parking

variance; (3) the application for a public assembly permit.  The plaintiffs do not dispute that they

have not obtained a final decision on these applications.[17]  Compl. ¶ 17 ("Nevertheless, after the

---

[16]     Also in this resolution, the Board referenced its November 2011 Findings of Fact where the Board had considered the application for a special exception permit to run a cabaret *in conjunction with* a restaurant.  *Id.* at 3.  Even though the instant application was for a certificate of occupancy for restaurant use only, the Board treated the application as a duplicate to the application for a cabaret-restaurant.  *See id.* at 3-4.

[17]     The plaintiffs point to *Patsy v. Bd. of Regents*, 457 U.S. 496 (1982), and argue that "it is well settled that exhaustion of state administrative remedies is <u>not</u> required to bring a § 1983 claim."  Pls.' Br. at 16 (emphasis in original).  In *Williamson*, the plaintiff asserted the same argument—that it did not need to seek variances or otherwise exhaust its administrative remedies because it brought its suit under 42 U.S.C. § 1983, also citing *Patsy*.  473 U.S. at 192.  *Patsy* holds that the "exhaustion of state administrative remedies should not be

public outcry in Wantagh, for the last two years the Defendants have been withholding the Cabaret permit, Public Assembly permit and off-street parking variance for the Plaintiffs' cabaret in Bellmore."); *Id.* ¶ 144 ("To date, the Defendants have refused to act on the Plaintiffs' pending application to renew the permit for the Bellmore Cabaret or for a variance for off-street parking.").

Thus, as to the plaintiffs' applications to the Town for both the Wantagh and the Bellmore properties, I find that the Town has not "arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson*, 473 U.S. at 191.

2. *Final Decision as to the Plaintiffs' First Amendment Claims*

Dean alleges that the defendants' actions have amounted to a "prior restraint and interference with expression and entertainment at the Wantagh Property," that the defendants have conspired to "suppress the exhibition of dancing and other entertainment . . . by engaging in a pattern of harassment," and that the defendants seek to "suppress the exhibition of entertainment" at both properties "pursuant to unconstitutional provisions—and unconstitutional application" of the Town's statutes. Compl. ¶¶ 164, 171, 176. Dean argues that the Town has selectively enforced the Town Code, in violation of the Code itself. *Id.* ¶¶ 197-200.

---

required as a prerequisite to bringing an action pursuant to § 1983." 457 U.S. at 516. But the *Williamson* court distinguished the concept of exhaustion from that of finality: "the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." 473 U.S. at 193. In other words, there is a difference between seeking a variance (a party must do so for her claim to be ripe), and seeking a remedial declaratory judgment regarding the validity of planning actions (a party need not do so for a claim to be ripe). *Id.* Plaintiffs' argument fails for the same reason that the *Williamson* plaintiffs' argument failed: it has not obtained a final decision from the initial decisionmaker, nor has it sought a variance.

For First Amendment claims, "the ripeness doctrine is somewhat relaxed." *Dougherty*, 282 F.3d at 90. Depending on the facts of a case, the *Williamson* test may not bar such a claim. *See id.* at 90-91. The Second Circuit has held that to determine whether I apply the *Williamson* final decision prong, I must first consider: "(1) whether the [plaintiffs] experienced an immediate injury as a result of [the Town's] actions and (2) whether requiring the [plaintiffs] to pursue additional administrative remedies would further define their alleged injuries." *Murphy*, 402 F.3d at 351.

In *Dougherty*, the Second Circuit carved out an exception to the applicability of *Williamson* to land use disputes, holding as follows:

> Dougherty's First Amendment claim of retaliation is significantly different from his due process and equal protection claims. The latter claims each raise a question of administrative finality, but Dougherty's First Amendment claim of retaliation is based upon an immediate injury. Dougherty suffered an injury at the moment the defendants revoked his permit, and Dougherty's pursuit of a further administrative decision would do nothing to further define his injury.

*Dougherty*, 282 F.3d at 90.

In *Murphy*, however, the Second Circuit applied the *Williamson* finality prong to a claim alleging violations of the First Amendment rights to assembly and free exercise. *Murphy*, 402 F.3d at 345. The municipality in that case had issued a cease and desist order to the plaintiffs, who were hosting weekly prayer meetings at their home, because these meetings violated a zoning ordinance prohibiting meetings exceeding 25 people. *Id.* *Murphy* found that if the plaintiffs had appealed to the zoning board of appeals, it may have stayed enforcement of the town codes. *Id.* at 351; *see id.* at 353 ("[T]hrough the variance process local zoning authorities function as flexible institutions; what they take with the one hand they may give back with the other." (internal quotation marks omitted)). The court found that "the resolution of the

constitutional and statutory claims we are asked to consider here hinge on factual circumstances not yet fully developed." *Id.* at 351.

I conclude that the Complaint insufficiently alleges immediate injury. The plaintiffs' First Amendment claims, which center around the applications for permits at Wantagh and Bellmore, are much closer to those raised in *Murphy* than the retaliation claims in *Dougherty*. As in *Murphy*, the plaintiffs could have taken a number of additional steps to obtain the relief they sought in their applications,[18] including appealing to the Board, which can stay an administrative decision, *see* Town Law § 267-a(6), or seeking mandamus relief. *See Riverhead Park Corp. v. Cardinale*, 2013 WL 1335600, at *9 (E.D.N.Y. Mar. 28, 2013) ("In addition, while the Plaintiffs assert that the [action] prevented them from using the property for more than three years . . . if the Plaintiffs had filed an appeal, the [action] would have been stayed unless [the agent] certified to the Board of Appeals that a stay would cause imminent peril to life or property." (citing to § 267–a(6))). Also, as in *Murphy*, the plaintiffs' "pursuit of additional administrative remedies (including, perhaps, waiting for a decision by the Board on its permit application, . . . filing an appeal to the appropriate Zoning Board of Appeals, . . . or filing a *mandamus* action) would have further defined Plaintiff's alleged injuries." *Roman Catholic Diocese of Rockville Ctr., New York v. Inc. Vill. of Old Westbury*, 2011 WL 666252, at *19 (E.D.N.Y. Feb. 14, 2011) (citing *Murphy*, 402 F.3d at 351).

Applying *Williamson's* final decision requirement to the First Amendment claims here makes sense. They are based on the same facts and require the same "administrative

---

[18]     Though *Dougherty* held that the revocation of a permit constituted an "immediate injury" at the time of revocation, 282 F.3d at 90, the claim there was one of retaliation. *Id.* In addition, as discussed above, I find that the Town's revocation of the special exception permit here was not a decision on the merits of the plaintiffs' application for a special use permit to operate the Wantagh Cabaret. The plaintiffs had a number of avenues in which to obtain administrative relief.

finality" as do the takings, equal protection, and due process claims.[19]  *Dougherty*, 282 F.3d at

90.  The application of the final decision prong to First Amendment claims in this case also

promotes the core reasons behind *Williamson's* final decision requirement: a fuller record will be

developed, it is possible that the plaintiffs will get the relief they seek without having a court

decide a constitutional issue, and it accords respect for federalism by allowing local resolution of

zoning disputes.  *See Murphy*, 402 F.3d at 348.

A plaintiff alleging claims "in the context of a land-use dispute is subject to the

final-decision requirement unless he can show that he suffered some injury independent of the

challenged land-use decision."  *Sunrise Detox*, 769 F.3d at 123; *see also id.* at 124 ("[I]n light of

administrative avenues for relief outlined in the zoning ordinance and the commissioner's letter,

we conclude that neither of these acts gave rise to an injury independent of the city's ultimate

land-use decision."); *Kurtz v. Verizon New York, Inc.*, 758 F.3d 506, 515 (2d Cir. 2014) ("We are

persuaded by those courts holding that *Williamson County* applies to due process claims arising

from the same nucleus of facts as a takings claim.").  Because the plaintiffs have not done so

here, I apply *Williamson's* prong-one final decision requirement to Dean's as-applied First

---

[19]    The similar nature of all the as-applied claims is illustrated by the damages sought here.  The plaintiffs state that they have "sustained considerable costs through the continued closure of the Wantagh Cabaret, and their inability to use that valuable commercial property," and that they have "sustained considerable costs through the Defendants' continued harassment of and refusal to issue the necessary permits to operate the Bellmore Cabaret."  Compl. ¶¶ 204-05.  These claims for damages are not "distinguishable based on whether the claim is styled as a First Amendment violation or a Fifth Amendment regulatory takings claim," *see Tini Bikinis-Saginaw, LLC v. Saginaw Charter Tp.*, 836 F. Supp. 2d 504, 519 n.7 (E.D. Mich. Dec. 22, 2011), nor could they be.  The alleged harm stems from the same actions (or non-actions) on the part of the defendants.  The plaintiffs also seek preliminary and permanent injunctions restraining the defendants from further interference "with the Plaintiffs' exercise of their right to freedom of speech, property rights, and right to operate their establishments," as well as from enforcing BZO § 267(D)(3) in connection with the applications to renew their cabaret permits and obtain a public assembly permit.  *Id.* at 60-61.  Finally, they seek a declaratory judgment compelling the defendants to issue them cabaret permits, a public assembly permit, an off-premises parking variance, and/or a certificate of occupancy.  Compl. at 60-61.  Again, these claims for relief center on the same factual issues.  *See Kowalczyk v. Barbarite*, 594 F. Appx. 690, 692-93 (2d Cir. 2014) ("Kowalczyk's procedural due process claims are unripe to the extent that they seek either to collect damages based on or to challenge the same land-use decisions as his substantive due process and equal protection claims do.").

Amendment claims against the Town.[20]  For the reasons detailed above, the plaintiffs have not received a "final decision" regarding their applications.  *See Kowalczyk*, 594 Fed. Appx. at 692-93 ("[A]ny procedural due process claims emanating from the Village's denials of permits or of certificates of occupancy are unripe for the same reasons that other related claims alleging constitutional violations based on those decisions are also unripe.").

3.     *The Futility Exception*

Dean argues that further efforts to obtain final decisions from the Town would be futile.  "[T]he finality requirement is not mechanically applied," and "[a] property owner, for example, will be excused from obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile."  *Murphy*, 402 F.3d at 349.  In other words, "a property owner need not pursue such applications when a zoning agency lacks discretion to grant variances[21] or has dug in its heels and made clear that all such applications will be denied."  *Id.*  Further, "[g]overnment authorities, of course, may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision."  *Palazzolo v. Rhode Island*, 533 U.S. 606, 621 (2001); *see also Sherman*, 752 F.3d at 561 (calling the futility and unfair/repetitive procedures exceptions "distinct concepts," but finding that in some cases the analyses for the two are the same).  Although the Second Circuit has not fully defined the precise

---

[20]     The Sixth Circuit, presented with analogous facts in *Insomnia*, applied the *Murphy* threshold test to plaintiffs' First Amendment claims and also found that plaintiffs (1) had not suffered an immediate injury because they could have filed a renewed plan as the agency had ordered, and there was a chance that the subsequent proposal would have been approved, obviating need for federal review, and (2) doing so would have "further define[d] the contours of Plaintiffs' claim of First Amendment retaliation."  *Insomnia*, 278 Fed. Appx. at 615-16.

[21]     For example, the defendants state that the Board "has no jurisdiction to entertain an application for an 'Adult Entertainment Cabaret' on property located within 500 feet of a residential district," citing to BZO §§ 383 *et seq.*  Defs.' Br. at 2; *see also* Answ. ¶¶ 428-29.  If the defendants had found that the Wantagh Cabaret or the Showtime Café were adult entertainment cabarets, then any further application to the Board would surely be futile, as both properties are located within 500 feet of a residential district.  Answ. ¶¶ 431, 434.  But the Board has made no such determinations here.  *See, e.g.*, *id.* ¶ 437 (stating that the Board denied the special exception permit for the Wantagh Cabaret not because it had determined the cabaret met the criteria for an "Adult Entertainment Cabaret," but instead because the plaintiffs had not provided enough details for the Board to even consider the issue).

contours of the futility exception, *see 545 Halsey Lane Props., LLC v. Town of Southampton*, 2015 WL 2213320, at *6 (E.D.N.Y. May 8, 2015), the exception is narrow in scope, *see Nenninger v. Vill. of Port Jefferson*, 509 F. Appx. 36, 38 (2d Cir. 2013).

a.      *The Meaningful Application Requirement*

As an initial matter, plaintiffs may generally invoke the futility exception only if they have filed at least one meaningful application; "[i]nformal efforts to gain approval for land development are insufficient, by themselves, to constitute final government action." *See, e.g.*, *Goldfine*, 80 F. Supp. 2d at 160; *see also Sunrise Detox*, 769 F.3d at 124 ("And [the plaintiff's] own failure to submit at least one meaningful application for a variance prevents us from determining whether the board has dug in its heels and made clear that all such applications will be denied." (internal quotation marks omitted)). The defendants state that, because "[t]here have been no denials on the merits in the first instance and no applications for variances," the futility doctrine "simply has no application." Defs.' Rebuttal Br., ECF No. 56-7, at 7. Dean, for his part, points to his several outstanding applications and argues that "[t]he record confirms that it would be absolutely futile for the Plaintiffs to return, once again, to the Building Department or Board of Appeals." Pls.' Suppl. Mem., ECF No. 55-22, at 7.

Even assuming the plaintiffs have made at least one meaningful application on each of their requested permits, I do not find that it would be futile for them to pursue the other administrative avenues outlined by the defendants. The defendants have identified a number of "non-discretionary building and zoning code deficiencies and violations" in connection with the applications. Defs.' Rebuttal Br. at 7. They have also outlined the steps the plaintiffs need to take to remedy these deficiencies.

First, with respect to the application for a special exception permit to run the Wantagh Cabaret, the defendants have consistently stated that the plaintiffs' would need to reapply and "make a full and truthful application." *Id*. at 2. As already discussed, because the Board made no determination about the special exception permit application on its merits, it would not be futile for the plaintiffs to avail themselves of the procedures set forth by the Town's laws.

Second, with respect to the Bellmore applications, the defendants have consistently stated that to apply for and receive a hearing on the application for a special use permit (and subsequently, for a public assembly license), the plaintiffs need to resolve their open building permit issues, which entails applying to New York State for a variance, and receiving the same. *See* Defs.' Rebuttal Br. at 5-6; Regina Aff. ¶¶ 24, 33-34 (noting that the plaintiffs had filed an application with the Building Department to legalize the use of their basement but had to seek a variance from New York State's code requirements; that these applications are still outstanding; and that the Board would not calendar an application for a hearing "if there were outstanding and unresolved building permit applications or issues"); Ex. F[1] (Dean's application to "legalize existing first floor and cellar of Show-Time Café Cabaret"); June 23, 2010 Letter, Defs.' Ex. F[2] (letter from the plaintiffs' architect seeking the same); Ex. F[3] (Building Department Objection Sheet noting that "[i]t appears that state code variances will be required for the cellar ceiling height and accessibility"); Ex. F[4] (noting that the plaintiffs filed an application for a variance with the Department of State's Board of Review).

Although Schwarz, on Building Department letterhead, and purportedly speaking for the Town of Hempstead, wrote to the New York State Department of State to "go on record as being opposed to the granting of relief on any of the provisions," Ex. F[5], that letter is "no[t]

commentary by the [Board] itself indicating that this [was] an entrenched position of any kind." *See 545 Halsey Lane Props., LLC*, 2015 WL 2213320, at *7. The Board, the Building Department, and the Town are separate entities. In support of the potential for future successful applications at the Bellmore Property, "in a show of good faith" the defendants have not issued any violations or attempted to close the business, even though the Showtime Café is currently operating without the necessary permits. *See* Compl. ¶ 158; Shwarz Aff. ¶ 25; Carnovale Aff. ¶ 24.

The futility of future applications for a certificate of occupancy to run a restaurant on the Wantagh Property presents a more challenging question. The Board determined in its September 17, 2014 resolution that it would not issue a certificate of occupancy for restaurant-only use on the Wantagh premises because the request was "barred by administrative res judicata" in light of the Board's earlier determination that—with regards to the plaintiffs' request to run a cabaret *and* a restaurant—"the premises are not laid out in such a manner as to support a full service restaurant and will not be entitled to a Certificate of Occupancy as so configured." Ex. BB at 2, 4. In the restaurant-only application, the Board cited its earlier determination that the premises' lack of windows was "even further support for our conclusion that the Applicant has not been fully candid and honest in" the earlier application for a special exception permit to run a cabaret. *Id.* at 2.

The plaintiffs persuasively argue that the Board's reliance on its prior decision, "premised on the building being used as a cabaret in conjunction with a restaurant, rather than merely just a restaurant—which is allowed as of right," is not entirely logical. Pls.' Suppl. Mem. at 8. But despite this questionable logic, the plaintiffs may still seek a variance from the imposed condition that the restaurant must have windows. *See Southview Assocs., Ltd. v. Bongartz*, 980

F.2d 84, 99 (2d Cir. 1992) ("As in *Williamson*, where it appeared that variances could have been granted to resolve the majority of the Planning Commission's objections to the subdivision plan . . . here it also appears that [the plaintiff] can obtain a permit for a subdivision situated on another part of its property." (internal quotation marks and citations omitted)); *accord S&R Dev. Estates, LLC v. Bass*, 588 F. Supp. 2d 452, 463 (S.D.N.Y. 2008) ("We can not conclude that because the [Board] ruled against [the plaintiffs] on the zoning classification of the Property, it would necessarily deny it a reasonable beneficial use of the Property."). In fact, such an application may be successful for the plaintiffs, as many of the arguments raised in the instant case seem relevant to "alleviat[ing] [the] Board's expressed concerns," *see* Ex. BB at 3, about the truthfulness of the plaintiff's initial application to open a business on the Wantagh Property. *See, e.g.*, Dean Aff. ¶ 33 (detailing his and Gordon's experience in food preparation and catering).

Further, there are a number of non-discretionary outstanding zoning code issues on the Wantagh Property, including a violation of a zoning setback that must be either removed or deemed permissible via a variance from the Board,[22] as well as fixing certain objections identified by the Town's Departments of Highways and Engineering, as detailed above. The defendants describe in detail the steps the plaintiffs need to take to submit new applications or clear up preexisting applications to fix these issues. *See generally, e.g.*, Fred Jawitz Aff., ECF No. 56-3; Louis Carnovale Aff., ECF No. 56-2. The plaintiffs' most recent filing to this court sets forth the efforts they are still making to clear up these issues. *See, e.g.*, Dean Aff. ¶ 49

---

[22] Dean states, relying on deposition testimony, that "[t]he portico is not an integral part of the structure and is merely an overhead canopy," Dean Aff. ¶ 53, and that "having something in the setback would <u>not</u> prevent the building from opening," *id.* ¶ 54. *See also* Christopher J. Cappelli Dep., Pls.' Ex. 15, ECF No. 55-16, at 181 ("It's nonstructural, non-life safety."); Louis Carnovale Dep., Pls.' Ex. 16, ECF No. 55-17, at 159 ("It may have to be cut back or a variance requested for that, but it's not a huge issue."). But the importance (or non-importance) of zoning violations is best left to a municipality, not a court. *See Murphy*, 402 F.3d at 348 ("[L]and use disputes are . . . more aptly suited for local resolution."). These arguments are properly directed to the Board with authority to grant a variance, not me.

(referencing work done on November 25, 2015 and November 30, 2015 on the plaintiffs' property in response to objections from the Town's Departments of Highways and Engineering); *id.* ¶ 51 (referencing an architect inspecting the plaintiffs' property on December 1, 2015, and stating that the plaintiffs "are just waiting for our revised final survey to be completed by the surveyor, showing the new sidewalk, and then the entire application will be submitted to the Town); *id.* ¶ 69 (referencing an outstanding application to the New York State Department of State for a variance relating to ceiling height in the basement).

The fact that the defendants have outlined steps that the plaintiffs can take, and that progress is being made on the applications, weakens any claim that further efforts on the part of the plaintiffs would be futile. *See Nenninger*, 509 Fed. Appx. at 39 ("Although defendants here indicated that even a completed application would not be calendared until [the plaintiff] cleared debris . . . this fact does not by itself compel a finding that the application inevitably would be denied on its merits once the alleged violations were resolved."). It also strengthens my belief that I should not insert myself in the middle of a zoning dispute when it is developing by the day. If the plaintiffs proceeded with their applications, any rejection they have received so far "may be reversed, and the project[s] may be permitted to proceed—or the application[s] may be rejected on other, non-discriminatory grounds." *Sunrise Detox*, 769 F.3d at 123. "Only after [the plaintiffs] complete[] the process will it be known," *id.*, whether the plaintiffs have grounds to seek relief for constitutional violations.

b.  *Other Alleged Grounds for Futility*

Dean argues that the plaintiffs "have been waiting many months and years for the Defendants to issue any decision on their long-pending applications." Pls.' Br. at 16. To support this claim, the plaintiffs allege that the Board has only acted on its applications after litigation

41

has been commenced. *See id.* at 17 (noting that the Board issued its November 2011 Findings of Fact only after the plaintiffs commenced an Article 78 proceeding and the Board issued its September 17, 2014 resolution on the plaintiffs' application for restaurant use only after the plaintiffs filed the instant lawsuit).

However, "a delay in rendering a final decision—eight years in the *Williamson* case, *see* 473 U.S. at 177-81—does not inflict the actual, concrete injury necessary to render a claim ripe, *see Dougherty*, 282 F.3d at 89 (not ripe despite five-and-a-half-year delay); *Homefront Org. v. Motz*, 570 F. Supp. 2d 398, 406 n.6 (E.D.N.Y. 2008) (collecting cases)." *Osborne*, 2009 WL 884697, at *5-6 (finding that an application before a board pending for more than eighteen months did not "excuse Plaintiffs' case from the final decision requirement"); *see also Country View Estates @ Ridge LLC v. Town of Brookhaven*, 452 F. Supp. 2d 142, 155 (E.D.N.Y. 2006) (no futility after a two-year delay); *Goldfine*, 80 F. Supp. 2d at 161 (no futility after a three-year delay); *545 Halsey Lane Props.*, 2015 WL 2213320, at *8 (no futility after a six-year delay). The same is true here. The delays cited by the plaintiffs do not excuse the plaintiffs from *Williamson*'s final decision requirement.[23]

Dean also argues that he has faced other hostile actions from the Town such that it would be futile to return to the Building Department or Board of Appeals. In support of this argument, Dean cites to the reopening and rehearing for the Wantagh special exception permit, Dean Aff. ¶ 23, and that defendant Kate Murray "caused" the reopening or otherwise has publicly and "vociferous[ly]" objected to the plaintiffs opening a business in Wantagh, *id.* ¶¶ 23,

---

[23] Indeed, the defendants allege that, at least with respect to the application for a cabaret permit at the Bellmore Property, it was their understanding that all parties concurred with a reservation of decision pending resolution of the state appeals over the application for a cabaret permit at the Wantagh Property, *see* Regina Aff. ¶ 28. Such an understanding would have contributed to delay regarding that application. I need not consider this point, however, as the precedent is clear that delay does not ordinarily ripen an otherwise non-justiciable case.

72.[24]  I find these statements to be of the same vein as the letter purportedly sent on behalf of the Town of Hempstead to the New York State Department of State: not evidence of what the Board of Appeals—the decision-maker in these applications and/or appeals and variances—would determine, or even give weight to.  *See 545 Halsey Lane Props., LLC*, 2015 WL 2213320, at *7 (finding that although the town attorney took a position on a relevant issue, "there has been no commentary by the Planning Board itself indicating that this [is] an entrenched position of any kind"); *Homefront Org., Inc.*, 570 F. Supp. 2d at 409 (noting that despite a defendant's negative views, "the Planning Board or the BZA could approve the proposal"); *S&R Dev. Estates, LLC*, 588 F. Supp. 2d at 463 ("The Town's alleged hostility and bias can not be imputed to the ZBA simply because the Town appoints the ZBA members.").

At any rate, hostility does not necessarily mean that future applications will be futile.  *See, e.g.*, *Homefront Org., Inc.*, 570 F. Supp. 2d at 402, 408-09 (finding no futility after a defendant stated that "no project of the plaintiffs was 'happening in our town,'" "'we are not like *you people* from Westhampton,'" and for plaintiffs to "'move on'"; after the Board resisted the plaintiff's ideas at meetings; and after a defendant pressured the property owner to sell the property to someone other than the plaintiffs); *Goldfine*, 80 F. Supp. 2d at 156, 160-61 (finding no futility after the defendant did not appear for site visits, misinterpreted regulations to make the proposed development more difficult, and the plaintiff met "strong opposition" at Board

---

[24]     Dean also states that in February 2012, Chief Building Inspector Brian Nocella showed him an email that Nocella had received which said "Do not issue a Certificate of Occupancy to Billy Dean for restaurant use at the Wantagh location."  Dean Aff. ¶ 55 (internal quotation marks omitted).  Dean states that Nocella and Building Inspector Robert Steppe "advised [Dean] not to go back to the Board of Appeals for restaurant use because it was a 'trap' and that the Town would never give [Dean] a Certificate of Occupancy for the Wantagh Property."  *Id.* ¶ 56.  Finally, Dean states that an unnamed member of the Board told him "that the rehearing was evidence of the Town's 'political jihadism' and that [he] could establish 'a clear pattern of behavior on the part of the Town officials to get [them.]'"  *Id.* ¶ 72.  First, the defendants—and Nocella—contest these claims.  *See* Brian Nocella Aff., ECF No. 56-1, ¶¶ 3-9.  Second, they are hearsay, and although I may consider materials outside the pleadings, I may not consider "conclusory or hearsay statements contained in the affidavits."  *J.S. ex rel. N.S.*, 386 F.3d at 110.  Therefore, I cannot credit these statements toward Dean's futility argument.

43

meetings); *Dix v. City of New York*, 2002 WL 31175251, at *8 (S.D.N.Y. Sept. 30, 2002) (finding no futility even after the defendant harassed and intimidated contractors on the premises, defamed the plaintiff, and interfered with BSA protocol).

Finally, although Dean argues that the plaintiffs "have been the target of a pattern of harassment by the Town,"[25] I find this case distinguishable from those in which a municipality's procedures have been so obstructive that a court finds a land dispute ripe even though a final decision is absent. For example, in *Sherman*, the plaintiff had sought approval to use his land for over a decade, but "every time [he] submitted or was about to submit a proposal for [the property], the Town changed its zoning regulations . . . [even] retroactively issu[ing] a six month moratorium on development that appears to have applied only to Sherman's property." 752 F.2d at 562. He was "financially exhausted to the point of facing foreclosure and possible personal bankruptcy." *Id.* at 563. And, at oral argument in that case, "the Town's counsel could not name one way Sherman could have appealed any aspect of the Town's decade of maneuvers in order to obtain a final decision." *Id.* The Second Circuit held that, though "it is no simple task to distinguish procedures that are merely frustrating from those that are unfair or would be futile to pursue . . . when the government's actions are so unreasonable, duplicative, or unjust as to make the conduct farcical, the high standard is met." *Id.*

Although the Town has imposed several burdensome steps on Dean, I cannot find that their actions have been "so unreasonable, duplicative, or unjust," *id.*, that further applications by Dean would be futile. In fact, the Town has outlined the steps that it expects

---

[25] Dean Aff. ¶ 62. "For example, in [sic] May 15, 2010, we receive a ticket from Code Enforcement Officer Roy Gunther for having a locked gate obstructing egress from the basement. However, the gate did not even belong to us. Instead, it was the landlord's gate. On June 14, 2010, the landlord replaced the gate. I brought proof that the violation had been corrected to court on June 24, 2010. Nevertheless, Roy Gunther and the town attorney, Brad Regenbogen, required me to come back to court <u>18 more times</u> before that violation, and others, could be resolved." *Id.* (emphasis in original).

Dean to take. Thus, I conclude that "[a] federal lawsuit at this stage would inhibit the kind of give-and-take negotiation that often resolves land use problems, and would in that way impair or truncate a process that must be allowed to run its course." *Sunrise Detox*, 769 F.3d at 124.

Nonetheless, I am sympathetic to the plaintiffs' complaints about the Town's inefficiency and hostility. Moreover, it was clear to me from the oral argument of the motion to dismiss that the case would benefit greatly from conferences with a judicial officer who is an expert at helping parties settle their disputes. To that end, Magistrate Judge Gold will schedule a conference.[26]

Although the defendants raised other grounds for dismissal in their motion papers, because only the facial claims remain in the case at this time and the parties did not brief as to only these claims, I decline to address these other grounds at this time. The parties may seek a promotion conference should they choose to file a motion to dismiss as to these claims. In the meantime, I strongly urge both of the parties to consider whether a reasonable settlement may best effectuate their interests.

CONCLUSION

Accordingly, I grant the motion to dismiss the plaintiffs' as-applied claims without prejudice to renewal when the plaintiffs' claims have ripened or when they can show an exception to the ripeness doctrine. I deny the motion to dismiss the plaintiffs' facial claims and

---

[26]  I need not reach whether—given the defendant's actions—I may retain jurisdiction over the case and hold it in abeyance, *see Wheaton College v. Sebelius*, 703 F.3d 551, 552-53 (D.C. Cir. 2012), as the plaintiffs' facial claims are not subject to the *Williamson* test and I decline to dismiss them. *See, e.g.*, *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n.10 (1997) ("[F]acial challenges to regulation[s] are generally ripe the moment the challenged regulation or ordinance is passed." (internal quotation marks omitted)); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 915 F. Supp. 2d 574, 595 (S.D.N.Y. 2013) (analyzing as-applied challenges under *Williamson*'s prong-one "final decision" requirement, but finding facial challenges to village zoning ordinances ripe for review); *Tini Bikinis-Saginaw, LLC*, 836 F. Supp. 2d at 517 ("Accordingly, because the facial challenge is premised on the idea that regardless of how the statute is applied, it will be unconstitutional, no final decision of the local government applying the particular ordinance to a specific set of facts is necessary to evaluate its constitutionality.").

direct the parties to appear before Magistrate Judge Gold, on a date to be set by him, prepared to

discuss a settlement of their dispute.

So ordered.

John Gleeson, U.S.D.J.

Dated: February 18, 2016
        Brooklyn, New York