UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

WILLIAM STEPHEN DEAN, *also known as Billy Dean*, RORI LEIGH GORDON, GREEN 2009 INC., ONE55DAY INC., and LOOK ENTERTAINMENT LTD.,

                    Plaintiffs,

           v.

THE TOWN OF HEMPSTEAD, KATE MURRAY, *individually and as the former Supervisor of the Town of Hempstead*, JOHN E. ROTTKAMP, *individually and as the Commissioner of the Department of Buildings of the Town of Hempstead*, DAVID P. WEISS, *individually and as the Chairman of the Town of Hempstead Board of Appeals*, GERALD C. MARINO, *individually and as a former Member of the Town of Hempstead Board of Appeals*, KATURIA E. D'AMATO, *individually and as a Member of the Town of Hempstead Board of Appeals*, JOHN F. RAGANO, *individually and as a Member of the Town of Hempstead Board of Appeals*, FRANK A. MISTERO, *individually and as a Member of the Town of Hempstead Board of Appeals*, JOSEPH F. PELLEGRINI, *individually and as a Member of the Town of Hempstead Board of Appeals*, KIMBERLY A. PERRY, *individually and as a Member of the Town of Hempstead Board of Appeals*, ANTHONY J. SANTINO, *individually and as the Supervisor of the Town of Hempstead,* GARY HUDES, *individually and as a member of the Town Board of the Town of Hempstead*, and DANIEL M. FISHER, *individually and as a Member of the Town of Hempstead Board of Appeals*,

                    Defendants.

**MEMORANDUM & ORDER**
14-CV-4951 (MKB)

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.    Background .................................................................................................................. 4
    a.   Factual background ................................................................................................ 4
        i.    The parties ..................................................................................................... 4
        ii.   The Town's laws ............................................................................................ 5
        iii.  History of the Wantagh Property ................................................................. 8
        iv.   Plaintiffs' purchase of the Wantagh Property and the Board's denial of the 2009
              building permit application ......................................................................... 10
        v.    The April 2010 hearing and decision ......................................................... 10
        vi.   The 2011 rehearing and decision ............................................................... 12
        vii.  Plaintiffs' 2016 applications ...................................................................... 13
    b.   Procedural background ........................................................................................ 14
II.   Discussion ................................................................................................................ 17
    a.   Standard of review .............................................................................................. 17
    b.   First Amendment claims ..................................................................................... 18
        i.    The Special Use Provision is content-neutral ............................................ 19
        ii.   The Cabaret Provision is an unconstitutional prior restraint ..................... 20
        iii.  The Cabaret Provision is overbroad on its face ......................................... 30
        iv.   Severability ................................................................................................. 43
    c.   Temporal Limit Provision vagueness claim ....................................................... 44
    d.   Regulatory takings claim .................................................................................... 48
        i.    Economic impact ........................................................................................ 51
        ii.   Investment-backed expectations ................................................................ 54
        iii.  Character of the governmental action ........................................................ 57
    e.   Municipal liability .............................................................................................. 59
    f.   Defenses raised by Non-Board Defendants Murray, Santino, and Hudes ......... 65
        i.    Official capacity claims against the Non-Board Defendants ...................... 65
        ii.   Personal involvement of the Non-Board Defendants ................................. 67
    g.   State law claims .................................................................................................. 72
        i.    Notice of claim ........................................................................................... 74
        ii.   Ripeness ...................................................................................................... 79
        iii.  Res judicata ................................................................................................ 86
        iv.   Free speech claims ...................................................................................... 90
        v.    Takings claim ............................................................................................. 92
        vi.   Equal protection claims .............................................................................. 93
        vii.  State immunities ......................................................................................... 94

viii.   Municipal liability ....................................................................................... 99

III.  Conclusion ...................................................................................................... 100

Plaintiffs William Stephen Dean, Rori Leigh Gordon, Green 2009 Inc. ("Green 2009"),

One55Day Inc. ("One55Day"), and Look Entertainment, Ltd. ("Look Entertainment"),

commenced the above-captioned action on August 20, 2014, alleging that Defendants the Town

of Hempstead (the "Town"), Kate Murray, John E. Rottkamp, David P. Weiss, Gerald C.

Marino, Katuria E. D'Amato, John F. Ragano, Frank A. Mistero, Joseph F. Pellegrini, Kimberly

A. Perry, and Anthony J. Santino violated their constitutional rights by refusing to approve

permits and other authorizations required for Plaintiffs to operate a cabaret located at 3500

Sunrise Highway in Wantagh, New York, in the Town of Hempstead (the "Wantagh Property").[1]

(Compl., Docket Entry No. 1.)  Plaintiff subsequently filed an Amended Complaint on

September 30, 2016, adding Gary Hudes as a defendant, (Am. Compl., Docket Entry No. 99),

and a Second Amended Complaint ("SAC") on February 7, 2017, adding Daniel M. Fisher and

Steven D. Rhoads[2] as defendants, (Second Amended Complaint ("SAC") ¶ 19, Docket Entry No.

137).  Plaintiffs bring claims under 42 U.S.C. §§ 1983 and 1985 alleging violations of their civil

and constitutional rights.

---

[1]  Plaintiffs also alleged that Defendants violated their constitutional rights in connection
with Plaintiffs' efforts to operate another cabaret located at 1536-38 Newbridge Road, North
Bellmore, New York, in the Town of Hempstead (the "Bellmore Property").  (Compl. ¶¶ 128–
162, 167–196.)  The Court dismissed Plaintiffs' federal claims based on the Bellmore Property
on January 4, 2021 (the "January 2021 Decision").  (Decision dated Jan. 4, 2021 ("Jan. 2021
Decision") 162–63, Docket Entry No. 222.)

[2]  Rhoads moved to dismiss the claims against him on March 10, 2017.  (Notice of Mot.
to Dismiss, Docket Entry No. 161.)  The Court dismissed all claims against him.  (Jan. 2021
Decision 162.)

On October 6, 2023, Plaintiffs moved for partial summary judgment[3] and Defendants cross-moved for summary judgment.[4]  For the reasons set forth below, the Court grants in part and denies in part Plaintiffs' motion for partial summary judgment and grants in part and denies in part Defendants' motion for summary judgment.

## I.  Background

The Court assumes familiarity with the facts as detailed in the Court's January 2021 Memorandum and Order denying in part and granting in part Defendants' motion to dismiss (the "January 2021 Decision"), and provides only a summary of the pertinent facts.  The following facts are undisputed unless otherwise noted.  (*See* Jan. 2021 Decision.)[5]

### a.  Factual background

#### i.  The parties

Dean is the president and Gordon is the vice president of One55Day.  (SAC ¶¶ 10, 14–15.)  Gordon is president of Green 2009 and Look Entertainment, while Dean is vice president of both corporations.[6]  (*Id.* ¶¶ 14–15.)  The Town is a municipal corporation organized under the

---

[3]  (Pls.' Mot. for Partial Summ. J. ("Pls.' Mot."), Docket Entry No. 284; Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), Docket Entry No. 285; Defs.' Mem. in Opp'n to Pls.' Mot. ("Defs.' Opp'n"), Docket Entry No. 291-12; Pls.' Reply in Supp. of Pls.' Mot. ("Pls.' Reply"), Docket Entry No. 288.)

[4]  (Defs.' Mot. for Summ. J. ("Defs.' Mot."), Docket Entry No. 289; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 289-52; Pls.' Mem. in Opp'n to Defs.' Mot. ("Pls.' Opp'n"), Docket Entry No. 292; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 290-3.)

[5]  (Pls.' Rule 56.1 Stmt. in Supp. of Pls.' Mot. ("Pls.' 56.1"), Docket Entry No. 287; Defs.' Resp. to Pls.' 56.1 ("Defs.' 56.1 Resp."), Docket Entry No. 291-13; Defs.' Rule 56.1 Stmt. in Supp. of Defs.' Mot. ("Defs.' 56.1"), Docket Entry No. 289-53; Pls.' Resp. to Defs.' 56.1 ("Pls.' 56.1 Resp."), Docket Entry No. 296.)

[6]  One55Day owns the Wantagh Property, and Green 2009 leases the property.  (SAC ¶¶ 10–11.)

laws of New York and located within Nassau County, New York.  (*Id.* ¶ 16.)  The remaining

Defendants are current or former Town officials who served as Supervisor of the Town or are

connected to the Town's Board of Zoning Appeals (the "Board") and/or Department of

Buildings (the "DOB").  (*Id.* ¶¶ 17–28; Answer to SAC ¶¶ 17–28, Docket Entry No. 156.)

### ii.   The Town's laws

New York Town Law ("Town Law") section 261 empowers the Board to "regulate and

restrict," among other things, "the location and use of buildings."  (*See* Pls.' 56.1 ¶ 1).  The

Board also has original jurisdiction over applications for special exceptions to certain uses, and is

empowered to authorize such exceptions so long as the use: (1) would not prevent orderly and

reasonable use of adjacent properties or other established uses in the district where the proposed

use is located; (2) would not affect the Town's safety, health, welfare, comfort, convenience, and

order; and (3) would be "in harmony with and promote the general purposes and intent" of the

zoning ordinance.  Building Zone Ordinance ("BZO") § 267(D)(2)(a)(4).  The Board also has the

power to grant use variances "in harmony with their general purpose and intent," Town Law

§ 261; (*see also* Pls.' 56.1 ¶ 1), when an applicant has shown that "applicable zoning regulations

and restrictions have caused unnecessary hardship," Town Law § 267-b(2)(b).

The DOB is charged with administering and enforcing rules regarding places of public

assembly and other real property and buildings.  Hempstead, N.Y., Town Code ("Town Code")

§ 52-3.  When a business owner seeks to construct, substantially alter, or "change the nature of

the occupancy" of a building in the Town, he must obtain a building permit from the DOB, and

when he seeks to occupy a building in the Town, he must obtain a Certificate of Occupancy or

Certificate of Completion from the DOB.  *See* Town Code §§ 86-9 (permits), -18 (certificates of

occupancy), -19 (certificates of completion).  To obtain a Certificate of Occupancy, a property

owner must have first obtained a building permit, and a building inspector must have examined the site and work for which the application was filed. *Id.* §§ 86-18, -21. The DOB must issue the certificate "within a reasonable time" after receiving an application for a Certificate of Occupancy. *Id.* § 86-22.

The DOB also has the power to grant public assembly permits, which are renewed annually. *Id.* §§ 96-1 to -4. Under the Town Code, it is "unlawful for any person to conduct, maintain or operate a place of public assembly within the Town who has not been issued a temporary license or an approved license . . . which is currently in effect for the premises wherein the place of public assembly is conducted, maintained or operated." Town Code § 96-3(A); (*see also* Pls.' 56.1 ¶ 6). The DOB will issue a public assembly permit only after the premises to be licensed are inspected and the DOB is satisfied that the applicant has complied with "all other applicable laws, ordinances, codes, rules and regulations pertaining to fire and safety requirements" and finds "that the premises are a safe place in which to conduct, maintain or operate a place of public assembly and that a proper use has been established for the premises." (Answer ¶ 250 (emphasis omitted) (quoting Town Code § 96-3(B)).)

Cabarets and restaurants are included in the definition of "place of public assembly." Town Code § 96-1(A); (*see also* Pls.' 56.1 ¶ 4). The Town Code defines a cabaret as any "room, place or space wherein musical entertainment, singing, dancing in a designated area or other form of amusement or entertainment is permitted in conjunction with the sale or service of food or drink to the public." Town Code § 96-1(A); (*see also* Pls.' 56.1 ¶ 5). To operate a cabaret in the Town, a business owner must apply for and obtain permission from the Board. BZO § 272(C)(6) (the "Special Use Provision"). According to the Special Use Provision as amended in March of 1997, "the grant of any cabaret use by the Board . . . shall be limited to the specific

cabaret use applied for and approved by the Board . . . and no other cabaret use" (the "Cabaret Provision"). *Id.*; (*see also* Pls.' 56.1 ¶ 3). The amended Special Use Provision also states that it "shall apply to any cabaret use hereafter or previously granted by the Board." BZO § 272(C)(6); (*see also* Pls.' 56.1 ¶ 3). In addition, the ordinance grants the Board the authority to "impose a condition of a grant which shall make the grant temporary in nature, for a duration of time to be fixed by the Board, subject to renewals as the Board may deem appropriate." BZO § 267(D)(3) (the "Temporal Limit Provision," and together with the Special Use Provision, the "Challenged Ordinances"). The BZO also requires that a restaurant may not be erected or maintained unless fifteen percent of the surface area of each exterior wall of the restaurant consists of windows. BZO § 302(Q) (the "Window Provision").

Town Law section 267-a(4) confers appellate jurisdiction on the Board to review "any order, requirement, decision, interpretation, or determination made by the administrative official charged with the enforcement of any ordinance or local law." Town Law § 267-a(4). In addition, pursuant to Town Law section 267-a(12), the Board has the power to hold a rehearing on any of its orders, decisions, or determinations not previously reheard. *Id.* § 267-a(12). The ordinance provides that the Board may "reverse, modify or annul its original order, decision or determination upon the unanimous vote of all members then present, provided the [B]oard finds that the rights vested in persons acting in good faith in reliance upon the reheard order, decision or determination will not be prejudiced thereby." *Id.* Appeals to the Board must be decided within sixty-two days of the hearing.[7] *Id.* § 267-a(8).

---

[7] New York courts have held that an applicant's sole remedy for a board's failure to act within the prescribed sixty-two-day period is a mandamus proceeding to compel the board to act. *See* Terry Rice, Practice Commentary, McKinney's Cons. Laws of N.Y., Book 61, Town Law § 267-a (2013) (citing *Berka v. Seltzer*, 565 N.Y.S.2d 234 (App. Div. 1991)).

The BZO also governs parking regulations and requires that cabarets have one parking space for each three authorized occupants.  BZO § 319(A)(7).  Applications for parking variances are submitted to the Board.  *Id.* § 319(C).  The Board may grant such variances "in any case in which it shall find that compliance herewith is not necessary to prevent traffic congestion or undue on-street parking, or where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of this section."  *Id.*

### iii.   History of the Wantagh Property

The parties agree that Plaintiffs are required to have a special use permit from the Board in order to operate a cabaret or other place of public amusement on the Wantagh Property.  (Pls.' 56.1 Resp. ¶ 70.)  The structures at the Wantagh Property include a one-story commercial building and a residential single-family dwelling, as well as a parking lot with thirteen spaces.[8] (*Id.* ¶¶ 53, 55.)  The Wantagh Property is situated in a zoned business district and sits on a "major commercial east-west thoroughfare," (Defs.' 56.1 Resp. ¶ 18), but the parties disagree as to whether the surrounding area is "substantially commercial" or "substantially residential," (*id.* ¶ 20; Pls. 56.1 Resp. ¶ 45).

On July 17, 1969, the Board granted an application made by the then-owner of the Wantagh Property to convert the premises to a cabaret featuring "dancing and live music" (the "1969 Permit").[9]  (Pls.' 56.1 Resp. ¶¶ 58, 61; Defs.' 56.1 Resp. ¶ 13; *see also* Special Use Permit

---

[8]  The parties agree that twenty-five parking spaces are required under the BZO, but dispute whether Plaintiffs needed to seek a variance before operating the Wantagh Property as a cabaret because, according to Plaintiffs, parking needs have not changed since the property's initial permit for restaurant use was issued.  (Pls.' 56.1 Resp. ¶ 53; *see also* Defs.' 56.1 ¶ 53.)

[9]  The parties dispute whether the cabaret use granted in 1969 was "limited to dancing on a dance floor by restaurant patrons to live music provided by a piano bar provided by the restaurant."  (Pls.' 56.1 Resp. ¶ 59.)

dated July 17, 1969, annexed to Decl. of Peter Sullivan in Supp. of Defs.' Mot. ("Sullivan Decl.") as Ex. L, Docket Entry No. 289-15.)  On November 18, 1969, the DOB issued a Certificate of Occupancy for the Wantagh Property.  (Pls.' 56.1 Resp. ¶ 62; Certificate of Occupancy, annexed to Sullivan Decl. as Ex. M, Docket Entry No. 289-16; Defs.' 56.1 Resp. ¶ 13.)  From 1969 through the 1980s, the Wantagh Property was operated as a cabaret.  (Pls.' 56.1 ¶ 15.)[10]

In 1991, the then-owner of the Wantagh Property applied to construct an addition to the premises and operate it as a restaurant, while preserving its previously approved use as a cabaret. (Pls.' 56.1 Resp. ¶ 64.)  The Board approved the application on October 30, 1991.  (Decision dated Oct. 30, 1991, annexed to Sullivan Decl. as Ex. N, Docket Entry No. 289-17.)  In 1997, the Town amended the BZO to require that the "grant of any cabaret use by the Board . . . shall be limited to the specific cabaret use applied for and approved by the Board."  (Pls.' 56.1 Resp. ¶ 68; Defs.' 56.1 Resp. ¶ 3); *see also* BZO § 272(C)(6).  The Wantagh Property was operated as

---

[10] Defendants purport to dispute this and other statements in Plaintiffs' Rule 56.1 statement by asserting that they "cannot admit nor deny" the statements or that because the statements are "not . . . uncontested fact[s]," they are "not properly asserted" in a Rule 56.1 statement, (*see, e.g.*, Defs.' 56.1 Resp. ¶¶ 15–17, 23–24, 33–35, 45, 47, 49, 51–59), but often do not cite evidence in support of their assertions or otherwise provide a basis for their disputes. Pursuant to Local Rule 56.1, responses to a Rule 56.1 statement that do not point to evidence in the record sufficient to create a disputed fact are not denials and may instead be treated as admissions of the stated fact.  *See, e.g.*, *Finnegan v. Berben*, No. 20-CV-10231, 2024 WL 1242996, at *1 n.2 (S.D.N.Y. Mar. 22, 2024) (collecting cases for the proposition that "[c]ourts in this district have consistently interpreted Local Rule 56.1 to provide that where there are no[] citations or where the cited materials do not support the factual assertions in the Statements, the [c]ourt is free to disregard the assertion" (alterations in original)); *Sanchez v. Nassau County*, 662 F. Supp. 3d 369, 380 (E.D.N.Y. 2023) ("[R]esponses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." (quoting *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014))).  Accordingly, where either party merely asserts that a fact is disputed but does not cite any evidence in support of their assertion, the Court declines to treat the fact as disputed.

a "cabaret with a full-service bar, food, [and] live amplified music" through 2008.  (Pls.' 56.1 ¶ 17.)

### iv. Plaintiffs' purchase of the Wantagh Property and the Board's denial of the 2009 building permit application

On or about March 19, 2009, One55Day purchased the Wantagh Property for a sum of $950,000.  (Pls.' 56.1 Resp. ¶ 69; Defs.' 56.1 Resp. ¶ 23.)  Plaintiffs purchased the Wantagh Property "in part because it had a cabaret permit, and [a] long history of being operated as a cabaret."  (Pls.' 56.1 ¶ 24.)  On May 8, 2009, Plaintiffs filed a Building Permit Application for interior alterations to the existing building (the "2009 Application").  (Pls.' 56.1 Resp. ¶ 71.)  On February 9, 2010, the DOB denied the 2009 Application after determining that:

> (a) the Plaintiffs' proposed use was significantly different from the use as a simple piano bar approved in 1969; (b) pursuant to the 1997 Code Amendment Plaintiffs [could] not rely on the 1969 permit; but (c) [needed to] apply for a new special exception; and (d) [needed to] (for either a cabaret or restaurant use) obtain a variance from the BZA from on-site parking requirements.

(*Id.* ¶ 73.)  On February 10, 2010, Plaintiffs appealed the DOB's determination to the Board.  (*Id.* ¶ 74.)  At the same time, Plaintiffs separately applied to the Board for a new special use permit and a variance from parking requirements (the "2010 Application").  (*Id.*)

### v. The April 2010 hearing and decision

On April 14, 2010, the Board held a public hearing (the "April 2010 Hearing") on Plaintiffs' 2010 Application and appeal of the 2009 Application.  (Pls.' 56.1 Resp. ¶ 75; Defs.' 56.1 Resp. ¶ 25.)  At the hearing, counsel for Plaintiffs represented that the Wantagh Property would not be used for "adult entertainment."  (Defs.' 56.1 Resp. ¶ 26.)

On April 28, 2010, the Board denied Plaintiffs' appeal from the DOB's determination of the 2009 Application, but approved a temporary special use permit for the requested cabaret use

and a parking variance.[11]  (Pls.' 56.1 Resp. ¶ 77; Defs.' 56.1 Resp. ¶ 29.)  The temporary special use permit was limited to five years and was conditioned on Plaintiffs not offering any "topless," "bottomless," or "nude" entertainment.  (Pls.' 56.1 Resp. ¶ 77; Defs.' 56.1 Resp. ¶¶ 29–30.)  On May 26, 2010, Plaintiffs sent a letter to the Board requesting that it amend its decision to make the special use permit permanent.  (Pls.' 56.1 Resp. ¶ 78.)  The Board granted Plaintiffs' request and made the special use permit permanent on June 2, 2010 (the "2010 Permit").  (Pls.' 56.1 Resp. ¶ 78; Defs.' 56.1 Resp. ¶ 31.)

The DOB subsequently issued Plaintiffs a building permit enabling them to alter the Wantagh Property for its proposed cabaret use.  (Pls.' 56.1 Resp. ¶ 79.)  Plaintiff began construction on the Wantagh Property in accordance with the plans submitted in support of the building permit.  (Id. ¶ 81.)  Plaintiffs "spent a substantial amount to renovate their building for the anticipated cabaret use."  (Pls.' 56.1 ¶ 33.)  During the renovations, Plaintiffs discovered a structural problem that required the front wall of the building to be reconstructed.  (Pls.' 56.1 Resp. ¶ 83.)  Plaintiffs submitted supplemental plans to the DOB to address the structural issue (the "Supplemental Plans"), and represented that the requested fix would not alter the configuration or look of the building.  (Id. ¶¶ 83–84.)  Defendants allege that Plaintiffs' fix included construction of a "new front portico to the east and forward towards Sunrise Highway" that "caused it to violate the front yard set-back regulations under the [BZO] for this corner property."[12]  (Defs.' 56.1 ¶¶ 86–87.)

---

[11]  The parties dispute the basis for the parking variance.  Defendants contend that the Board "approved the parking variance for cabaret . . . based on the surrounding circumstances as [they] then existed."  (Defs.' 56.1 ¶ 77.)  Plaintiffs argue that "[t]his is a contested fact" but do not provide a basis for their dispute.  (Pls.' 56.1 Resp. ¶ 77.)

[12]  Plaintiffs assert that this fact is in dispute.  (Pls.' 56.1 Resp. ¶ 87.)

### vi.   The 2011 rehearing and decision

On March 30, 2011, the Board unanimously voted to reopen Plaintiffs' 2010 Application pursuant to Town Law section 267-a(12).  (Pls.' 56.1 Resp. ¶ 90.)  The Board held a hearing on May 18, 2011, where it heard from additional witnesses and considered other evidence and legal arguments (the "2011 Rehearing").  (*Id.* ¶ 91; Defs.' 56.1 Resp. ¶ 37.)  Defendant Murray testified at the hearing that "we don't want to see the types of activities authorized here that would turn a beautiful residential neighborhood into a red light district."  (Defs.' 56.1 Resp. ¶ 39.)  Plaintiffs' counsel represented that "there would not be any adult entertainment."  (*Id.* ¶ 40.)

On August 25, 2011, the Board unanimously annulled its prior determinations, denied Plaintiffs' request for a special use permit, and granted the parking variance but limited it to restaurant use.[13]  (Pls.' 56.1 Resp. ¶ 94; Defs.' 56.1 Resp. ¶ 41.)  The Board denied Plaintiffs' request for a special use permit on the grounds that Plaintiffs "willfully chose to mislead [the] Board as to the nature of its proposed entertainment, not by intentionally false statements, but by a studied attempt at a lack of candor and transparency in their presentation as to the details of entertainment to be offered."  (Defs.' 56.1 Resp. ¶ 42; *see also* Pls.' 56.1 Resp. ¶ 96.)  Plaintiffs challenged the Board's decision in an Article 78 proceeding pursuant to the New York Civil Practice Law and Rules, *Green 2009, Inc. v. Weiss*, No. 14456/11, 2012 WL 1985817, at *1 (Sup. Ct. May 14, 2012) (*Green 2009 I*), and the New York State Appellate Division dismissed the petition, *Green 2009, Inc. v. Weiss*, 980 N.Y.S.2d 510, 511 (App. Div. 2014) (*Green 2009 II*) (the "2012 Article 78 Proceeding").

---

[13]  The Board also re-denied Plaintiffs' appeal from the DOB's initial determination denying the 2009 Application.  (Pls.' 56.1 Resp. ¶ 94.)

### vii.   Plaintiffs' 2016 applications

On or about May 20, 2016, Plaintiffs submitted a new application to the DOB for a building permit to operate the Wantagh Property as a cabaret only.  (Building Permit Application dated May 20, 2016 ("2016 Permit Application"), annexed to Sullivan Decl. as Ex. LL, Docket Entry No. 289-51; *see also* Pls.' 56.1 Resp. ¶ 114.)  The DOB denied Plaintiffs' application because Plaintiffs did not have: (1) a special use permit; (2) a parking variance; or (3) a variance for the front yard portico.  (Pls.' 56.1 Resp. ¶ 115.)  The DOB also determined that Plaintiffs needed a variance to maintain a six-foot tall rear fence.  (*Id.* ¶ 116.)

Plaintiffs subsequently applied to the Board for: (1) a special use permit to operate a cabaret on the Wantagh premises; (2) a parking variance; (3) a variance for the front yard portico; and (4) a variance for the six-foot high rear fence (the "2016 Application").  (*Id.* ¶ 117.) Plaintiffs also appealed the DOB's determinations that a new special use permit and a new parking variance were required.  (*Id.*)

On October 13, 2016, the Board held a hearing on Plaintiffs' four applications and two appeals, and it considered new testimony in favor of and against the applications and appeals. (*Id.* ¶ 118; Defs.' 56.1 Resp. ¶ 48.)  At the hearing, Plaintiffs stated that they intended to "book acts comparable to those seen in the television show America's Got Talent, acrobats, magicians, knife throwers, sword swallowers, singers, dancers, musicians, and a huge variety of acts in the context of a dinner theater with food, soft drinks, [and] alcohol beverages."  (Defs.' 56.1 Resp. ¶ 48.)  Members of the Board also inspected the exterior of the Wantagh Premises.  (Defs.' 56.1 ¶ 120.)

On November 2, 2016, the Board denied the two appeals, denied Plaintiffs' applications for a special use permit, parking variance, and a variance for the front yard portico, but granted

their application for a variance for the six-foot high rear fence.  (Pls.' 56.1 Resp. ¶ 122; Defs.' 56.1 Resp. ¶ 50.)  Several months later, on February 14, 2017, the Board issued written findings of fact.  (Pls.' 56.1 Resp. ¶ 125; *see also* Board Findings of Fact, annexed to Sullivan Decl. as Ex. K, Docket Entry No. 289-14.)  In relevant part, the Board determined that Plaintiffs' proposed use of the Wantagh Property was "not in compliance with the off-street parking requirements of the zoning code or the front yard set back on this dangerous corner" and that Plaintiffs were "not entitled to the requested special exceptions, not as a matter of discretion . . . but as a matter of law."  (Board Findings of Fact 64–65; *see also* Pls.' 56.1 Resp. ¶ 129.) The Board concluded that it had "no jurisdiction to grant the relief requested" and that "the proposed cabaret [was] neither desirable nor appropriate at this particular location."  (Board Findings of Fact 65; *see also* Pls.' 56.1 Resp. ¶ 129.)

On January 19, 2017, Plaintiffs filed a petition in state court seeking review of the Board's determinations pursuant to Article 78 of New York's Civil Practice Law and Rules (the "2017 Article 78 Proceeding").  (Pls.' 56.1 Resp. ¶ 130.)  Defendants answered Plaintiffs' petition.  (*Id.* ¶ 131.)  On Plaintiffs' request, the state court stayed the 2017 Article 78 Proceeding pending the resolution of this action.  (*Id.* ¶ 132.)

### b.  Procedural background

On August 20, 2014, Plaintiffs commenced this federal action.  (Compl.)  By Memorandum and Order dated February 18, 2016, Judge John Gleeson dismissed certain claims asserted in the Complaint for lack of ripeness (the "February 2016 Decision"), (*see* Feb. 2016 Decision, Docket Entry No. 65), and on September 30, 2016, Plaintiffs filed an Amended Complaint, (Am. Compl.), followed by the SAC on February 7, 2017, (SAC).

The SAC asserted the following claims pursuant to 42 U.S.C. § 1983: (1) "imposing a prior restraint and interfering with constitutionally protected expression at the Wantagh Property," (2) "conspiring to deprive [Plaintiffs] of their constitutional rights and civil rights," (3) "restricting and depriving [Plaintiffs] of their property rights at the Wantagh Property," (4) "discriminating against [Plaintiffs] and continuing to deprive them of their cabaret permit, public assembly permit and off-parking variance at the Bellmore [Property]," (5) unconstitutionally "requiring restaurants to have windows" under the Window Provision, (6) unconstitutionally "imposing a temporal restriction on the issuance of permissive uses[,] including cabaret permits" under the Temporal Limit Provision, (7) unconstitutionally "requiring a special exemption to use the premises for a place of public assembly and amusement" under the Special Use Provision, (8) engaging in "selective enforcement," (9) "fail[ing] to comply with the Town's newly enacted preference statute which requires the Board . . . and [DOB] to timely act on pending applications" in violation of Plaintiffs' constitutional rights, (10) causing Plaintiffs to "incur[] significant damages," and (11) individually "violat[ing] clearly established constitutional rights."  (SAC ¶¶ 447–513.)  Plaintiffs sought injunctive and declaratory relief to compel Defendants to issue a cabaret permit and/or Certificate of Occupancy for the Wantagh Property and the Bellmore Property, judgments enjoining and voiding the relevant portions of the Special Use Provision, the Temporal Use Provision, and the Window Provision, actual and punitive damages, and costs in connection with litigating this action.  (*Id.* at 137–39.)

By Memorandum and Order dated January 4, 2021, the Court granted in part and denied in part Defendants' motion to dismiss the SAC.  (Jan. 2021 Decision.)  The Court dismissed Plaintiffs' federal claims arising out of (1) the 2010 Application for the Wantagh Property, (2) the Bellmore Property, and (3) the First Amendment challenge to the Window Provision of

the BZO for lack of ripeness and standing.  (Jan. 2021 Decision 162.)  The Court also dismissed Plaintiffs' claims against Defendants for failure to state a claim under the Federal Constitution for substantive and procedural due process, equal protection, and conspiracy, as well as the *Monell* municipal liability claims based on those alleged constitutional violations.  (*Id.* at 162–63.)  The Court denied Defendants' motion to dismiss Plaintiffs' claims based on the 2016 Application for lack of subject-matter jurisdiction and denied Defendants' motion with respect to Plaintiffs' facial First Amendment challenges to the Challenged Ordinances, as well as Plaintiffs' *Monell* claim premised on the surviving claims.  (*Id.* at 162–63.)

Accordingly, after the January 2021 Decision, the following claims remained outstanding:[14] (1) Plaintiffs' facial and as-applied First Amendment challenges to the Challenged Ordinances arising out of the 2016 Application; (2) Plaintiffs' Fifth Amendment regulatory takings claim arising out of the 2016 Application; (3) all of Plaintiffs' claims under the New York State Constitution;[15] and (4) Plaintiffs' municipal liability claims.  (*See generally* Jan. 2021 Decision; SAC.)

---

[14]  Because Defendants moved only as to certain of Plaintiffs' federal constitutional claims and the parties did not brief the state constitutional claims, the Court "only addresse[d] the federal constitutional claims that Defendants specifically moved to address in their briefing." (Jan. 2021 Decision 4 n.6.)

[15]  In the SAC, Plaintiffs bring facial and as-applied free speech challenges to the BZO Special Use Provision and the BZO Temporal Limit Provision under Article 1 § 8 of the New York State Constitution, a vagueness challenge to the Window Provision under Article 1 § 6 of the New York State Constitution, as well as takings, due process, and equal protection claims under Article 1 §§ 6 and 11 of the New York State Constitution, arising out of Defendants' actions with respect to the various applications at the Wantagh and Bellmore Properties.  (SAC ¶¶ 448, 455, 465, 477, 489.)  Plaintiffs appear to cite in the SAC only to Article 1 § 6 of the New York State Constitution as the basis for their state law takings claim, (*see* SAC ¶ 465), but the Court notes that Article 1 § 7 is the New York State constitutional provision providing protection from the taking of private property without just compensation.

After engaging in discovery, on October 6, 2023, the parties cross-moved for summary judgment.  (Pls.' Mot.; Defs.' Mot.)  Plaintiffs seek summary judgment on their facial and as-applied First Amendment challenges to the Special Use Provision and the Temporal Limit Provision.  (Pls.' Mem.)  Defendants seek summary judgment on certain of Plaintiffs' remaining claims:[16] (1) the facial and as-applied First Amendment challenges to the Challenged Ordinances; (2) the Fifth Amendment regulatory taking claim; (3) the free speech, takings, due process, and equal protection challenges to the Challenged Ordinances under the New York State Constitution; and (4) the municipal liability claims.  (Defs.' Mem.).  In addition, Defendants Murray, Rottkamp, Weiss, Marino, D'Amato, Ragano, Mistero, Pellegrini, Perry, Santino, Hudes, and Fisher (the "Individual Defendants") assert several defenses to all claims brought against them.  (Defs.' Mem. 17–22, 28–30.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).  The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir.

---

[16] Defendants' motion purports to seek summary judgment as to "the remaining [c]auses of [a]ction within Plaintiffs' [SAC] in their entirety."  (Defs.' Mot. 2.)  However, Defendants do not address Plaintiffs' state law claims pertaining to the Bellmore Property or Plaintiffs' state law vagueness claim pertaining to the Window Provision, and therefore the Court does not address those claims.

2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  The role of the court "is not

to resolve disputed questions of fact but only to determine whether, as to any material issue, a

genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021)

(quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).  A genuine issue of fact

exists when there is sufficient "evidence on which the jury could reasonably find for the

[nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The "mere

existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.*  The

court's function is to decide whether, "after resolving all ambiguities and drawing all inferences

in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v.

N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing

*Anderson*, 477 U.S. at 248; and then citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127,

129 (2d Cir. 2013)).

### b.  First Amendment claims

Plaintiffs argue that they are entitled to summary judgment on their First Amendment

claims that the Special Use Provision, BZO § 272(C)(6), is (1) a content-based prior restraint on

free speech both facially and as applied to Plaintiffs, and (2) unconstitutionally overbroad on its

face.  (Pls.' Mem. 12–20.)

Defendants argue that they are entitled to summary judgment on Plaintiffs' facial and as-

applied First Amendment and overbreadth claims because the Challenged Ordinances[17] are

---

[17]  Defendants argue they are entitled to summary judgment on Plaintiffs' First
Amendment claim as to the Temporal Limit Provision.  (Defs.' Mem. 5–6.)  Plaintiffs note that
the Temporal Limit Provision also "necessarily implicate[s] the First Amendment," (Pls.' Mem.
14), but focus their prior restraint arguments on the Cabaret Provision, (*id.* at 14–27).  The Court
therefore understands Plaintiffs' Temporal Limit Provision challenge to be a challenge for
vagueness, as it did in the January 2021 Decision.  (Jan. 2021 Decision 154–57.)  The Court

"facially neutral and generally applicable to all types of businesses for the purpose of protecting public health and safety."  (Defs.' Mem. 1.)

### i.   The Special Use Provision is content-neutral

Plaintiffs argue that the Special Use Provision, BZO § 272(C)(6), is content-based because it establishes a close enough nexus to expression to pose a "real and substantial threat" of identified censorship risks.  (Pls.' Mem. 15.)

Defendants argue that the Special Use Provision is content-neutral because the language of the ordinance is neutral and it is "generally and rationally aimed at *all* businesses to mitigate threats to health and safety . . . [and] to ensure the well[-]being of the community."  (Defs.' Mem. 2.)

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see also Brokamp v. James*, 66 F.4th 374, 395 (2d Cir. 2023) (same).  The determination of whether a regulation is content-based therefore "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."  *Reed*, 576 U.S. at 163.  Facially content-based regulations of speech include those that are (1) "obvious, defining regulated speech by particular subject matter," and (2) "more subtle, defining regulated speech by its function or purpose."  *Id.* at 163–64.  In addition, regulations that are facially content-neutral, but "cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message [the speech] conveys" are considered "content-based regulations of speech."

---

therefore addresses Plaintiffs' challenge to the Temporal Limit Provision separately.  (*See infra* section II.c.)

*Id.* (internal quotation marks and citation omitted) (alteration in original).  The Supreme Court has concluded that certain zoning regulations, such as those directed to adult theaters, are content-neutral time, place, and manner restrictions where they "do[] not ban [the type of business] altogether, but merely provide[]" for limitations on the businesses' location and proximity to other types of buildings such as family dwellings, churches, and schools.  *See, e.g.*, *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46 (1986).

The Special Use Provision is a content-neutral time, place, and manner ordinance. Although the Special Use Provision, BZO § 272(C)(6), indicates that cabaret licenses will be limited to the type of use applied for and approved by the Board, it does not, on its face, "license 'views it finds acceptable,' while refusing to license 'less favored or more controversial views,'" nor does it facially "condemn 'certain ideas or viewpoints.'"  *Brokamp*, 66 F.4th at 393 (first quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 96 (1972); and then quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992)).  Rather, it "applies — regardless of what is said — only to speech having a particular purpose, focus, and circumstance," *i.e.*, speech consisting of the types of live entertainment defined in Town Code § 96-1 in the context of a cabaret permit.  *Id.*

### ii.   The Cabaret Provision is an unconstitutional prior restraint

Plaintiffs argue that the Cabaret Provision imposes an unconstitutional prior restraint because it allows for too much discretion in the Board's decision-making as to whether to issue a permit.  (Pls.' Mem. 14–15.)  In addition, Plaintiffs argue that they raised a facial prior restraint claim in the SAC, and note that Defendants did not raise a challenge to that claim in their motion to dismiss.  (Pls.' Opp'n 8–9.)

Defendants argue that the Special Use Provision, BZO § 272(C)(6),[18] is not an unconstitutional prior restraint because the ordinance is "facially neutral and generally applicable" to all businesses, not just cabarets. (Defs.' Mem. 4.)  Defendants also argue that there is no evidence of intent by the Board to restrict expression in drafting the subject ordinances. (*Id.* at 5.)  Finally, Defendants argue that Plaintiffs have not established a facial prior restraint challenge and did not allege one in the SAC.[19]  (*Id.*)

"A regulation may constitute a prior restraint even if it is not content-based."  *Beal v. Stern*, 184 F.3d 117, 124 (2d Cir. 1999).  "A 'prior restraint' on speech is a law, regulation or judicial order that suppresses speech — or provides for its suppression at the discretion of government officials — on the basis of the speech's content and in advance of its actual expression."  *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005); *see also Citizens United v. Schneiderman*, 882 F.3d 374, 386 (2d Cir. 2018) (same).  "While '[p]rior restraints are not unconstitutional *per se*,'" a system of prior restraint "bears a heavy presumption against its constitutional validity."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225–26 (1990) (first

---

[18]  Defendants argue that the challenged language should be read broadly as encompassing the entire public assembly Special Use Provision, but Plaintiffs challenge the Provision specifically as it applies to cabarets, arguing that the Board is improperly required to consider the type of anticipated entertainment offered at the cabaret when determining whether to grant a cabaret a special use permit.  (*See* Pls.' Reply 6 ("Plaintiffs are not seeking to invalidate the Town's entire special use permitting scheme.  Instead, the focus is on the application of the permitting scheme to cabarets.").)  The Court therefore considers only whether the Cabaret Provision is an unconstitutional prior restraint.

[19]  Defendants also argue that Plaintiffs' facial federal constitutional claims are barred under the principle of *res judicata* because the 2012 Article 78 proceeding was a hybrid proceeding during which Plaintiffs could have raised their constitutional claims.  (Defs.' Opp'n 5–6.)  The Court declines to revisit its determination in the January 2021 Decision that Plaintiffs are not barred by the doctrines of claim or issue preclusion from bringing their federal claims.  (Jan. 2021 Decision 94–104.)  Moreover, for the reasons stated *infra* in section II.g.iii, the 2012 Article 78 proceeding was not a hybrid proceeding and therefore does not bar Plaintiffs' federal or state claims.

alteration in original).  There are "two traditional types of prior restraint: (1) preventing the
printed publication of disfavored information, and (2) a facially-neutral law that sets up an
administrative apparatus with the power and discretion to weed out disfavored expression before
it occurs." *Schneiderman*, 882 F.3d at 386–87 (citations omitted).  "[T]he presumption against
prior restraint is best reserved for situations that closely resemble these two clear cases." *Id.* at
387.  The first type of prior restraint is content-based, and the second is content-neutral.
*Schneiderman*, 882 F.3d at 387; *see also 689 Eatery Corp v. City of New York*, --- F. Supp.
3d ---, 2024 WL 519967, at *65 (S.D.N.Y. Feb. 9, 2024) (noting the same two types of prior
restraint and that "[t]he first type of prior restraint is content based, while the second is not.").

Thus, "even content-neutral time, place, and manner restrictions can be applied in such a
manner as to stifle free expression." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002).
"Where the licensing official enjoys unduly broad discretion in determining whether to grant or
deny a permit, there is a risk that he will favor or disfavor speech based on its content," and
therefore time, place, and manner regulations must (1) "contain adequate standards to guide the
official's decision and render it subject to effective judicial review," (2) "not be based on the
content of the message," (3) "be narrowly tailored to serve a significant governmental interest,"
and (4) "leave open ample alternatives for communication." *Id.* at 323 & n.3 (quoting *Forsyth
County v. Nationalist Movement*, 505 U.S. 123, 131 (1992)); *see also Lusk v. Village of Cold
Spring*, 475 F.3d 480 (2d Cir. 2007) ("Generally, 'time, place, and manner restrictions are
permitted so long as they . . . are "content neutral," "narrowly tailored to serve a significant
governmental interest, . . . leave open ample alternatives for communication," and . . . do "not
delegate overly broad licensing discretion" to government officials.'" (quoting *Beal*, 184 F.3d at
124)); *"Q"-Lungian Enterprises, Inc. v. Town of Windsor Locks*, 272 F. Supp. 3d 289, 300 (D.

Conn. 2017) (noting that the *Thomas* test for time, place, and manner regulations requires "that an ordinance (1) must contain adequate standards to guide the official's decision, (2) must not be based on the content of the message, (3) must be narrowly tailored to serve a significant government interest, and (4) must leave open ample alternatives for communication" (quoting *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 623 (6th Cir. 2009))).  Thus, "[f]acially content-neutral laws that require permits or licenses of individuals or entities engaged in certain forms of expression only constitute prior restraints when they (1) disallow that expression unless it has previous permission from a government official and (2) vest that official with enough discretion that it could be abused."  *Schneiderman*, 882 F.3d at 387 (footnote omitted).

Where the governing body contends that the regulation is actually enforced with less discretion than it provides for on its face, "[t]he doctrine requires that the limits the [government] claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice."  *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 769 (1988) (first citing *Poulos v. New Hampshire*, 345 U.S. 395 (1953); and then citing *Kunz v. New York*, 340 U.S. 290 (1951)); *see also Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 176 (2d Cir. 2006) ("[W]e are permitted — indeed, required — to consider the well-established practice of the authority enforcing the ordinance." (quoting *MacDonald v. Safir*, 206 F.3d 183, 191 (2d Cir. 2000))); *689 Eatery*, 2024 WL 519967, at *61 (same); *Liu v. N.Y.C. Campaign Fin. Bd.*, No. 14-CV-1687, 2015 WL 1514904, at *14 (S.D.N.Y. Mar. 31, 2015) (same); *500 North Ave. LLC v. City of Bridgeport*, No. 10-CV-1281, 2012 WL 1067649, at *11 (D. Conn. Mar. 30, 2012) (same).

The text of the Cabaret Provision provides the Board too much discretion, and Defendants have not established that there is a well-established practice of applying the provision without discretion.

### 1.   Text of the regulation

On the record before the Court, the standards used to determine whether a special use permit may be issued to cabarets vests the Board with an unconstitutional amount of discretion. Section 267(D)(3) states that the Board "shall, in authorizing such permissive uses, impose such conditions and safeguards as it may deem appropriate, necessary or desirable to preserve and protect the spirit and objectives of this ordinance."  BZO § 267(D)(3).  Similar provisions providing for the imposition of "such other terms and conditions deemed necessary and reasonable by" the governing body have been determined by the Supreme Court and other courts to "contain no explicit limits on [the governing body's] discretion."  *City of Lakewood*, 486 U.S. at 769; *see also, e.g.*, *500 North Ave.*, 2012 WL 1067649, at *11 (concluding that a provision stating that the governing body "may impose such additional conditions on the proposed development, as [it] deems necessary to conform to the requirements of" the permitting scheme "appear[ed] to permit the [governing body] to exercise unbridled discretion in imposing additional conditions and requirements for the approval of" the relevant permits).

The other sections of the Special Use Provision also indicate the Board has too much discretion to determine whether to grant a special use permit to cabarets.  Section 267(D)(2)(a) states that whenever a use is "permitted only if the Board of Appeals shall approve thereof," the Board shall make several determinations, including for example that "[t]he use will not prevent the orderly and reasonable use of adjacent properties"; "[t]he safety, the health, the welfare, the comfort, the convenience or the order of the Town will not be adversely affected by the proposed

use and its location"; and "[t]he use will be in harmony with and promote the general purposes and intent of this ordinance."  BZO § 267(D)(2).  These requirements are similar to those that the Supreme Court and other courts have found to be too indefinite to limit a board's discretion. *See, e.g.*, *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969) (concluding that an ordinance that relied upon the city commission's determinations of "public welfare, peace, safety, health, decency, good order, morals or convenience" allowed for "unbridled and absolute power" by the commission); *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) (noting that requirements that town officials "withhold permits on the basis of their views as to health, safety, welfare, comfort, convenience, and order" are "broad standards of the type that have been held insufficient to pass First Amendment muster"); *500 North Ave.*, 2012 WL 1067649, at *11 (concluding that requirements that the governing commission find that a use is "compatible with" the overall ordinance, "promotes the public health, safety, and general welfare," and "promotes the economic well being" of the town or city may provide for too much discretion); *B&V Greene Inc. v. City of Albany*, No. 99-CV-921, 2000 WL 1876426, at *4–5 (N.D.N.Y. Dec. 18, 2000) (concluding that standards including whether the use will have "an undue adverse effect upon adjacent property, the character of the neighborhood, traffic conditions, parking, utility facilities or other matters affecting the public health, safety, welfare or convenience" contained "ambiguous and indefinite requirements" that were "riddled with vague and essentially subjective requirements that fail[ed] to adequately advise applicants whether, and under what circumstances, they can engage in their constitutionally protected activities"); *T & A's, Inc. v. Town Bd. of Ramapo*, 109 F. Supp. 2d 161, 172 (S.D.N.Y. 2000) (collecting cases and concluding that requirements that members of the town's planning board "deny permits on the basis of their views as to health, safety, comfort and convenience and any

other additional standards, conditions and requirements, including a limitation on hours of operation, as it may deem necessary or appropriate to promote the public health, safety and welfare and to otherwise implement the intent of" the ordinance "offer[ed] no meaningful guidance" to the planning board).

In addition, the Temporal Limit Provision, BZO § 267(D)(3), which allows the Board to approve a permit for a temporary period of time, also demonstrates that the Challenged Ordinances allow for significant discretion.  The Temporal Limit Provision provides that, "[w]here the Board of Appeals deems it appropriate under all of the circumstances of a case, it may impose a condition of a grant which shall make the grant temporary in nature, for a duration of time to be fixed by the Board, subject to renewals as the Board may deem appropriate," BZO § 267(D)(3), and the Supreme Court has found that "a multiple or periodic licensing requirement is sufficiently threatening to invite judicial concern," *City of Lakewood*, 486 U.S. at 759–60.[20]

Finally, the language of the Cabaret Provision, the portion of the Special Use Provision that requires that any special use permit issued by the Board for a cabaret "shall be limited to the specific cabaret use applied for and approved by the Board . . . and no other cabaret use," itself also supports this conclusion.  BZO § 272(C)(6).  The ordinance does not lay out any additional standards the Board must consider or comply with in determining what "specific cabaret use,"

---

[20]  The Court notes that the Temporal Limit Provision does state that "[a]ny renewals shall be granted only if the Board shall find that the grant has not had an unreasonably deleterious effect on surrounding area character and property values, and/or the use and enjoyment of neighboring properties, during the temporary period."  BZO § 267(D)(3).  Without further explanation of the standards for determining an "unreasonably deleterious effect on surrounding area character," for example, this provision nevertheless gives the Board significant discretion in determining whether a special use permit will be renewed.  *See, e.g.*, *Field Day*, 463 F.3d at 178 ("[A] municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak . . . according to their own opinions regarding the potential effect of the activity in question on the 'welfare,' 'decency,' or 'morals' of the community." (quoting *Shuttlesworth*, 394 U.S. at 153)).

*id.*, it will approve, providing an opportunity for the Board to "judge[] [applications for cabaret use] on the basis of their content," *Lusk*, 475 F.3d at 495; *cf. Thomas*, 534 U.S. at 322–23 ("A licensing standard which gives an official authority to censor the content of a speech differs *toto coelo* from one limited by its terms, or by nondiscriminatory practice, to considerations of public safety and the like." (quoting *Niemotko v. Maryland*, 340 U.S. 268, 282 (1951) (Frankfurter, J., concurring in result))); *Ward v. Rock Against Racism*, 491 U.S. 781, 793–94 (1989) ("Our cases permitting facial challenges to regulations that allegedly grant officials unconstrained authority to regulate speech have generally involved licensing schemes that 'ves[t] unbridled discretion in a government official over whether to permit or deny expressive activity.'" (quoting *City of Lakewood*, 486 U.S. at 767); *Lusk*, 475 F.3d at 495 (concluding that an ordinance laying out requirements for permitting signage based on aesthetic standards and historical fidelity was sufficiently definite, but noting that if the board in question had been "permitted to decide whether a sign *including its message* me[t] the [ordinance's] criteria," then the ordinance would have been "too imprecise to be a meaningful restraint on the exercise of the judgment of the Board's members" because "[w]hile the ordinance may be content neutral on its face, signs erected or to be erected could be judged on the basis of their content — whether Village officials agree[d] or disagree[d] with the point of view that is expressed" (emphasis in original)).

## 2.   Well-established practice

In addition to the text of the regulation, the Court is also required to consider the Board's "well-established practices" for implementing the regulation in determining whether the Cabaret Provision provides the Board too much discretion.  *City of Lakewood*, 486 U.S. at 770 ("The doctrine requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice."); *see*

*also Field Day*, 463 F.3d at 176 ("[W]e are permitted — indeed, required — to consider the

well-established practice of the authority enforcing the ordinance." (quoting *MacDonald*, 206

F.3d at 191)).

      Plaintiffs argue that the Cabaret Provision, even at its inception, has been used to silence

expression, and point specifically to the closure of a club based on allegations that the club

owner was issued a restaurant permit, but was actually operating as a cabaret.  (Pls.' Mem. 19.)

Plaintiffs also point to Board decisions denying applications for special use permits for cabaret

use, as well as decisions limiting the types of entertainment allowed.  (*See, e.g.*, Board Permit

Decisions 13, 23, 25, 28, annexed to Aff. of Robert Bogle ("Bogle Aff.") as Ex. A-1, Docket

Entry No. 291-2; Board Permit Decisions Imposing Conditions 1, annexed to Decl. of Erica

Dubno ("Dubno Decl.") as Ex. 17, Docket Entry No. 286-17 (granting a cabaret license with

several restrictions, including prohibitions on full or partial nudity and "see through" clothing for

employees, limitation of "[e]ntertainment" to "a two (2) piece acoustic guitar act and/or disc

jockey"); *id.* at 9 (limiting the type of music allowed by excluding "heavy metal" music).)

      Defendants argue that the Cabaret Provision does not "require Board approval before

'musical entertainment, singing, dancing . . . or other forms of amusement' may be permitted at a

cabaret."  (Defs.' Reply 6 (emphasis omitted) (quoting Pls.' Mem. 1).)  Defendants also submit

"a certified collection of various decisions of the BZA with respect to applications for special use

permits . . . and hearing transcripts demonstrating multiple examples of approvals and denials

without any focus or conditions on forms of protected expression."  (Defs.' Opp'n 25; Board

Permit Transcripts, annexed to Bogle Aff. as Exs. A-2–A-10, Docket Entry Nos. 291-3–291-11.)

The hearing transcripts, however, rather than showing a well-established practice of

nondiscretionary enforcement, indicate that the Board, at a minimum, considers the type of

entertainment to be offered before granting cabaret permits.  (*See, e.g.*, Board Permit Transcripts, Ex. A-2 at 35–36 (questioning applicant as to what type of instruments constituted the musical duo played at the applicant's establishment and the general type of music played by the duo); *id.* at 41 (questioning applicant as to whether there would be "any entertainment whatsoever" and specifically "any singers" or "go-go girls or that kind of stuff"); Ex. A-6 at 13154–55 (suggesting, without prompting from the applicant, including a provision to the applicant's permit that would exclude "naked Irish dancers" from the entertainment provided, and when the applicant stated he was comfortable with limiting the permit to live music only, asking if the applicant would want to "restrict [the music] to Irish music"); Ex. A-8 at 256–60 (considering the applicant's request that in addition to a juke box and disk jockey, his establishment be allowed to provide "live characters" for family and children, and questioning what other type of entertainment he would seek to provide under his updated permit, such as "a comedian" or "a little karaoke," with an interested community member noting that the "caution was to not have an undesirable style of entertainment"); Ex. A-9 at 134 (questioning whether the music would be limited to a disc jockey or also include live music); *id.* at 140 (questioning whether there would be dancing).)  Defendants have therefore failed to show that there is a well-established pattern of enforcement limiting the Board's discretion in issuing cabaret permits based on the type of entertainment offered.  Because any limitations Defendants argue exist as to the Board's discretion are not "made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice," *City of Lakewood*, 486 U.S. at 770, the Court finds that the Cabaret Provision of the Town's permitting scheme is unconstitutional on its face.  The Court therefore grants summary judgment to Plaintiffs as to their claim that the Cabaret

Provision is facially unconstitutional.[21]

### iii.   The Cabaret Provision is overbroad on its face

The Cabaret Provision is also unconstitutionally overbroad.  Plaintiffs argue that the Court should grant summary judgment on their overbreadth claim because the Cabaret Provision implicates a substantial amount of protected expression and cannot be narrowly construed to avoid the constitutional question.[22]  (Pls.' Mem. 16–22; Pls.' Reply 6.)

Defendants argue that the Court should grant summary judgment to Defendants on Plaintiffs' overbreadth claim because the Special Use Provision does not implicate protected expression or give the Board the authority to restrict the type of entertainment offered at a permitted cabaret.  (Defs.' Reply 3–6.)  Defendants also argue that to the extent restrictions are

---

[21] Because the Court concludes that the Cabaret Provision is unconstitutional on its face, it does not reach Plaintiffs' claims that it is unconstitutional as applied to them.  Defendants correctly note that "[t]he Supreme Court has 'strong[ly] admon[ished] that a court should adjudicate the merits of an as-applied challenge before reaching a facial challenge to the same statute.'"  *Kane v. De Blasio*, 19 F.4th 152, 174 (2d Cir. 2021) (quoting *Commodity Trend Serv. v. CFTC*, 149 F.3d 679, 683 (7th Cir. 1998)).  In cases where the regulation at issue is a licensing regulation placing "unbridled discretion in the hands of a government official or agency," however, "without standards to fetter the licensor's discretion, the difficulties of proof and the case-by-case nature of 'as applied' challenges render the licensor's action in large measure effectively unreviewable."  *City of Lakewood*, 486 U.S. at 757–59; *see also Child. First Found., Inc. v. Fiala*, 790 F.3d 328, 342–43 (2d Cir. 2015) (construing the plaintiff's First Amendment challenge as an unbridled discretion facial prior restraint challenge and noting that the "risks to free expression" that the prior restraint unbridled discretion doctrine is "designed to prevent 'can be effectively alleviated only through a facial challenge'" and that "'only a facial challenge can effectively test' for the standards required to limit the administrator's discretion" (quoting *City of Lakewood*, 486 U.S. at 757–58)), *withdrawn and superseded on rehr'g on other grounds by* 611 F. App'x 741 (2d Cir. 2015).

[22] Plaintiffs in their opening brief appeared to argue that the full Special Use Provision was unconstitutional but clarify in their Reply that they are challenging only the Cabaret Provision.  (*See* Pls.' Reply 6 ("Plaintiffs are not seeking to invalidate the Town's entire special use permitting scheme.  Instead, the focus is on [the] application of the permitting scheme to cabarets.").)

applied, they are subject to as-applied challenges and do not properly raise a facial overbreadth challenge.  (*Id.* at 3–4.)

"A law is unconstitutionally overbroad if it punishes a substantial amount of protected free speech, judged in relation to its plainly legitimate sweep." *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 127 n.8 (2d Cir. 2014) (quoting *United States v. Farhane*, 634 F.3d 127, 136 (2d Cir. 2011)); *United States v. Thompson*, 896 F.3d 155, 163 (2d Cir. 2018) ("[T]o be struck as overbroad, the statute must be overbroad 'not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.'" (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008))), *cert. denied*, 139 S. Ct. 2715 (2019); *Adams v. Zelotes*, 606 F.3d 34, 38 (2d Cir. 2010); *see also Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984) ("There are two quite different ways in which a statute may be considered invalid 'on its face' — either because it is unconstitutional in every conceivable application, or because it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad.'"); *Sorrell*, 758 F.3d at 127 (describing the two "different ways in which a statute may be considered invalid 'on its face'" (quoting *Taxpayers for Vincent*, 466 U.S. at 796)).  The Supreme Court has described an overbreadth challenge as "limited" and has noted that its force weakens as the regulated behavior at issue "moves from 'pure speech' toward conduct and that conduct — even if expressive — falls within the scope of otherwise valid criminal laws." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973); *Farhane*, 634 F.3d at 136–37 (noting that "invalidat[ing] *all* enforcement of a challenged law . . . is 'strong medicine'" (quoting *Williams*, 553 U.S. at 292)); *see also Gospel Missions of Am. v. City of Los Angeles*, 419 F.3d 1042, 1050 (9th Cir. 2005) ("[T]he overbreadth doctrine's concern with 'chilling' protected speech attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech'

toward conduct." (alteration in original) (quoting *Virginia v. Hicks*, 539 U.S. 113, 124 (2003)));
*United States v. Richards*, No. 13-CR-818, 2014 WL 3765712, at *3 (S.D.N.Y. July 29, 2014)
(quoting *Broadrick*, 413 U.S. at 615).

"[T]he first step in overbreadth analysis is to construe the challenged statute; it is
impossible to determine whether a statute reaches too far without first knowing what the statute
covers." *United States v. Stevens*, 559 U.S. 460, 474 (2010) (quoting *Williams*, 553 U.S. at 293);
*see also United States v. Hansen*, 599 U.S. 762, 770 (2023) ("To judge whether a statute is
overbroad, we must first determine what it covers.").  The second step is to determine whether
the statute, as construed by the court, "prohibits a substantial amount of protected speech."
*Williams*, 553 U.S. at 292; *see also Adams*, 606 F.3d at 38 (noting that determining whether the
statute as construed "reach[es] 'a substantial amount of protected expressive activity'" is the
"second step in an overbreadth analysis" (quoting *Williams*, 553 U.S. at 297)).  "[I]n considering
facial challenges we must 'vigorously enforce[] the requirement that a statute's overbreadth be
*substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate
sweep.'" *Adams*, 606 F.3d at 38 (quoting *Williams*, 553 U.S. at 292).  The Court addresses each
step of the analysis below.

### 1.   Construction of the Cabaret Provision

Plaintiffs argue that the language of the broad Cabaret Provision, in conjunction with the
regulations' definition of cabaret, "directly implicates places of amusement and public assembly
for unlimited purposes."  (Pls.' Mem. 17.)  In particular, Plaintiffs argue that musical
entertainment, including singing and dancing, is implicated, and that the phrase "other form of
amusement or entertainment" in the definition of cabaret is broad and provides little guidance as
to what type of amusement may be implicated.  (*Id.*)

Defendants do not attempt to construe the relevant language of the Cabaret Provision, but instead argue that the Challenged Ordinances are "facially neutral and generally applicable to all types of businesses for the purpose of protecting public health and safety," and seemingly urge the Court to construe the entire permitting scheme "as a whole, and not piecemeal."  (Defs.' Mem. 1, 3; Defs.' Opp'n 7–10, 20–21.)  Defendants thus assert generally that the proper reading of the permitting scheme as a whole is that it "regulate[s] the location of various forms of conduct, not speech."  (Defs.' Mem. 3 (quoting *Hulinsky v. County of Westchester*, No. 22-CV-6950, 2023 WL 3052267, at *3 (S.D.N.Y. Apr. 24, 2023)).)  Defendants argue, however, that if the Court considers solely the Cabaret Provision, it does not give the Board the authority to "restrict the number and types of musical instruments at a cabaret . . . [and] limit performers on a stage," but rather merely regulates the location of certain types of businesses within certain zoning districts.  (Defs.' Reply 3–4 (quoting Pls.' Mem. 2).)  Defendants therefore contend that "if the Board has, at times, granted special use permits with such restrictions, such is not because of the requirements of the ordinance" but rather "is typically on consent, and, if not, . . . are subject as a matter of law to 'as-applied' challenges by those property owners."  (*Id.* at 4.)

In construing whether First Amendment protected activity is covered by the BZO, "[t]he language of the [l]aw itself is . . . the proper starting point."  *Muchmore's Cafe, LLC v. City of New York*, No. 14-CV-5668, 2016 WL 11469539, at *8 (E.D.N.Y. Sept. 29, 2016); *see also New York v. Mountain Tobacco Co.*, 942 F.3d 536, 546 (2d Cir. 2019) ("The plain meaning [of a statute] is best discerned by 'looking to the statutory scheme as a whole and placing the particular provision within the context of that statute.'" (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003))); *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 155 (2d Cir. 2013) (stating that statutory analysis begins with a "review [of] the statutory text,

considering . . . the placement and purpose of [the] words in the statutory scheme" (quoting *United States v. Aguilar*, 585 F.3d 652, 657 (2d Cir. 2009))), *cert. dismissed*, 569 U.S. 1040 (2013).[23]

Courts have contemplated cabaret laws with similar language to the Cabaret Provision and found that the law in question implicates protected expression in the form of dance, musical performance, and other forms of entertainment.  (Jan. 2021 Decision 147.)  For example, New York City's recently repealed cabaret law contained similar provisions to the Cabaret Provision and required licenses for "any person to conduct, maintain or operate, or engage in the business of conducting, maintaining or operating, a public dance hall, cabaret or catering establishment." *Muchmore's Cafe, LLC*, 2016 WL 11469539, at *1 (quoting N.Y.C. Admin. Code § 20-360 (repealed 2018)).  Under that law, "cabaret" was defined as

> [a]ny room, place or space in the city in which any musical entertainment, singing, dancing or other form of amusement is permitted in connection with the restaurant business or the business of directly or indirectly selling to the public food or drink, except eating or drinking places, which provide incidental musical entertainment, without dancing, either by mechanical devices, or by not more than three persons.

*Id.* (quoting N.Y.C. Admin. Code § 20-359).

Courts construing the New York City statute "have clearly found that the statute covers dance and other forms of entertainment and amusement that implicate protected expression."  *Id.* at *10; *see also Merco Props., Inc. v. Guggenheimer*, 395 F. Supp. 1322, 1328 (S.D.N.Y. 1975) (addressing a constitutional challenge to the New York City cabaret law and finding that it "implicates [F]irst [A]mendment rights to the extent that musical entertainment, singing, and

---

[23]  The Court notes that neither Plaintiffs nor Defendants have pointed to any decisions of other courts that have examined the Cabaret Provision in an effort to determine its scope and sweep, and the Court is not aware of any.

dancing are considered communicative forms of expression"); *People v. Caroline's for Comedy, Inc.*, 535 N.Y.S.2d 904, 906 (Crim. Ct. 1988) (finding that the "defendant's assertion that [stand-up] comedy cannot fit within the definition of a cabaret because it is not amusement similar to singing or dancing is clearly specious" and rejecting the defendant's argument that stand-up comedy should be excluded from the definition of "similar amusement" because the term was overbroad and should not be construed to include a form of protected speech); *Club Winks v. City of New York*, 417 N.Y.S.2d 178, 179–81 (Sup. Ct. 1979) (considering cases of plaintiff lessees and operators of establishments "offering live dance entertainment as well as food and drink" who were served summonses by inspectors of the New York City Department of Consumer Affairs for operating unlicensed cabarets and finding that "live dance entertainment . . . clearly is included within the protective umbrella of the First Amendment"); *Chiasson v. N.Y.C. Dep't of Consumer Affs.* (*Chiasson I*), 505 N.Y.S.2d 499, 504 (Sup. Ct. 1986) (holding that New York City's cabaret law's prohibition on percussion, wind, and brass instruments being used to play incidental music in unlicensed clubs "implicates First Amendment rights to the extent that musical entertainment, singing and dancing are considered communicative forms of expression").

Similar to the New York cabaret law, the Town requires a special use permit for all types of performance and expressive activity occurring in cabarets, including "musical entertainment, singing, dancing in a designated area or other form of amusement or entertainment." Town Code § 96-1(A); *see also* BZO § 272(C)(6). The language of the Cabaret Provision therefore directly implicates public assembly for all sorts of purposes, including cabarets, nightclubs, civic engagement, and recreation. *See* BZO § 272(C)(6); Town Code § 96-1(A) (defining place of public assembly). In addition, dancing, singing, and other forms of musical entertainment are

implicated because the provision states that it applies to cabarets, *see* BZO § 272(C)(6) ("For purposes of this section, the term 'cabaret' shall be the same as defined in Chapter 96 of the [Town Code].", and the language in the provision of the Town Code defining "cabaret" is broad, describing the forms of amusement as "musical entertainment, singing, dancing in a designated area or other form of amusement or entertainment," Town Code § 96-1(A); *see also, e.g.*, *Metropolis of Conn. LLC v. Fleming*, No. 01-CV-670, 2002 WL 1359688, at *4 (D. Conn. June 18, 2002) (considering an ordinance stating that "[e]ntertainers shall perform only in fixed locations approved by the" local regulator, and concluding that because the ordinance "ma[de] no distinction with regard to the kind of entertainment that is being performed," the ordinance's requirement of prior approval "before . . . entertainment may take place implicate[d] a broad range of First Amendment activity"). The Cabaret Provision generally describes "cabaret use" to define the parameters of the conduct prohibited without a license. BZO § 272(C)(6).[24] Musical entertainment plainly suggests the performance of music, and singing seems to suggest singing as a performance. The term "other form of amusement or entertainment" is similarly broad and provides little guidance since "nearly anything could be considered amusing to someone." *Muchmore's Cafe, LLC*, 2016 WL 11469539, at *9 (construing a similar cabaret licensing provision); *see also People v. Walter*, 431 N.Y.S.2d 776, 778 (Crim. Ct. 1980) (finding that the phrase "any musical entertainment[,] singing, dancing or other form of amusement" in a similar

---

[24] The ordinance does not distinguish between performative conduct by performers or participatory conduct by patrons, but other provisions of the Town Code seem to classify venues with participatory conduct by patrons differently. *See, e.g.*, Town Code § 96-1(A) (defining a dance hall as "[a]ny room, place or space in which dancing is carried on and to which the public may gain admission").

cabaret law "may include activities such as the playing of backgammon, chess or any electronic game").

Accordingly, the Cabaret Provision also implicates protected expression in the form of dance, musical performance, and other forms of entertainment.  The Court next determines whether the ordinance can be construed such that the constitutional question may be avoided. *Sorrell*, 221 F.3d at 386 ("The question, then, is whether a narrowing construction can be applied to either set of provisions to rescue it from facial invalidity on . . . First Amendment grounds[.]").

### 2.   The Cabaret Provision cannot be construed to avoid the constitutional question

Plaintiffs argue that the Cabaret Provision cannot be construed to avoid the constitutional question because the provision "covers all singing, dancing, and musical entertainment," and therefore the permitting scheme is "inextricably intertwined with constitutionally protected expression."  (Pls.' Mem. 20.)

Defendants make no argument as to whether there is a narrowing construction of the Cabaret Provision that would allow the Court to avoid the constitutional question, outside of the conclusory assertion that the ordinance does not give the Board the authority to restrict special use permits based on, for example, the number and types of musical instruments or performers allowed at a specific cabaret.  (*See, e.g.*, Defs.' Mem. 3; Defs.' Opp'n 20–21.)

"For a federal court to adopt such a narrowing construction of a state statute, 'the statute must be "readily susceptible" to the limitation; we [may] not rewrite a state law to conform it to constitutional requirements.'"  *Sorrell*, 221 F.3d at 386 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 386 (1988)) (alteration in original); *see also Hansen*, 599 U.S. at 781 (noting that "the canon of constitutional avoidance" requires a court to adopt a narrowing construction as long as it "is at least 'fairly possible,'" even if it is not the "best" interpretation of

the statute); *Jones v. Stanford*, 489 F. Supp. 3d 140, 153 (E.D.N.Y. 2020) ("[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction[.]" (alterations in original) (quoting *Erznozik v. City of Jacksonville*, 422 U.S. 205, 216 (1975))).

The Cabaret Provision requires a permit for all "[p]laces of amusement or public assembly." BZO § 272(C)(6). It explicitly states that "the grant of any cabaret use by the [Board] shall be limited to the specific cabaret use applied for and approved by the [Board] and no other cabaret use." *Id.* Defendants assert only that the ordinance does not provide the Board the authority to restrict permits based on the type of performance offered at a cabaret, but offer no alternative reading of the Provision that would support that conclusion. (*See, e.g.*, Defs.' Mem. 3; Defs.' Opp'n 20–21.) The limitation that any grant of cabaret use "shall be limited to the specific cabaret use applied for and approved by" the Board, BZO § 272(C)(6), combined with the specification that a cabaret is an establishment "wherein musical entertainment, singing, dancing in a designated area or other form of amusement or entertainment is permitted," Town Code § 96-1(A), indicates that the "specific cabaret use" referred to is the type of live entertainment provided. There is therefore no construction of the Provision that would avoid its implication of protected expression specified in the definition of "cabaret," and therefore it cannot be read to avoid the constitutional question.

Because the Cabaret Provision cannot be narrowed to avoid the constitutional question, the Court must determine whether the provision substantially burdens protected speech.[25]

---

[25] Defendants and Plaintiffs dispute which level of scrutiny should be applied to determine the constitutionality of the Cabaret Provision. Defendants argue that because the Challenged Ordinances are generally applicable to multiple types of businesses that seek to locate in the town and are not based on the content or viewpoint of speech or other expressive

### 3.   The Cabaret Provision substantially burdens free speech

Plaintiffs argue that the Cabaret Provision substantially burdens protected speech because limitations on, for example, "the number of instruments or the type of expression inside a cabaret are irrelevant to external issues and quality of life concerns."  (Pls.' Mem. 21.)  Plaintiffs also argue that of the previous Board decisions raised by Defendants regarding public amusement and assembly special use permits, most of them addressed permits granted for gyms and fitness centers, not cabarets, and those addressing cabaret use were either denied or granted with restrictions.  (Pls.' Reply 8–11.)

Defendants argue that the Cabaret Provision does not substantially burden protected speech because "it does not prohibit any form of conduct that is apparently intended to convey a message."  (Defs.' Reply 4 (quoting *City of Chicago v. Morales*, 527 U.S. 41, 52–53 (1999).)

---

conduct, the ordinances are content neutral, and as such do not merit a heightened standard of review.  (Defs.' Mem. 6–11.)  Plaintiffs argue that the Challenged Ordinances are subject to heightened scrutiny.  (Pls.' Mem. 21–22.)  As discussed in the Court's January 2021 Decision, the test to determine whether the Cabaret Provision is facially invalid on overbreadth grounds is whether "it prohibits a substantial amount of protected speech."  *United States v. Williams*, 553 U.S. 285, 292–93 (2008); *see also Golb v. Attorney Gen. of the State of New York*, 870 F.3d 89, 102 (2d Cir. 2017) ("[A]n overbreadth challenge succeeds only if a statute 'prohibits a *substantial* amount of protected speech.' (quoting *Williams*, 553 U.S. at 292)); *Sibley v. Watches*, No. 19-CV-6517, 2020 WL 6721467, at *6 (W.D.N.Y. Nov. 16, 2020) (quoting the "*substantial* amount of protected speech" test in *Williams* and holding that "[a]n overbreadth challenger 'must demonstrate from the text of [the law] and from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally'" (second and third alterations in original) (quoting *United States v. Thompson*, 896 F.3d 155, 163 (2d Cir. 2018))); *D.H. v. City of New York*, 309 F. Supp. 3d 52, 73 (S.D.N.Y. 2018) ("[A] statute is facially invalid for overbreadth 'if it prohibits a substantial amount of protected speech'" (quoting *Williams*, 553 U.S. at 292)).  Therefore, the issue of whether an ordinance is a prior restraint subject to strict scrutiny or a content-neutral time, place, and manner restriction subject to a form of intermediate scrutiny is inapplicable to Plaintiffs' overbreadth claim.  *See Beal v. Stern*, 184 F.3d 117 (2d Cir. 1999) (holding that in disputes concerning licensing and permitting regulations, to determine which level of scrutiny applies, a court must determine whether the government action at issue amounts to a prior restraint on speech or if it is a content-neutral time, place, and manner restriction).

They also argue that "if the Board has, at times, granted special use permits with such restrictions, such is not because of the requirements of the ordinance" but rather are "on consent" or are more properly subject to "as-applied" challenges. (*Id.*) Finally, Defendants argue that the Town's interest in the Challenged Ordinances is whether establishments "have an adverse impact on the surrounding neighborhood and properties or present a danger to the public." (*Id.*)

"The concept of 'substantial overbreadth' is not readily reduced to an exact definition," but "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984); *see also Williams*, 553 U.S. at 303 (same). To succeed on an overbreadth challenge, "the challenging party 'must demonstrate from the text of [the law] and from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally.'" *Thompson*, 896 F.3d at 163 (quoting *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988) (alterations in original); *see also Sibley*, 501 F. Supp. 3d at 223 (same). The overbreadth must therefore "be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Golb*, 870 F.3d at 102 (emphasis omitted) (quoting *Williams*, 553 U.S. at 292); *see also Hansen*, 599 U.S. at 770 ("To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep."); *Farrell v. Burke*, 449 F.3d 470, 499 (2d Cir. 2006) ("In order to prevail on an overbreadth challenge, 'the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'" (quoting *Broadrick*, 413 U.S. at 615)).

The Cabaret Provision is overbroad. Defendants assert that the Cabaret Provision "is simply and rationally necessary to account for the nature of cabaret uses and their differing and

often changing impacts on the surrounding community, as the use or the surrounding community may change over time," (Defs.' Reply 5), and that the Challenged Ordinances are "aimed at *all* businesses to mitigate threats to health and safety," including "traffic volume [and] noise," (Defs.' Mem. 2).[26]  "The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities," however, "the zoning power is not infinite and unchallengeable; it 'must be exercised within constitutional limits.'"  *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 68 (1981) (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 514 (1977)).

The Board opinions cited by Plaintiffs include several denials of special use permits sought for cabaret use as well as grants of cabaret special use permits with limitations placed on the types of entertainment allowed.  (*See, e.g.*, Board Permit Decisions 13, 23, 25, 28; Board Permit Decisions Imposing Conditions 1 (granting a cabaret license with several restrictions, including prohibitions on full or partial nudity and "see through" clothing for employees, and limitation of "[e]ntertainment" to "a two (2) piece acoustic guitar act and/or disc jockey"); *id.* at 9 (limiting the type of music allowed by excluding "heavy metal" music).)  These examples

---

[26]  Defendants urge the Court to weigh the Cabaret Provision against the language of the entire public assembly Special Use Provision when determining whether the Cabaret Provision substantially burdens protected speech.  (*See, e.g.*, Defs.' Mem. 2 (arguing that Plaintiffs must show the Challenged Ordinances reach a substantial amount of protected speech "relative to the statute's plainly legitimate sweep in protecting public health and safety").)  However, the question of whether "a substantial number of instances exist in which the [l]aw cannot be applied constitutionally," *Thompson*, 896 F.3d at 163, does not contemplate whether the impermissible applications of a subsection of an ordinance outweigh permissible applications of the remainder of the broader regulation.  Rather, the question is whether the "presumptively impermissible applications of [a particular section] (properly construed) . . . outnumber [the] permissible ones." *United States v. Stevens*, 559 U.S. 460, 481 (2010); *see also Hansen*, 599 U.S. at 774–75 (weighing the lawful applications of particular language in 8 U.S.C. § 1324(a)(1)(A)(iv) against the same language's applications to protected speech).

contain substantially more than "a string of hypotheticals," *Hansen*, 599 U.S. at 782, and indicate that the Board may, and does, consider the type of entertainment offered when determining whether to issue a special use permit to cabarets, *cf. United States v. Schulte*, 436 F. Supp. 3d 747, 752 (S.D.N.Y. 2020) (concluding that the statute in question was not overbroad because the defendant's "hypothetical examples under his reading of the statute fail[ed] to persuade" and noting that "[a]bsent from the record is evidence showing a substantial number of prosecutions" of the type proposed under the defendant's reading of the statute). Given the types of restrictions already imposed, it is possible to envision a broad number of additional scenarios in which the provision may be applied to unconstitutionally distinguish between, and even prohibit, certain types of live entertainment at the discretion of the Board.

As a result, "the deterrent effect of this ordinance is both real and substantial." *Erznozik*, 422 U.S. at 216. Pursuant to the Cabaret Provision, parties seeking a cabaret permit must limit the type of entertainment offered to that approved by the Board, or risk either an outright denial of a cabaret permit or being subject to the Board's limitations on an issued permit. *See, e.g.*, *id.* (concluding that an ordinance prohibiting drive-in movie theaters from showing movies containing nudity when the screen is visible from a public street or place was unconstitutionally overbroad in part because "the owners and operators of these theaters are faced with an unwelcome choice: to avoid prosecution of themselves and their employees they must either restrict their movie offerings or construct adequate protective fencing which may be extremely expensive or even physically impracticable").

The Court therefore grants summary judgment to Plaintiffs as to their claim that the Cabaret Provision is overbroad.

###### iv.   Severability

Plaintiffs argue that the unconstitutional portion of the Special Use Provision can be severed from the remainder of the ordinance because (1) New York state courts have severed unconstitutional provisions from similar special use provisions of zoning ordinances and (2) the BZO contains a severability clause.  (Pls.' Reply 6–7 (citing, *inter alia*, BZO § 315).)

Defendants make no arguments as to severability.

After finding a statute unconstitutional, a court "must determine whether the invalid portions of the statute can be severed from the valid portions so the remainder of the statute can be preserved."  *Nat'l Advertising Co. v. Town of Niagara*, 942 F.2d 145, 148 (2d Cir. 1991).  "Severability is a question of state law and, in New York, turns on 'whether the Legislature would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether.'"  *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 88 (2d Cir. 2015) (quoting *Greater N.Y. Metro. Food Council, Inc. v. Giuliani*, 195 F.3d 100, 110 (2d Cir. 1999)); *see also Nat'l Advertising*, 942 F.2d at 148 ("Severability is a question of state law."); *Crowne Castle Fiber LLC v. City of Rochester*, 623 F. Supp. 3d 165, 174 (W.D.N.Y. 2022) ("New York recognizes a preference for severance, which is 'particularly strong when the law contains a severability clause.'" (quoting *Nat'l Advertising*, 942 F.3d at 148)).  "The preference for severance is particularly strong when the law contains a severability clause," but "[t]he presence of such a clause . . . is not dispositive."  *Nat'l Advertising*, 942 F.2d at 148.  "[S]everance is inappropriate when the valid and invalid provisions are so intertwined that excision of the invalid provisions would leave a regulatory scheme that the legislature never intended."  *Id.*; *see also Crown Castle Fiber*, 623 F. Supp. 3d at 174 ("[T]he presence of [a severability] clause is not dispositive, and the preference for severability may be overcome if 'the valid and invalid

provisions are so intertwined that excision of the invalid provisions would leave a regulatory scheme that the legislature never intended.'" (quoting *Nat'l Advertising*, 942 F.2d at 148)).

Section 315 of the BZO states "[s]hould any section or provision of this ordinance be declared by a court of competent jurisdiction to be invalid, such decisions shall not affect the validity of the ordinance as a whole or any part thereof."  BZO § 315.  Thus, based on the BZO, the Town has indicated that any invalid portion of the regulation be severed.  *See, e.g.*, *Cuomo*, 783 F.3d at 88 (concluding that the state legislature's "intent [wa]s clear" where the statute included a severability provision).  The Cabaret Provision is also easily severable from the regulation, without impacting the remainder of Section 272(C)(6).  Removing the Cabaret Provision leaves in effect the requirement that special use permits be issued for "[p]laces of amusement or public assembly," which operated effectively without the Cabaret Provision prior to March of 1997.  The Court therefore finds that the Cabaret Provision can properly be severed from the remainder of the Special Use Provision.[27]

### c.  Temporal Limit Provision vagueness claim

Plaintiffs also seek summary judgment as to their claim that the Temporal Limit Provision, BZO § 267(D)(3), which allows the Board to approve a permit for a temporary period of time, is unconstitutionally vague.  (Pls.' Mem. 28–30.)  Plaintiffs argue only that the Temporal Limit Provision "deprives Plaintiffs and the public of notice of how long a permit may last."  (*Id.* at 28.)

Defendants argue that Plaintiffs' claim that the Temporal Limit Provision is vague fails because the provision does not have a "close nexus" to protected expression. (Defs.' Opp'n 10.)

---

[27]  With the Cabaret Provision severed, the updated BZO § 272(C)(6) reads "Places of amusement or public assembly."

"A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Brokamp*, 66 F.4th at 403 ("A statute is unconstitutionally vague in violation of the Due Process clause if it (1) 'fails to provide a person of ordinary intelligence fair notice of what is prohibited,' or (2) 'is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18 (2010))); *Kissel v. Seagull*, 552 F. Supp. 3d 277, 285–86 (D. Conn. 2021) (same); *Muchmore's Cafe, LLC*, 2016 WL 11469539, at *17 (quoting *Farrell*, 449 F.3d at 485) (same).  "In reviewing a statute's language for vagueness, 'we are relegated . . . to the words of the ordinance itself, to the interpretations the court below has given to analogous statutes, and perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it.'"  *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)); *see also Keepers, Inc. v. City of Milford*, 944 F. Supp. 2d 129, 150–51 (D. Conn. 2013) (same), *vacated in part and remanded on other grounds*, 807 F.3d 24 (2d Cir. 2015).

"When a statute 'is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts.'"  *VIP of Berlin*, 593 F.3d at 186 (quoting *Farrell*, 449 F.3d at 485) (alteration in original).  However, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language."  *Id.* at 187 (quoting *Grayned*, 408 U.S. at 110); *see also Cunney v. Bd. of Trs. of Grand View*, 660 F.3d 612, 621 (2d Cir. 2011) (same).  "Rather, regulations may embody 'flexibility and reasonable depth,' and 'satisfy due process as long as a reasonably prudent

45

person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require.'" *Cunney*, 660 F.3d at 621 (first quoting *Grayned*, 408 U.S. at 110, and then quoting *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 156 (2d Cir. 1999)).

As with a facial challenge for overbreadth, "[w]hen considering a facial challenge to the . . . vagueness of a statute as measured against the [F]irst [A]mendment, 'a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.'" *Dorman v. Satti*, 862 F.2d 432, 436 (2d Cir. 1988) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982)); *see also Farrell*, 449 F.3d at 496 ("Facial vagueness challenges may go forward only if the challenged regulation 'reaches a substantial amount of constitutionally protected conduct.'" (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983)); *Helms Realty Corp. v. City of New York*, 320 F. Supp. 3d 526, 533 (S.D.N.Y. 2018) (finding that "[w]hether [the plaintiff] can mount a facial challenge to [the challenged law] depends . . . on whether it reaches constitutionally protected speech, which in turn requires a [c]ourt to examine the (ambiguous and unambiguous) scope of the statute").

To determine whether a statute reaches a substantial amount of constitutionally protected conduct, the Court "must first determine whether the [ordinance at issue] will have a substantial chilling effect on protected conduct." *Farrell*, 449 F.3d at 497. "In determining whether a regulation reaches substantial protected conduct, [a court] must consider everything that falls within the ambiguous scope of the" challenged regulation. *Id.*; *see also Helms Realty Corp.*, 320 F. Supp. 3d at 533 (same).[28]

---

[28] Defendants also argue that they are entitled to summary judgment as to Plaintiffs' vagueness claim regarding the Window Provision which establishes window requirements for

In the Court's January 2021 Decision, it noted that the parties did "not meaningfully attempt to construe" the Temporal Limit Provision, or "specify which forms of expression are impacted by this provision and whether the provision should be analyzed in concert with the definition of cabaret." (Jan. 2021 Decision 155–56.)  The parties' conclusory statements that the Temporal Limit Provision "deprives Plaintiffs and the public of notice of how long a permit may last," (Pls.' Mem. at 28), and that it does not have a close nexus to speech, (Defs.' Mem. 10, 19–20), do not cure the deficiencies the Court identified in the parties' arguments in its January 2021 Decision, (*see* Jan. 2021 Decision 155–56).  The parties do not address whether the provision implicates constitutionally protected conduct, what forms of expression are implicated by the provision, or whether the Court can construe the provision to not implicate constitutionally protected conduct.[29]  The Court therefore denies Defendants' motion for summary judgment as

_____

new restaurants in the Town.  (Defs.' Mem. 10.)  In support, Defendants argue (1) the amendment applies only to restaurants and therefore does not impact freedom of expression, (2) Plaintiffs have not sought a certificate of occupancy to operate a restaurant, and (3) regardless, the regulation is not vague in its definition of a window.  (*Id.* at 10–11.)  Plaintiffs do not respond to this argument.

In the January 2021 Decision, the Court dismissed Plaintiffs' challenge to the Window Provision for lack of standing to the extent Plaintiffs brought a facial First Amendment challenge, because the provision does not implicate protected expression and because it "constitutes a manageable standard, not unbridled discretion."  (Jan. 2021 Decision 82–83.)  To the extent Plaintiffs challenge the Window Provision as vague and therefore a due process violation, neither party has addressed in full whether the provision implicates constitutionally protected conduct, and if so what type, or whether it can be read narrowly to avoid the constitutional question.  Because these are necessary to the Court's determination of whether the Window Provision is vague and violates due process, the Court declines to grant summary judgment to Defendants as to the Window Provision.

[29]  The remainder of Plaintiffs' arguments as to the Temporal Limit Provision appear to be Fourteenth Amendment substantive due process arguments.  (*See, e.g.*, Pls.' Mem. 28 (stating that the Temporal Limit Provision "imposes a considerable burden on business owners' right to be secure in their ability to use their property"); *id.* at 29 (stating that the Temporal Limit Provision "imposes a considerable burden on property rights, safeguarded by the Fourteenth

to Plaintiffs' vagueness claims related to the Temporal Limit Provision.[30]

### d. Regulatory takings claim

Defendants argue that they are entitled to summary judgment on Plaintiffs' claim of a "partial taking" and "deprivation of property rights without due process."  (Defs.' Mem. 14.)  In support, Defendants contend that the three "considerations described in *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978)" — the challenged regulatory action's impact on Plaintiffs, its interference with Plaintiffs' investment-backed expectations, and the character of the challenged action — all weigh against a finding of regulatory taking.  (Defs.' Mem. 15–17.)  Defendants also argue that Plaintiffs' "claims fail as a matter of law [because] New York provides adequate post[-]deprivation procedures in the form of CPLR Article 78 relief" and "Plaintiffs have commenced an Article 78 proceeding [that is] still pending in State Court."  (*Id.* at 14.)

Plaintiffs do not explicitly address the *Penn Central* factors but argue that under New York law, they had cognizable property interests in: (1) "the special use permit that existed and ran with the land when they purchased the Wantagh [Property]," and (2) the "new permanent special use permit" that the Board granted in 2010, because Plaintiffs "detrimentally relied [on it]

---

Amendment").)  Plaintiffs' substantive and procedural due process claims, however, were dismissed in the Court's January 2021 Decision.  (Jan. 2021 Decision 113, 118.)

[30] Defendants also argue that the Temporal Limit Provision vagueness claim is improperly raised because it was not raised in the SAC.  (Defs.' Opp'n 17.)  As the Court determined in its January 2021 Decision, however, it construes Plaintiffs' challenge to the Temporal Limit Provision as inclusive of a vagueness claim.  (Jan. 2021 Decision 154.)

Plaintiffs also argue that the Special Use Provision is unconstitutionally vague.  (Pls.' Mem. 22.)  Defendants are correct that Plaintiffs do not plead this in the SAC and therefore may not raise such a claim at summary judgment.  *See, e.g.*, *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 413 (S.D.N.Y. Aug. 2, 2012) ("It is 'well settled that a Court should not on summary judgment consider factual allegations and legal theories not raised in the complaint.'" (citation omitted)).

in expending significant sums to renovate the building for cabaret use."[31]  (Pls.' Opp'n 20.)
Plaintiffs also argue that there are outstanding factual disputes as to whether their interests in the
permits "vested" under state law when they began renovations to the Wantagh Property in
reliance on the 2010 permit.  (*Id.* at 21–23.)

   "The Fifth Amendment provides that 'private property [shall not] be taken for public use,
without just compensation.'"  *Brinkmann v. Town of Southold*, 96 F.4th 209, 211 (2d Cir. 2024)
(alteration in original) (quoting U.S. Const. amend. V); *335-7 LLC v. City of New York*, No. 21-
823, 2023 WL 2291511, at *2 (2d Cir. Mar. 1, 2023) (same) (alteration in original) (quoting U.S.
Const. amends. V and XIV, § 1).  "The law recognizes two forms of takings: physical takings
and regulatory takings."  *TZ Manor, LLC v. Est. of Daines*, 750 F. App'x 26, 28 (2d Cir. 2018).
"Legislation effects a regulatory taking when it goes 'too far' in restricting a landowner's ability
to use his own property."  *335-7 LLC*, 2023 WL 2291511, at *2 (citations omitted).  "Regulatory
takings are further subdivided into categorical and non-categorical takings."  *Sherman v. Town of
Chester*, 752 F.3d 554, 564 (2d Cir. 2014).  "A categorical taking occurs in 'the extraordinary
circumstance when *no* productive or economically beneficial use of land is permitted,'" while
"'[a]nything less than a complete elimination of value, or a total loss,' is a non-categorical
taking."  *Id.* (emphasis in original) (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l
Planning Agency*, 535 U.S. 302, 330 (2002)).

---

   [31]  Plaintiffs acknowledge that the "Court dismissed Plaintiffs' claims based on the 2010
Application for the Wantagh Property under federal law" but assert that "those claims remain
eligible for consideration under State law, which is more protective of constitutional rights."
(Pls.' Opp'n 20.)  The Court addresses Plaintiffs' takings claims under federal and state law
separately.  (*See supra* section II.g.v.)

To determine whether a use restriction effects a non-categorical taking, courts "apply the balancing test set forth in [*Penn Central*], which considers, among other factors, a regulation's [economic] impact, its interference with reasonable investment-backed expectations, and the character of the government action." *74 Pinehurst LLC v. New York*, 59 F.4th 557, 555 (2d Cir. 2023), *cert. denied*, No. 22-1130, 2024 WL 674658 (U.S. Feb. 20, 2024); *see also 1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 263 (2d Cir. 2014) ("Primary among [the *Penn Central*] factors are '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.'" (second alteration in original) (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538–39 (2005))).

For the reasons set forth below, the Court finds that Plaintiffs have failed to establish that the *Penn Central* factors support the conclusion that Defendants' conduct constitutes a regulatory taking in violation of the Fifth Amendment.[32]

---

[32]  The Court understands Plaintiffs to be raising an as-applied regulatory taking challenge based on the allegations that Defendants' actions "prevent[ed] Plaintiffs from using their property for its intended (and historical) purpose [and] constitute an as applied partial taking." (SAC ¶ 464.)  In the SAC, Plaintiffs further allege that "Defendants, acting under color of law, have taken and deprived the Plaintiffs of their significant property rights at the Wantagh Property without a sufficient legal or factual basis, and without due process, in violation of" the Fifth Amendment, among other things.  (*Id.* ¶ 465.)  Plaintiffs do not appear to raise a facial regulatory challenge, and Plaintiffs do not argue in their summary judgment briefing "that no set of circumstances exists under which the [Challenged Ordinances] would be valid" under the Fifth Amendment.  *74 Pinehurst LLC*, 59 F.4th at 562 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *Rent Stabilization Ass'n of City of N.Y. v. Dinkins*, 5 F.3d 591, 595 (2d Cir. 1993) ("Following the Supreme Court, we have stated that a facial challenge must establish that no set of circumstances exists under which the challenged act would be valid." (alterations, internal quotation marks, and citation omitted)); (*see also* SAC; Pls.' Mem.; Pls.' Opp'n.)

i.   **Economic impact**

Defendants argue that the Board's actions do not constitute a regulatory taking because Plaintiffs have not established that the Board destroyed all the value of Plaintiffs' property or that it "effectively prevented [Plaintiffs] from making any economic use of [their] property." (Defs.' Mem. 16 (alterations in original) (emphasis omitted) (quoting *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 165 (S.D.N.Y. 2020)).)  Defendants also contend that because Plaintiffs could have operated the Wantagh Property as a restaurant, they retained "an 'economically viable' use of [their] property."  (*Id.* at 17 (citing *Hertz Corp. v. City of New York*, 1 F.3d 121, 132 (2d Cir. 1993)).)

Plaintiffs argue that, based on "their valid permit,"[33] they "made renovations to the property that were specifically related to the cabaret use" which were rendered "essentially valueless" by the Board's subsequent actions.  (Pls.' Opp'n 21 (quoting *Town of Orangetown v. Magee*, 88 N.Y.2d 41, 47–48 (1996)).)  In addition, Plaintiffs argue that no evidence "regarding the return which may be realized from permitted uses has yet been presented in light of this Court's bifurcation order."[34]  (Pl.'s Opp'n 19 (internal quotation marks omitted).)

The first *Penn Central* factor, the impact of the challenged regulation, requires a court to consider "the economic impact of the regulation on the claimant."  *Cmty. Hous. Improvement*

---

[33]  Plaintiffs do not explain whether the "valid permit" they refer to is the special use permit that was granted to the prior owners of the Wantagh Property in 1969 or the special use permit that the Board granted in June of 2010 and subsequently revoked.  The Court assumes that Plaintiffs are referring to both special use permits for purposes of addressing whether the *Penn Central* factors weigh in favor of or against finding a regulatory taking.

[34]  On July 20, 2021, Plaintiffs moved to "bifurcate fact and expert discovery, and [to] bifurcate liability and damages for purposes of summary judgment and/or trial."  (Pls.' Mot. to Bifurcate 2, Docket Entry No. 238.)  On August 10, 2021, the Court found "bifurcation to be appropriate" and "grant[ed] Plaintiffs' motion."  (Order dated Aug. 10, 2021.)

*Program v. City of New York*, 59 F.4th 540, 555 (2d Cir. 2023) (citation omitted). "[M]ere diminution in the value of property, however serious, is insufficient to demonstrate a taking" under the first *Penn Central* factor. *335-7 LLC*, 2023 WL 2291511, at *3 (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993)); *see also 74 Pinehurst LLC*, 59 F.4th at 566 (acknowledging the "legion of cases that have upheld regulations which severely diminished the value of commercial property" (quoting *Park Ave. Tower Assocs. v. City of New York*, 746 F.2d 135, 139–40 (2d Cir. 1984)). In addition, the "prohibition of the most profitable or beneficial use of a property will not necessitate a finding that a taking has occurred." *Sadowski v. City of New York*, 732 F.2d 312, 317 (2d Cir. 1984); *see also 31FO, LLC v. Incorporated Village of Lloyd Harbor*, No. 22-CV-3303, 2023 WL 6385187, at *9 (E.D.N.Y. Sept. 29, 2023) (quoting same). Rather, in determining the economic impact of a regulation, courts often consider whether the challenged action prevented the plaintiff from "making any economic use of his property." *Sherman*, 752 F.3d at 565 (finding an economic impact on plaintiff that could "never develop his property" because the town "kept stringing him along" by changing zoning regulations in response to his efforts to comply with applicable requirements); *see also Vanderveer v. Zoning Bd. of Appeals*, No. 19-CV-3833, 2020 WL 7042669, at *3 (E.D.N.Y. Dec. 1, 2020) (finding that although a town's denial of the plaintiff's application to use his property for commercial purposes had "a real economic impact," the first *Penn Central* factor carried "less weight" because the plaintiff did not allege that the town "effectively prevented him from making any economic use" of the property (alterations and citation omitted)). "[T]he key question in determining whether a property restriction is so economically burdensome as to constitute a taking is not whether the regulation allows operation of the property as a profitable enterprise for the owners, but whether others might be interested in

52

purchasing all or part of the land for permitted uses." *Park Ave. Tower Assocs.*, 746 F.2d at 139 (internal quotation marks and citation omitted).

The first *Penn Central* factor weighs against finding a regulatory taking. Plaintiffs claim that the Board's actions rendered their renovations "essentially valueless." (Pls.' Opp'n 21 (citation omitted)). Such a "diminution in the value of property, however serious, is insufficient to demonstrate a taking." *74 Pinehurst LLC*, 59 F.4th at 566 (alteration and citation omitted). While the parties agree that the Wantagh Property has been "unused since 2008" and that the Board rejected Plaintiffs' 2016 Application for a special use permit to operate a cabaret on the premises, (Pls.' 56.1 Resp. ¶¶ 56, 122), Plaintiffs have not argued or demonstrated that Defendants prevented them from making some other permissible use of the Wantagh Property. Indeed, section 272(C) of the BZO provides for at least twenty-six other permitted uses for properties situated in a business district. *See* BZO § 272(C). Plaintiffs have not submitted any evidence establishing that the Wantagh Property could not be repurposed for any of the other uses permitted by section 272(C), or that it could not have been sold to others who would be willing to develop the premises for those uses. *See Sadowsky*, 732 F.2d at 317–18 (finding that the district court "did not err" when it determined that the plaintiffs had not established "that all economically viable uses of the property would be precluded by the [challenged regulation] since, if plaintiffs [could not] financially undertake the project, another developer might be able to do so" (internal quotation marks and alterations omitted)).

Because Plaintiffs have not shown that Defendants' enforcement of the Challenged Ordinances prevented them from making "any economic use" of the Wantagh Property, the first *Penn Central* factor weighs against finding a taking. *See id.* at 317 ("[I]t is clear that prohibition of the most profitable or beneficial use of a property will not necessitate a finding that a taking

has occurred."); *see also 31FO, LLC*, 2023 WL 6385187, at *9 (concluding that the plaintiff's claim that it could "no longer use the property for commercial filming" failed to "plausibly allege an economic impact that rises to the level of a taking"); *Morris Motel, LLC v. DeChance*, No. 20-CV-3350, 2023 WL 2682937, at *6 (E.D.N.Y. Mar. 29, 2023) (granting summary judgment on regulatory takings claim because the plaintiff did "not offer any supporting explanation or analysis" in support of its argument that the town had "diminished the value of [the] property to an unconstitutional level"); *Yu v. Incorporated Village of Oyster Bay Cove*, 579 F. Supp. 3d 391, 399 (E.D.N.Y. 2022) (noting that "a party must prove that the State has deprived it of all reasonable uses of its land" (citation and internal quotation marks omitted)); *Vanderveer*, 2020 WL 7042669, at *3 (finding no taking where the plaintiff could have used his property as a residence despite the town's refusal to allow him to use the property for commercial purposes).

### ii.   Investment-backed expectations

Defendants argue that "there is a complete lack of loss of any investment-backed expectation [because] Plaintiffs purchased the Wantagh [P]roperty with knowledge of the need for a special use permit to operate a cabaret and the restrictions of the 1997 amendment."  (Defs.' Mem. 16 (citing *Anaheim Gardens, L.P. v. United States*, 953 F.3d 1344 (Fed. Cir. 2020)).)

Plaintiffs contend that the Board interfered with their rights to the special use permit that existed on the Wantagh Property when Plaintiffs purchased it in 2009, and to the special use permit that the Board initially granted in response to Plaintiffs' 2010 Application.  (Pls.' Opp'n 20–21.)

Under the second *Penn Central* factor, which considers a regulation's interference with reasonable investment-backed expectations, courts evaluate the extent to which the regulatory

action "has upset [a plaintiff's] investment-backed economic expectations by altering its rights to a constitutionally protected property interest." *1256 Hertel Ave. Assocs., LLC*, 761 F.3d at 266. "The reasonableness of owners' expectations ensures that compensation is limited to those owners who can demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *74 Pinehurst LLC*, 59 F.4th at 567. Thus, "the critical time for considering investment-backed expectations is the time a property is acquired, not the time the challenged regulation is enacted." *Id.* (alteration and citation omitted).

The second *Penn Central* factor weighs against finding a regulatory taking for two reasons. First, to the extent Plaintiffs assert a property interest in the outcome of the 2010 Application, the Court declines to consider such arguments because, as set forth in the January 2021 Decision, "Plaintiffs' claims related to the 2010 Application are unripe." (Jan. 2021 Order 49.) In its prior decision, the Court determined that Plaintiffs' claims as to the 2010 Application were not ripe because Plaintiffs had not established that they attained a final decision on that application, nor had they availed themselves of the futility exception. (*Id.* at 47–48.) Plaintiffs do not argue — and do not present any evidence establishing — that their federal takings claims arising out of the 2010 Application are now ripe.[35]

_____

[35] Rather, the evidence supports the Court's conclusion that the Board's determination of the 2010 Application was 'not 'final' because it was based on a lack of credibility and not on the merits." (Jan. 2021 Decision 47.) The Board's written findings of fact following the 2011 Rehearing state that, in light of Plaintiffs' "vague, contradictory and misleading statements and representations," the Board could not determine whether Plaintiffs' proposed use for the Wantagh Property would not "fall within the purview of the Adult Use Ordinance." (*See* Findings of Fact dated Nov. 30, 2011, at 29–30, annexed to Sullivan Decl. as Ex. DD, Docket Entry No. 289-33.) As a result of the ambiguity regarding whether the Wantagh Property would be subject to the Town's adult use ordinances, the Board stated that it "decline[d] to determine on [the 2010 Application] whether the proposed use [met] the legislated requirements for a special exception, and specifically, whether the proposed cabaret warrant[ed] approval in accordance with the criteria set forth in section 267(D) of the [BZO]." (*Id.*) Thus, the evidence

Second, to the extent Plaintiffs assert an interest in the 1969 Permit, they have not shown that they purchased the Wantagh Property "in reliance on a state of affairs that did not include the challenged regulatory regime." *74 Pinehurst LLC*, 59 F.4th at 567.  Plaintiffs purchased the Wantagh Property in 2009.  (Pls.' 56.1 Resp. ¶ 69; Defs.' 56.1 Resp. ¶ 23.)  The "key question" is whether in 2009, Plaintiffs "could have expected the [BZO] to include the type of restrictions they now claim constitute a taking." *74 Pinehurst LLC*, 59 F.4th at 567.  Since 1997, the BZO has provided that the grant of any cabaret use by the Board is "limited to the specific cabaret use applied for and approved by the Board of Zoning Appeals and no other cabaret use," and that this restriction would "apply to any cabaret use . . . previously granted by the Board."  BZO § 272(C)(6).

Thus, a reasonable investor in 2009 would have anticipated the need to obtain a new special use permit in order to depart from the cabaret use initially approved by the Board in 1969, and would have been aware of the risk that subsequent applications could fail to meet the Town's requirements or be denied in the Board's discretion.  *See Yu*, 579 F. Supp. 3d at 399 (concluding that the second *Penn Central* factor weighed against finding a taking in part because the plaintiffs "could not have reasonably expected that they could build without a permit or violate Village Code without consequences"); *see also Bristol v. Town of Camden*, 669 F. Supp. 3d 135, 158 (N.D.N.Y. Apr. 19, 2023) (finding that the second *Penn Central* factor weighed against the plaintiffs' taking claim because "a reasonable landowner would have to assume that Town officials would place limits, restrictions, and compromises on use of the land based on the Zoning Law").

---

supports the Court's finding that Plaintiffs did not receive a final decision on the 2010 Application because the Board's determination was based on its finding that Plaintiffs lacked credibility.  (*See* Jan. 2021 Decision 41.)

Accordingly, the second *Penn Central* factor weighs against finding a regulatory taking. *See 74 Pinehurst LLC*, 59 F.4th at 568 (finding that the "investment-backed expectations factor fail[ed] to support the [challengers'] as-applied regulatory takings challenge" because a reasonable investor "would have anticipated their rental properties would be subject to regulations, and that those regulations . . . could change").

### iii. Character of the governmental action

Defendants argue that the Board advanced "legitimate reasons . . . for rationally denying the Plaintiffs' application" based on Plaintiffs' lack of a Certificate of Occupancy, the front portico set-back violation, and the lack of sufficient on-site parking. (Defs.' Mem. 15.) Defendants also contend that the Board's actions were "an exercise of [its] police power directed at protecting the safety, health, and welfare of the communities surrounding the [Plaintiffs' property]" and therefore were "the type of governmental action that has typically been regarded as not requiring compensation for the burdens it imposes on private parties." (*Id.* at 15–16 (second alteration in original) (quoting *Rith Energy, Inc. v. United States*, 270 F.3d 1347 (Fed. Cir. 2001), *cert. denied*, 535 U.S. 958 (2002)).) Plaintiffs do not respond to Defendants' arguments.

Under the third *Penn Central* factor, the character of the government action, a regulatory taking "may more readily be found when the interference with property can be characterized as a physical invasion . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common-good." *Penn Central*, 438 U.S. at 124 (citation omitted). "[I]n analyzing the 'character' of the governmental action, courts should focus on the extent to which a regulation was 'enacted solely for the benefit of private parties' as opposed to a legislative desire to serve 'important public interests.'" *74 Pinehurst LLC*, 59 F.4th

at 568 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 485–86 (1987));

*Cmty. Hous. Improvement Program*, 59 F.4th at 555 (same).

The third *Penn Central* factor does not weigh in favor of or against a finding of

regulatory taking and is therefore neutral.  On the one hand, Plaintiffs do not make any

arguments or offer any evidence establishing that the Challenged Ordinances can be

characterized as a "physical invasion" of Plaintiffs' property rather than as part of "some public

program adjusting the benefits and burdens of economic life to promote the common good."

*Penn Central*, 438 U.S. at 124.  Indeed, the Challenged Ordinances are part of a larger

"comprehensive regulatory regime," *74 Pinehurst LLC*, 59 F.4th at 568, that applies to all

properties in the Town's business districts and is designed to ensure, among other things, that

proposed uses will not "adversely affect[]" the "safety, the health, the welfare, the comfort, the

convenience, or the order of the Town," BZO § 267(D)(2)(A)(3); *see also Bristol*, 669 F. Supp.

3d at 158 (noting that a town's "[a]ttempts to control noise, prevent dust in the air, limit

disruption of neighboring properties, and prevent accumulated waste" through zoning restrictions

were "efforts to protect the public" and therefore weighed against the plaintiffs' takings claim);

*Yu*, 579 F. Supp. 3d at 400 (concluding that "the character of the government action weigh[ed]

against finding a taking because, as . . . [the] regulations at issue . . . were intended to protect the

wetlands, it 'arises from some public program adjusting the benefits and burdens of economic

life to promote the common-good'" (citation omitted)); *Martin v. Town of Simsbury*, 505 F.

Supp. 3d 116, 133–34 (D. Conn. 2020) (finding that the regulations under which the town

refused to grant the plaintiff a permit to develop his land were "part of a public program

adjusting the benefits and burdens of public life and to which all landowners in the [t]own [were]

subject" (internal quotation marks and citation omitted)).  On the other hand, the Court has found

that the Cabaret Provision is unconstitutional, which weighs against a conclusion that the Cabaret Provision served an important public interest.  (*See supra* sections II.b.ii–iv.)

Because Plaintiffs have failed to establish the first and second *Penn Central* factors — that the regulatory action negatively impacted their ability to make economic use of the Wantagh Property and upset their investment-backed expectations — Plaintiffs have not shown that the Challenged Ordinances and Defendants' enforcement of them inflicts a "deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking."  *Keystone*, 480 U.S. at 493; *see also Becker v. City of Hillsboro*, 689 F. Supp. 3d 1090, 1108 (E.D. Mo. 2023) (granting summary judgment because "even if the [c]ourt were to consider the [third *Penn Central*] factor neutral on balance, or even weighing slightly in favor of [p]laintiffs, [p]laintiffs still would not be able to demonstrate a taking in light of the other factors and the record as a whole"); *Goertz v. City of Kirkland*, 641 F. Supp. 3d 990, 1003 (W.D. Wash. 2022) (granting summary judgment because although the third *Penn Central* factor "weigh[ed] slightly against summary judgment," the plaintiffs presented "no evidence of (1) lost economic value in the [p]roperty . . . and (2) reasonable investment backed interests," which are "the two most important factors of the *Penn Central* test").

Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiffs' Fifth Amendment regulatory takings claim.

### e.   Municipal liability

Defendants argue that "[t]here is no *Monell* liability" against the Town because Plaintiffs have failed to establish that the Challenged Ordinances violate the First Amendment.  (Defs.' Mem. 12; Defs.' Reply 7.)

Plaintiffs contend that the Town is liable under *Monell* because the Challenged Ordinances constitute governmental policies that violate their First Amendment rights.  (Pls.' Opp'n 28–29.)

To establish a municipal liability claim, a plaintiff is required to plead and prove three elements: "(1) an official policy or custom that (2) cause[s] [the plaintiff] to be subjected to (3) a denial of a constitutional right."  *Torcivia v. Suffolk County*, 17 F.4th 342, 355 (2d Cir. 2021) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)); *Lucente v. County of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (same); *see also Friend v. Gasparino*, 61 F.4th 77, 94 (2d Cir. 2023) ("[M]unicipalities may not be held liable 'unless action pursuant to official municipal policy of some nature caused a constitutional tort.'" (emphasis omitted) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978))); *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 257 (2d Cir. 2020) ("To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." (quoting *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019))).  A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates.  *See Friend*, 61 F.4th at 93 ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011))); *O'Kane v. Plainedge Union*

*Free Sch. Dist.*, 827 F. App'x 141, 143 (2d Cir. 2020) (finding that failure to "take appropriate action to prevent or sanction violations of constitutional rights" amounted to deliberate indifference (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012))); *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13–14 (2d Cir. 2015) (formal policy officially endorsed by the municipality); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); *Carter v. Incorporated Village of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014) (failure to train amounting to deliberate indifference); *Jones*, 691 F.3d at 81 (policymaking official's "express" or "tacit" ratification of low-level employee's actions).

"[U]nder *Monell*[,] municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants."  *Barrett v. Orange Cnty. Hum. Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999); *see also Rutigliano v. City of New York*, 326 F. App'x 5, 9 (2d Cir. 2009) (affirming that a "'municipality may be found liable under [section] 1983 even in the absence of individual liability' . . . only in very special circumstances" (quoting *Barrett*, 194 F.3d at 350)); *Haslinger v. Westchester County*, No. 18-CV-5619, 2020 WL 2061540, at *8 (S.D.N.Y. Apr. 29, 2020) (dismissing claim against individual defendants but denying dismissal against county because the plaintiff "plausibly alleged all three prongs of a *Monell* municipal liability claim"); *Cartelli v. County of Suffolk*, No. 15-CV-6890, 2019 WL 6875376, at *9 (E.D.N.Y. Dec. 17, 2019) ("Courts may find *Monell* liability for constitutional injuries even in the absence of individual liability." (quoting *Barrett*, 194 F.3d at 350)).  "[E]ven in situations where the acts or omissions of individual employees do not violate an individual's constitutional rights, 'the combined acts or omissions of several employees acting under a

governmental policy or custom may violate' those rights." *Barrett*, 194 F.3d at 350 (first quoting *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985); and then quoting *Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir. 1985)); *see also Rutigliano*, 326 F. App'x at 9 ("The rule [the Second Circuit] articulated in *Barrett* applies where 'the combined acts or omissions of several employees acting under a governmental policy or custom may violate [constitutional] rights.'" (quoting *Barrett*, 194 F.3d at 350)). In addition, where "the individual defendants violated plaintiff's rights but nonetheless enjoy qualified immunity," a plaintiff can pursue a *Monell* claim. *Bonilla v. Jaronczyk*, 354 F. App'x 579, 582 (2d Cir. 2009) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 71 (2d Cir. 2001)); *cf. Curley*, 268 F.3d at 71 (affirming the district court's grant of summary judgment as to the plaintiff's *Monell* claim where the municipality was "implicated in plaintiff's amended complaint only by way of the individual defendants' conduct" and the plaintiff alleged that the "policies and/or customs of [the municipality] were the moving force behind the actions of the individual [d]efendant police officers, resulting in the injuries to the [p]laintiff").

Although a finding of municipal liability is not contingent on a finding that the individual defendants are liable, the Second Circuit has held that when a plaintiff sues both municipal actors and the municipality "that promulgated the offensive policy, the plaintiff's failure to secure a judgment against the individual actors would . . . preclude a judgment against the municipality *if* the ruling in favor of the individual defendants resulted from the plaintiff's failure to show that they committed the alleged [violation]." *Askins v. Doe No. 1*, 727 F.3d 248, 253–54 (2d Cir. 2013); *see also Demosthene v. City of New York*, 831 F. App'x 530, 534 n.3 (2d Cir. 2020) ("[I]n light of the absence of an underlying constitutional violation, the district court correctly dismissed the claim against the [c]ity pursuant to *Monell*."); *Morales v. City of New York*, 752

F.3d 234, 238 (2d Cir. 2014) ("[H]aving properly dismissed [the plaintiff's] underlying constitutional claims against the individual . . . defendants, the [d]istrict [c]ourt also properly dismissed his claim against the [c]ity . . . for municipal liability under *Monell*.").

The Cabaret Provision qualifies as a municipal "policy" for purposes of establishing *Monell* liability.  *See Friend*, 61 F.4th at 93 (noting that "[o]fficial municipal policy includes," among other things, "the decisions of a government's lawmakers"); *MHANY Mgmt. Inc. v. Incorporated Village of Garden City*, 985 F. Supp. 2d 390, 428 (E.D.N.Y. 2013) (rejecting the village's argument that "the enactment of a zoning ordinance . . . does not qualify as a 'policy or custom' supporting a violation of [section 1983]" because '[i]t is well-settled that municipalities may be sued directly under [section] 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental . . . ordinance" (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983))).  The Court has concluded that the Cabaret Provision is facially unconstitutional, (*see supra* section II.b), and there is no dispute that Plaintiffs were subject to the Cabaret Provision.[36]  As a result, Plaintiff has established that the Town can be held liable pursuant to *Monell*.  *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) ("Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward." (emphasis in original)); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("No one has ever doubted

---

[36]  (*See* Board Findings of Fact 59 (concluding that "the 1997 amendment," *i.e.* the Cabaret Provision, "did not deprive [Plaintiffs of their] rights under the [1969 Permit], but it limited such rights to dancing by restaurant patrons to piano bar music, and not the unlimited 'Las Vegas Style' entertainment exhibitions now proposed by [Plaintiffs] for [their] new proposed cabaret"); *see also* Defs.' 56.1 ¶¶ 117, 122 (noting that Plaintiffs "appealed to the [Board] . . . from the DOB decision that, pursuant to the [Cabaret Provision,] a new special use permit [was] required," and that "[b]y decision dated November 2, 2016[,] the Board denied [Plaintiffs'] . . . appeal[]").)

. . . that a municipality may be liable under [section] 1983 for a single decision by its properly constituted legislative body . . . because even a single decision by such a body unquestionably constitutes an act of official government policy."); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("[A]lleging that a municipal policy or ordinance is itself unconstitutional is always sufficient to establish the necessary causal connection between the municipality and the constitutional deprivation, because an employee's act of enforcing an unconstitutional municipal policy may be considered the act of the municipality itself."); *Leather v. Ten Eyck*, 2 F. App'x 145, 149 (2d Cir. 2001) ("*Monell* . . . makes clear that '[l]ocal governing bodies . . . can be sued directly under [section] 1983 for monetary, declarative, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a[n] . . . ordinance . . . officially adopted and promulgated by that body's officers."  (second, third, and fourth alterations in original) (quoting *Monell*, 436 U.S. at 690)); *Persaud v. City of New York*, No. 22-CV-2919, 2024 WL 2159852, at *9 (S.D.N.Y. May 14, 2024) (same); *Rapp v. NaphCare, Inc.*, No. 21-CV-5800, 2023 WL 4705996, at *2 (W.D. Wash. July 24, 2023) ("A party may bring a direct *Monell* claim by arguing "that a particular municipal action *itself* violates federal law." (emphasis in original) (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 404)); *Best Payphones, Inc. v. Dobrin*, 410 F. Supp. 3d 457, 538 (E.D.N.Y. 2019) ("In general, a plaintiff may make a prima facie *Monell* claim . . . by showing . . . that an officially promulgated and endorsed municipal policy facially violates constitutional rights."); *Muffett v. City of Yakima ex rel. members of its City Council*, No. 10-CV-3092, 2012 WL 2915472, at *4 (E.D. Wash. July 17, 2012) (granting summary judgment on *Monell* claim because "if the [c]ourt concludes that [plaintiff's] amended complaint states a facial challenge to the Yakima zoning ordinances, then [he] will have necessarily met the *Monell* standard for section 1983 claims").

Accordingly, the Court denies Defendants' motion for summary judgment as to Plaintiffs' claim of municipal liability against the Town.

### f.   Defenses raised by Non-Board Defendants Murray, Santino, and Hudes

Murray and Santino, two former supervisors of the Town, and Hudes, one of its former councilmembers (the "Non-Board Defendants"), assert several additional defenses against Plaintiffs' claims against them.  The Non-Board Defendants argue that the claims against them in their official capacities should be dismissed as duplicative of the claims brought against the Town because a section 1983 action "against a municipal officer in his [or her] official capacity [must be] . . . treated as an action against the municipality itself."  (Defs.' Mem. 18 (alterations in original) (quoting *Demarest v. Town of Underhill*, No. 21-CV-167, 2022 WL 911146, at *9 (D. Vt. Mar. 29, 2022), *aff'd*, No. 22-956 (2d Cir. Dec. 7, 2022)).)  In addition, the Non-Board Defendants argue that the claims against them in their personal capacities fail because Plaintiffs have not sufficiently established their personal involvement in the alleged constitutional violations, and because they are entitled to qualified, legislative, and absolute immunities.  (*Id.* at 17–22.)

Plaintiffs do not address whether the official-capacity claims against the Non-Board Defendants are duplicative of their claims against the Town, but argue that they took actions that render them liable to Plaintiffs in their personal capacities.  (Pl.'s Opp'n 26–28.)  Plaintiffs also argue that the Non-Board Defendants are not entitled to any immunities.  (*Id.* at 23–28.)

### i.   Official capacity claims against the Non-Board Defendants

The Supreme Court has "emphasized that official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).  Thus, when a plaintiff brings identical section 1983 claims against a municipal entity and officers of

65

the entity in their official capacities, courts routinely dismiss the official-capacity claims as duplicative of the claims against the entity itself. *See Rodriguez v. City of Rochester*, 624 F. App'x 16, 18 (2d Cir. 2015) (noting that "the plaintiffs named [a city official] as a defendant in addition to the City of Rochester itself, which would have been duplicative had they intended to bring only official-capacity claims"); *see also Hawkland v. Hall*, 860 F. App'x 326, 328 n.2 (5th Cir. 2021) ("Any claims against [individual defendants] in their official capacities are duplicative of the claim against the District itself." (citing *Rayborn v. Bossier Par. Sch. Bd.*, 881 F.3d 409, 417 (5th Cir. 2018))); *Direct Constr. Servs., LLC v. City of Detroit*, 820 F. App'x 417, 420 (6th Cir. 2020) ("The claims against the individuals sued exclusively in their official capacities were properly dismissed because they are duplicative of the claims against the entities for which the individuals work."); *Crowell v. Cowlitz County*, 726 F. App'x 593, 595 n.3 (9th Cir. 2018) ("The district court may also want to consider whether to dismiss [the individual defendant] as a defendant given that the claims against her in her official capacity appear to be duplicative of the claims of the County itself." (citing *Melendres v. Arpaio*, 784 F.3d 1254, 1260 (9th Cir. 2015))); *Baez v. Lancaster County*, 487 F. App'x 30, 32 (3d Cir. 2012) ("The claim against [an individual defendant] is duplicative of the suit against the County.  As a result, summary judgment was properly granted in favor of the County and [the individual] in his official capacity."); *Ruttenberg v. Jones*, 375 F. App'x 298, 299 (4th Cir. 2010) ("To the extent that the police chief and the officers were sued in their official capacities, the district court dismissed the claim as duplicative of the claim against the City."); *Soley v. County of Nassau*, No. 18-CV-377, 2022 WL 2954055, at *7 (E.D.N.Y. July 26, 2022) ("Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." (citation omitted)); *Castanza v.*

*Town of Brookhaven*, 700 F. Supp. 2d 277, 284 (E.D.N.Y. Mar. 22, 2010) ("Based upon the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources." (quoting *Escobar v. City of New York*, No. 05-CV-3030, 2007 WL 1827414, at *3 (E.D.N.Y. June 25, 2007))).

Plaintiffs bring claims under section 1983 against the Non-Board Defendants in their "individual and official capacit[ies]." (SAC ¶¶ 17, 18, 28, 447–509.) Plaintiff brings the same claims against the Town. (*Id.* ¶¶ 16, 447–509.) Because Plaintiffs' claims against the Non-Board Defendants in their official capacities are merely "another way of pleading" their claims against the Town, Plaintiffs' official-capacity claims are duplicative of the claims they bring against the Town and the Court therefore dismisses these claims.

Plaintiffs' claims against the Non-Board Defendants in their individual capacities remain pending, subject to the individual defenses they raise, which are addressed in relevant part below. *See Napolitano v. Saltzman*, 315 F. App'x 351, 351 (2d Cir. 2009) ("Immunity, either absolute or qualified, is a personal defense that is available only when officials are sued in their individual capacities." (emphasis and alteration omitted) (quoting *Almonte v. City of Long Beach*, 478 F.3d 100, 106 (2d Cir. 2007)).

### ii.   Personal involvement of the Non-Board Defendants

The Non-Board Defendants argue that Plaintiffs have failed to establish that they played any role in the Board's decision to deny the 2016 Application, or that there is a causal connection between their "written and spoken words, and the loss of a constitutional right in Wantagh." (Defs.' Mem. 17–18, 21.) In support, Non-Board Defendants assert that Plaintiffs have failed to

establish that they were personally involved in the alleged constitutional violation because Plaintiffs allege only that: (1) Murray sent a letter to her constituents in 2011 regarding her request that the Board reopen its initial approval of the 2010 Application, testified at the 2011 Rehearing, and held a press conference to speak against the proposed cabaret at the Wantagh Property (*id.* at 17–18 (citing SAC ¶¶ 89, 93, 412)); (2) Santino sent a letter to a constituent in 2015 stating his opposition to opening a cabaret at the Wantagh Property, (*id.* at 17 (citing SAC ¶ 435)); and (3) Hudes testified at the 2011 Rehearing, voted to pass the Window Provision, and held a press conference to speak against the proposed cabaret at the Wantagh Property, (*id.* (citing SAC ¶¶ 94, 220, 412)).[37]

Plaintiffs contend that the "Complaint establishes that the [Non-Board Defendants'] conduct in this case fell far outside the scope of their official duties" because, for example, Murray "instigated" the "unprecedented" "rehearing of the permit application in Wantagh," while Santino "wrote to the President of the Wantagh Civil Association[] that he wholeheartedly support[ed] the Town's efforts in the fight against a proposed 'Las Vegas Style' cabaret and would continue to do so as the Town's next supervisor."  (Pls.' Opp'n 27–28 (citations and internal quotation marks omitted).)  Plaintiffs also argue that certain other "actions speak volumes" because the SAC alleges that: (1) Murray "abused her position" and "interfered with the actions of the Board" by "implor[ing] the Board to reopen the hearing" in 2011, (*id.* at 26 (emphasis omitted)); (2) Murray "deviated from the Board's protocol and testified . . . before Plaintiffs ever had a chance to present their application and case" at the 2011 Rehearing, (*id.* at

---

[37]  The Non-Board Defendants also reference allegations against them relating to the Bellmore Property.  (Defs.' Mem. 17–18.)  Because Plaintiffs' federal claims arising out of the Bellmore Property were dismissed in the January 2021 Decision for both lack of ripeness and standing, the Court declines to consider these allegations.  (*See* Jan. 2021 Decision 162.)

26–27 (citing Tr. of May 18, 2011 Hearing ("2011 Rehearing Tr.") 34, annexed to Decl. of

William Stephen Dean as Ex. 21, Docket Entry No. 294-2)); (3) Murray "lied to mislead" the

public regarding Plaintiffs and their proposed business when she "publicly stated that 'we want

to make sure that the quality of life of our neighborhoods is preserved and that this does not turn

into a red-light district,'" (*id.* at 26 (quoting SAC ¶ 91)); and (4) on or about September 8, 2014,

Murray and Hudes "trespassed on the Plaintiffs' property . . . and conducted a press conference"

where Murray "announced that 'we will continue to fight this latest effort to open a cabaret at

this location,'" (*id.* (quoting SAC ¶ 412)).

"[T]he 'personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under [section] 1983.'" *Victory v. Pataki*, 814 F.3d 47, 67

(2d Cir. 2016) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)), *as amended* (Feb.

24, 2016); *Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) ("To 'establish a defendant's

individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's

personal involvement in the alleged constitutional deprivation." (quoting *Grullon v. City of New

Haven*, 720 F.3d 133, 138 (2d Cir. 2013))).  A plaintiff must allege the direct participation or

personal involvement of each of the named defendants in the alleged constitutional deprivation.

*Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010); *Farrell*, 449 F.3d at 484 ("It is well settled in

this [c]ircuit that personal involvement of [the] defendants in alleged constitutional deprivations

is a prerequisite to an award of damages under [section] 1983." (quoting *Wright v. Smith*, 21 F.3d

496, 501 (2d Cir. 1994))); *Thomas v. Genova*, 698 F. Supp. 3d 493, 515 (E.D.N.Y. 2023) (same).

As the Second Circuit has made clear, "there is no special rule for supervisory liability," and to

find a state official liable under section 1983, "a plaintiff must plead that 'each [g]overnment-

official defendant, through the official's own individual actions, has violated the Constitution.'"

*Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676); *see also Kravitz*, 87 F.4th at 129 ("[A] plaintiff must plead and prove that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." (internal quotation marks and citation omitted)).

Plaintiffs have failed to establish that the Non-Board Defendants, though their own actions, violated the Constitution.  Plaintiffs do not point to any evidence refuting Defendants' assertion that the Non-Board Defendants "played no role, supervisory or other, in the actions taken by the [DOB] or [Board]" in relation to the 2016 Application.  (Defs.' Mem. 17–18.) Although the evidence shows that Murray sent a letter to a constituent on March 30, 2011, noting her "request[] that the Board . . . reopen" Plaintiffs' 2010 Application, (*see* Letter from Kate Murray & Angie M. Cullin dated Mar. 30, 2011, annexed to Dubno Decl. as Ex. 11, Docket Entry No. 286-11), and that she subsequently testified at the 2011 Rehearing, (2011 Rehearing Tr. 34), Plaintiffs' claims regarding the 2010 Application are no longer before the Court, (*see* Jan. 2021 Order 162 ("[T]he Court dismisses Plaintiffs' claims based on the 2010 Application for the Wantagh Property . . . for lack of ripeness and standing.")).

Plaintiffs also do not cite any evidence in support of the remainder of their factual allegations against the Non-Board Defendants.  *ABC v. NYU Hosps. Ctr.*, 629 F. App'x 46, 49 (2d Cir. 2015) (noting that the district court "was 'not required to scour the record on its own in a search for evidence when the plaintiffs fail to present it.'" (quoting *CILP Assocs., L.P. v. PricewaterhouseCoopers LLP*, 735 F.3d 114, 125 (2d Cir. 2013))).  Instead, Plaintiffs rely on allegations in the SAC to support their assertions that: (1) Murray and Hudes held a press conference on September 8, 2014, where Murray stated her continued opposition to Plaintiffs' efforts to open a cabaret, (Pls.' Opp'n 26 (quoting SAC ¶ 412)), and (2) Santino wrote a letter on

December 3, 2015, expressing support for "the Town's efforts in the fight against" Plaintiffs'

proposed cabaret and "would continue to do so as the Town's next Supervisor," (*id.* at 28

(internal quotation marks omitted) (quoting SAC ¶ 435)).[38]  These allegations do not

demonstrate that the Non-Board Defendants' actions had any impact on the Board's decision to

deny the 2016 Application.  Moreover, there is no evidence that the Non-Board Defendants

participated in the Board's hearing on the 2016 Application or were otherwise involved in the

Board's decision-making processes.  (*See* Board Findings of Fact 23–35 (summarizing the

testimony presented at the Board's hearing on the 2016 Application)); *see also Black v.*

*Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) (finding "no error in the dismissal of the claim against

[an individual defendant] for lack of personal involvement" where the individual claimed "he

had not been personally involved in the administrative hearing or appeal" and the plaintiff "had

not come forward with any evidence of [his] personal involvement").  Absent such evidence,

there is no "genuine dispute" as to whether the Non-Board Defendants, "through [their] *own*

*individual actions* . . . violated the Constitution," and the Court therefore dismisses the claims

---

[38]  Defendants also reference an allegation in the SAC that Hudes "voted for the 'window' ordinance," *i.e.* the Window Provision.  (Defs.' Mem. 17 (citing SAC ¶ 220).) Plaintiffs do not address this allegation in their opposition brief, nor do they offer any evidence in support of their allegation that Hudes voted in favor of the ordinance.  (*See generally* Pls.' Opp'n; SAC.)  Even if Plaintiffs had produced evidence demonstrating that Hudes cast a vote in favor of the Window Provision, however, Hudes would be entitled to legislative immunity arising out of any such vote because legislative immunity "covers all aspects of the legislative process," including "the casting of a vote on a resolution or bill."  *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007); *see also Strauss v. City of Chicago*, 346 F. Supp. 3d 1193, 1205 (N.D. Ill. 2018) (finding an individual defendant "immune from civil liability premised on his introduction of, and votes in favor of, the [zoning] ordinances at issue in this case").

against them.[39]  *Victory*, 814 F.3d at 67 (citation omitted); *Komondy v. Gioco*, 253 F. Supp. 3d 430, 459 (D. Conn. 2017) ("Absent sufficient evidence of [the defendant's] personal involvement as an individual defendant in the alleged constitutional deprivation, [p]laintiff cannot receive an award of damages from her under § 1983.").

Accordingly, the Court grants summary judgment to the Non-Board Defendants on Plaintiffs' First Amendment prior restraint, overbreadth, and vagueness claims.[40]

### g.  State law claims

Defendants argue the Court should dismiss Plaintiffs' state law free speech, takings, and equal protection claims as to the Wantagh Property[41] because (1) Plaintiffs did not file a notice

---

[39]  In view of the Court's finding that Plaintiffs have failed to state a claim against the Non-Board Defendants, it declines to address whether they would be entitled to qualified, legislative, or absolute immunities.  *See, e.g.*, *Salu v. Miranda*, 830 F. App'x 341, 348 n.5 (2d Cir. 2020) (affirming dismissal of claims against state official where "the district court held that she had no personal involvement in plaintiffs' cases, and thus did not reach whether she was entitled to qualified immunity").

[40]  Because Plaintiffs have failed to allege that the Non-Board Defendants were personally involved in the alleged First Amendment violation, and Plaintiffs' free speech claims under Article 1 § 8 of the New York Constitution are subject to the same analysis, the Court also concludes that Plaintiffs have not shown their personal involvement in the alleged state law free speech violation.  *See Martinez v. Sanders*, 307 F. App'x 467, 468 & n.2 (2d Cir. 2008) (noting that the plaintiff's "freedom of speech, political freedom and affiliation, and freedom of association" claims under Article 1 § 8 of the New York State Constitution were "subject to the same standards as the First Amendment claims").  Plaintiffs have therefore failed to state a free speech claim against the Non-Board Defendants and the Court dismisses those claims against them.

[41]  Defendants move for summary judgment on Plaintiffs' state law free speech, takings, and equal protection claims as to the Wantagh Property only.  (*See* Defs.' Mem.)  As discussed above, Defendants do not address the merits of Plaintiffs' state law claims pertaining to the Bellmore Property or Plaintiffs' state law vagueness claim pertaining to the Window Provision of the BZO.  (*See supra* note 16.)  In addition, the parties do not address whether, in light of the January 2021 Decision, Plaintiffs' state law claims pertaining to the Bellmore Property are ripe for consideration.  As discussed *infra*, when evaluating takings claims brought under the Fifth Amendment and the New York State equivalent, New York Courts apply the same ripeness

of claim, which is required to bring an action against a state entity, (2) Plaintiffs' state law claims are not ripe for review because they never received a final decision on the permit for the Wantagh Property, and (3) Plaintiffs' state law claims are barred by *res judicata* because they could have been raised in the Article 78 proceeding previously brought by Plaintiffs, which Defendants assert was a "hybrid" proceeding.  (Defs.' Mem. 23–26.)  Defendants also argue that the Court should grant summary judgment to Defendants on Plaintiffs' free speech claims under Article 1 § 8 of the New York State Constitution, regulatory takings claims under Article 1 § 7 of the New York State Constitution, and equal protection claims under Article 1 § 11 of the New York State Constitution for the same reasons the Court should grant summary judgment on Plaintiffs' federal First Amendment, regulatory takings, and equal protection claims.  (*Id.* at 22–28.)  Finally, Defendants argue that the state law claims against the Individual Defendants in their official capacities are duplicative of the claims against the Town, that certain of the Individual Defendants are entitled to absolute or qualified immunity in their individual capacities, and that Plaintiffs may not hold the Town vicariously liable under state law for state constitutional torts.  (*Id.* at 28–30.)

---

analysis to both claims.  In the January 2021 Decision, the Court determined that Plaintiffs had not obtained a final determination on their application as to the Bellmore Property because Plaintiffs "concede[d] that the Board ha[d] yet to render a final determination on" the application.  (Jan. 2021 Decision 49–50.)  In addition, the Court concluded that the futility exception did not apply because Plaintiffs were "required to cure building violations, pass the building inspection, and receive a Certificate of Completion" before they could receive a final decision on their applications.  (*Id.* at 50–53.)  The record before the Court does not provide a basis to depart from the Court's prior determination.  Accordingly, the Court directs Plaintiffs to show cause why the Court should not dismiss their state law claims as to the Bellmore Property as unripe.

### i.   Notice of claim

Defendants argue that the Court does not have jurisdiction to reach Plaintiffs' state claims because Plaintiffs failed to file a notice of claim in accordance with New York General Municipal Law § 50-e.  (Defs.' Mem. 23; Defs.' Reply 10–11.)

Plaintiffs do not assert that they filed a notice of claim, but contend that Defendants are estopped from arguing that they were required to do so because Defendants have not raised this procedural defect until this late stage of the proceedings.[42]  (Pls.' Opp'n 15–16.)

Section 50-e of the New York General Municipal Law provides that to proceed on a state tort action[43] "against [a] New York municipal entit[y] or their employees acting within the scope

---

[42]  Plaintiffs also argue that they were not required to file a notice of claim because notice of claim provisions are inapplicable to section 1983 actions brought in federal court.  (Pls.' Opp'n 15.)  It is true that a failure to file a notice of claim does not bar Plaintiffs' section 1983 claims, *see Felder v. Casey*, 487 U.S. 131, 141 (1988) ("[N]otice-of-claim statutes are inapplicable to federal-court § 1983 litigation."), but New York's notice-of-claim requirements do apply to Plaintiffs' state law claims, *see id.* at 151 ("[F]ederal courts entertaining state-law claims against . . . municipalities are obligated to apply the [state] notice-of-claim provision."); *Diarra v. City of New York*, 771 F. App'x 69, 71 (2d Cir. 2019) (concluding that New York's notice-of-claim requirement was "preempted . . . as to [the plaintiff's] 1983 claims" but that the district court was "'obligated to apply [the] notice-of-claim provision' to [the plaintiff's] state-law claims" (quoting *Felder*, 487 U.S. at 151)); *Richardson v. Westchester County*, No. 20-CV-5907, 2022 WL 785217, at *3 (S.D.N.Y. Mar. 15, 2022) ("While Plaintiff is correct that such state law [notice-of-claim] requirements do not apply to his federal law claims, these requirements nonetheless apply to his *state law* claims." (emphasis in original)).

[43]  Section 50-e states that a notice of claim is required "[i]n any case founded upon tort where a notice of claim is required by law."  N.Y. Gen. Mun. Law § 50-e(1)(a); *see also id.* § 50-i (requiring that a notice of claim be served "in compliance with section [50-e]" to sustain an action against a town for "personal injury, wrongful death or damage to real or personal property").  This applies to constitutional torts brought under the New York State Constitution, such as the claims brought by Plaintiffs.  *See, e.g.*, *Alwan v. City of New York*, 311 F. Supp. 3d 570, 585 (E.D.N.Y. 2018) (noting that the plaintiff "served a notice of claim against the City of New York" in an action involving claims of excessive force and equal protection brought under the New York State Constitution); *Pratt v. Indian River Cent. Sch. Dist.*, 803 F. Supp. 2d 135, 146 (N.D.N.Y. 2011) (applying sections 50-e and 50-i to a claim that the defendant violated the plaintiff's free speech rights under Article 1 § 8 of the New York State Constitution); *Mirro v. City of New York*, 74 N.Y.S.3d 356, 359 (App. Div. 2018) ("The plaintiff's failure to serve a

of their employment," a notice of claim must be filed "within ninety days of the incident giving

rise to the claim." *Grantley v. City of New York*, No. 12-CV-8294, 2013 WL 6139688, at *3

(S.D.N.Y. Nov. 21, 2013) (citing N.Y. Gen. Mun. Law §§ 50-e, 50-i); *see also* N.Y. Gen. Mun.

Law §§ 50-e(2)–(3) (discussing the required contents of the notice of claim and the procedure for

serving the notice of claim upon an officer, appointee or employee of a public corporation); *Allen

v. Antal*, 665 F. App'x 9, 14 (2d Cir. 2016) (dismissing a case for failure to file a timely notice of

claim pursuant to section 50-e); *Hardy v. N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 795 (2d

Cir. 1999) (same); *O'Brien v. City of Syracuse*, No. 22-CV-948, 2023 WL 6066036, at *22

(N.D.N.Y. Sept. 18, 2023) (same).

      The New York Court of Appeals has "long held" that "statutory requirements

conditioning suit [against a governmental entity] must be strictly construed." *Varsity Transit,

Inc. v. Bd. of Educ. of N.Y.C.*, 5 N.Y.3d 532, 536 (2005) (alteration in original) (quoting *Dreger

v. N.Y. State Thruway Auth.*, 81 N.Y.2d 721, 724 (1992)); *see also Incorporated Village of

Freeport v. Freeport Plaza W., LLC*, 170 N.Y.S.3d 166, 168 (App. Div. 2022) (same).  "This is

true even where the [entity] 'had actual knowledge of the claim or failed to demonstrate actual

prejudice.'" *Varsity Transit*, 5 N.Y.3d at 536 (quoting *Parochial Bus. Sys. v. Bd. of Educ. of

N.Y.C.*, 60 N.Y.2d 539, 548 (1983)); *see also Freeport Plaza*, 170 N.Y.S.3d at 168 (same).  As a

result, "[f]ailure to comply with these requirements ordinarily requires a dismissal for failure to

state a cause of action." *Diarra*, 771 F. App'x at 71 (quoting *N.Y.C. Health & Hosp.*, 164 F.3d at

---

notice of claim requires dismissal of the cause of action alleging violations of the State
Constitution." (citing, *inter alia*, *423 S. Salina St. v. City of Syracuse*, 68 N.Y.2d 474, 482
(1986))); *Pierce v. Vill. of Horseheads Police Dep't*, 970 N.Y.S.2d 95, 100 (App. Div. 2013)
(applying section 50-e to the plaintiff's state constitutional claims and concluding that "it does
not appear that plaintiff can prevail in her cause of action alleging a state constitutional tort
against the" county defendant).

794); *see also Kassapian v. City of New York*, 65 N.Y.S.3d 562, 566 (App. Div. N.Y. 2017) ("The Supreme Court properly granted dismissal of the cause of action alleging violations of the State Constitution on the ground that the plaintiff failed to serve a notice of claim.").

However, under the doctrine of equitable estoppel, a defendant may be estopped from asserting that a plaintiff is procedurally barred from bringing state claims for failure to file a notice of claim. *See, e.g.*, *Lebanon Valley Landscaping Inc. v. Town of Nassau*, 596 N.Y.S.2d 587, 587–88 (App. Div. 1993) (explaining that the town defendant "may be estopped from advancing [a notice of claim defense] at trial"). "The doctrine of equitable estoppel is to be invoked sparingly and only under exceptional circumstances," and applies "only when the [municipality's] conduct was calculated to, or negligently did, mislead or discourage a party from serving a timely notice of claim and when that conduct was justifiably relied upon by that party." *Freeport Plaza*, 170 N.Y.S.3d at 168 (first quoting *Sanchez v. Jericho Sch. Dist.*, 120 N.Y.S.3d 163, 165 (App. Div. 2020); then quoting *Khela v. City of New York*, 937 N.Y.S.2d 311, 314 (App. Div. 2012)); *see also E. Coast Res., LLC v. Town of Hempstead*, 707 F. Supp. 2d 401, 407 (E.D.N.Y. 2010) ("To successfully invoke the doctrine of equitable estoppel, the plaintiff must have relied on the defendant's actions, and that reliance must have been justifiable." (alterations, internal quotation marks, and citation omitted)). Numerous courts, however, have also found the doctrine of equitable estoppel applicable where a defendant had actual notice of the plaintiff's claim and delayed in raising the notice of claim defense. *See Rasmussen v. City of New York*, No. 10-CV-1088, 2010 WL 11700298, at *3 (E.D.N.Y. Nov. 30, 2010) (noting that courts have "precluded a defendant from asserting a notice of claim defense in limited cases, such as . . . where the defendant received actual notice of the claim and failed to raise the defense for a lengthy period of time" (citations omitted)); *E. Coast Res.*, 707 F. Supp. 2d at 407 (finding

estoppel where "[i]n the more than two years that [the] action ha[d] been pending, the [defendant] never once raised the issue of [the plaintiff's] failure to file a notice of claim as a defense to liability until practically the eve of trial when the parties appeared . . . for a pretrial conference"); *see also Lebanon Valley Landscaping*, 596 N.Y.S.2d at 587–88 ("[W]here, as in this instance, defendant received actual notice of the claim and did not raise the issue of lack of formal notice for over two years, instead allowing the case to proceed through discovery and arbitration, it may be estopped from advancing that contention at trial."); *cf. Cancel v. Metro Transp. Auth.*, 70 N.Y.S.3d 358, 362–63 (Sup. Ct. 2018) (declining to apply equitable estoppel where the defendant "did not engage in conduct that can be described as purposeful, strategic silence while actively litigating the case, that may invoke the doctrine of estoppel" (internal quotation marks and citation omitted)).

Defendants are equitably estopped from raising Plaintiffs' failure to serve a notice of claim at this stage in the litigation. Defendants received actual notice of Plaintiffs' claims when they were served with the initial complaint in this action in September of 2014. (*See* Compl.; Proof of Service, Docket Entry No. 4.) Defendants moved to dismiss the Complaint on September 24, 2015, but did not raise Plaintiffs' failure to serve a notice of claim at that time. (*See* Defs.' Sept. 24, 2015 Mot. to Dismiss ("Defs.' First Mot. to Dismiss"), Docket Entry No. 43; Defs.' Mem. in Supp. of Defs.' First Mot. to Dismiss, Docket Entry No. 43-6.) Plaintiffs filed an Amended Complaint on September 30, 2016. (*See* Am. Compl.) Defendants did not move to dismiss the Amended Complaint, and on February 7, 2017, Plaintiffs filed the SAC. (*See* SAC.) Defendants moved to dismiss the SAC on March 7, 2017, and again did not raise Plaintiffs' failure to serve a notice of claim as a basis for dismissal. (Defs.' Mar. 7, 2017 Mot. to Dismiss ("Defs.' Second Mot. to Dismiss"), Docket Entry No. 157; Defs.' Mem. in Supp. of

Defs.' Second Mot. to Dismiss, Docket Entry No. 160.)  Defendants did not raise this issue until

they moved for summary judgment in October of 2023, over nine years after they first received

notice of these claims.  (*See* Defs.' Mem. 23).  Defendants' delay of over nine years in raising

Plaintiffs' failure to serve a notice of claim, despite moving to dismiss the Complaint and the

SAC, estops Defendants from raising this defense at this stage.  *See E. Coast Res.*, 707 F. Supp.

2d at 408 (applying estoppel where the defendant did not raise the plaintiff's failure to serve a

notice of claim in "the more than two years that [the] action ha[d] been pending" and waited

until "practically the eve of trial" to raise it); *Steimel v. Incorporated Village of Rockville Center*,

965 F. Supp. 366, 373–74 (E.D.N.Y. 1997) (applying estoppel where the motion "was made

almost a half decade after the initiation of the litigation" and the defendant "never raised the

issue until after the trial had commenced"); *Lebanon Valley Landscaping*, 596 N.Y.S.2d at 587–

88 (applying estoppel where the "defendant received actual notice of the claim and did not raise

the issue of lack of formal notice for over two years, instead allowing the case to proceed

through discovery and arbitration").[44]

---

[44]   The Court is aware of cases where courts decline to apply estoppel when the defense
is raised at the summary judgment stage.  *See, e.g.*, *Feliciano v. N.Y.C. Hous. Auth.*, 999
N.Y.S.2d 456, 457 (App. Div. 2014); *Davis v. N.Y.C. Hous. Auth.*, 101 N.Y.S.3d 65, 66–67
(App. Div. 2019); *Diarra v. City of New York*, 771 F. App'x 69, 71 (2d Cir. 2019).  As noted
above, however, the Court finds that under the circumstances of this case based both on the fact
that Defendants twice moved to dismiss the Complaint and SAC and never raised this issue,
coupled with the length of time the case has been litigated, distinguishes this case from those
cases.  In *Feliciano*, 999 N.Y.S.2d 456, the Appellate Division concluded that the lower court
"should have granted the [defendant's] motion for summary judgment dismissing the complaint
on the ground that the plaintiff failed to serve a timely notice of claim."  *Id.* at 459.  The court's
decision was based on its conclusions that: (1) the defendant was "under no obligation to plead,
as an affirmative defense, the plaintiff's failure to comply with the statutory notice of claim
requirement"; (2) "participation in pretrial discovery did not preclude [the defendant] from
raising the untimeliness of the notice of claim"; and (3) there was no evidence that the defendant
"engaged in any misleading conduct" or that the plaintiff "relied upon any alleged act or
omission of the [defendant] or that such reliance caused the plaintiff to change her position to her

Accordingly, under the circumstances of this case, the Court finds that Plaintiffs' failure to serve a notice of claim on Defendants does not bar them from asserting their state constitutional claims.

### ii. Ripeness

Defendants argue that Plaintiffs' state law claims are not ripe for review because Plaintiffs never obtained a final decision regarding the use of the Wantagh Property. (Defs.' Mem. 24–25; Defs.' Reply 12.) In support, Defendants contend that before Plaintiffs could submit a "meaningful" application for a special use permit, they were required to (1) cure the lack of on-site parking; (2) cure the front yard portico set back violation; and (3) obtain a Certificate of Occupancy for the Wantagh Property. (Defs.' Mem. 26–27; Defs.' Reply 12; Defs.' Suppl. Letter Br. on Ripeness ("Defs.' Ripeness Letter") 2–4, Docket Entry No. 300.)[45] Defendants argue that because Plaintiffs did not take these steps prior to seeking a special use

---

detriment or prejudice." *Id.* Similarly, in *Davis*, 101 N.Y.S.3d 65, the Appellate Division affirmed the lower court's decision granting summary judgment to the defendant based on the plaintiff's failure to serve a notice of claim because there was "no evidence in the record demonstrating that the defendant waived its right to move for summary judgment on the basis of lack of timely service of the notice of claim, or engaged in any misleading conduct which would estop it from moving for summary judgment on this ground." *Id.* at 67. In addition, in 2019 the Second Circuit affirmed a district court decision granting summary judgment based on the notice of claim defense, but there is no indication the plaintiff raised estoppel in that case. *See Diarra*, 771 F. App'x at 71 (affirming the district court's grant of summary judgment because the district court was "obligated to apply [New York's] notice-of-claim provision' to [the plaintiff's] state law claims" (first alteration in original) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988))).

[45] On March 7, 2024, Defendants filed a letter to notify the Court of the Second Circuit's discussion and decision in *BMG Monroe I, LLC v. Village of Monroe*, 93 F.4th 595 (2d Cir. 2024). (Defs.' Letter dated Mar. 7, 2024, Docket Entry No. 298.) On March 8, 2024, the Court directed the parties to "explain *BMG Monroe*'s impact on each of Plaintiffs' claims." (Order dated Mar. 8, 2024.) The parties subsequently filed supplemental briefing addressing *BMG Monroe*'s impact on the ripeness of Plaintiffs' claims. (*See* Defs.' Ripeness Letter; *see also* Pls.' Suppl. Letter on Ripeness ("Pls.' Ripeness Letter"), Docket Entry No. 301.) The Court considers the parties' supplemental briefing in addressing Defendants' arguments that Plaintiffs' state law claims are not ripe.

permit, their application was not a "meaningful" one and the Board "had no jurisdiction to grant a special use permit on the merits." (Defs.' Mem. 26; Defs.' Reply 12; Defs.' Ripeness Letter 2–4.)

Plaintiffs argue that the Court should find that their claims related to the 2016 Application are ripe. (Pls.' Opp'n 17; Pls.' Ripeness Letter.) In support, Plaintiffs contend that they obtained a final decision from the Board when it (1) denied their appeal of the DOB's determination that a new special use permit was required and (2) denied their applications for a new special use permit and related variances from the Board. (Pls.' Ripeness Letter 2–6.) In addition, Plaintiffs argue that their claims are ripe because seeking further administrative review would have been futile. (Pls.' Opp'n 17–18; Pls.' Ripeness Letter 6–8.)

When evaluating takings claims brought under both the Fifth Amendment of the United States Constitution and Article 1 § 7 of the New York Constitution, New York courts apply the same ripeness analysis to both claims. *See, e.g.*, *Matter of Ward v. Bennett*, 79 N.Y.2d 394, 396 (1992) (applying the standard set forth in the Supreme Court's decision in *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), to conclude that the plaintiffs' claims were not ripe due to lack of finality); *Church of St. Paul & St. Andrew v. Barwick*, 67 N.Y.2d 510, 514, 520–23 (1986) (applying *Williamson County* to determine whether the plaintiff's federal and state constitutional takings claims were ripe); *CBS Outdoor, Inc. v. City of New York*, 16 N.Y.S.3d 411, 432 (Sup. Ct. 2015) (analyzing the ripeness of the plaintiff's federal and state takings claims together based on the standards set forth in *Matter of Ward*); *Peck Slip Assocs., L.L.C. v. City Council of City of N.Y.*, 789 N.Y.S.2d 806, 520–21 (Sup. Ct. 2004) (applying *Williamson County* to determine the ripeness of takings claims brought under the federal and state constitutions), *aff'd*, 809 N.Y.S.2d 56 (App. Div. 2006); *cf.*

*de St. Aubin v. Flacke*, 68 N.Y.2d 66 75 (1986) (noting that the Court of Appeals "applied [*Williamson County*] in *Church of St. Paul & St. Andrew*" to determine the ripeness of takings claims).[46]

The Supreme Court has held that a Takings Clause claim relating to land use is not ripe unless a local regulatory agency has rendered a final decision regarding the use of the property at issue.  *Knick v. Township of Scott*, 588 U.S. 180, 187–88 (2019) (holding, in contrast to *Williamson County*, that a plaintiff asserting a Takings Clause claim need not seek relief in state courts before bringing a claim in federal court); *Williamson County*, 473 U.S. at 186 (reiterating that a Takings Clause claim "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue"), *overruled on other grounds by Knick*, 588 U.S. at 187–88; *Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 294 (2d Cir. 2022) (explaining that, although the Supreme Court "has since overruled the exhaustion requirement" articulated in *Williamson County*, the "final-decision requirement . . . remains good law"); *Morabito v. New York*, 803 F. App'x 463, 468 (2d Cir. 2020), *as amended*, (Feb. 27, 2020) ("[T]he Supreme Court recently overturned the portion of its *Williamson* decision that required exhaustion of remedies in state court."); *Sagaponack Realty, LLC v. Village of Sagaponack*, 778 F. App'x 63, 64 (2d Cir. 2019) (applying the finality requirement but not the state-litigation requirement from *Williamson County* because "the validity of th[e] finality requirement" was not at issue in *Knick* (quoting *Knick*, 588 U.S. at 188)).

---

[46] As a result, the Court applies the same analysis to the ripeness of Plaintiffs' state takings claims as it did to the federal takings claims in the January 2021 Decision.

The Second Circuit has "made clear that 'appealing to the Zoning Board of Appeals *and* request[ing] variance relief' are both necessary prerequisites to ripeness." *BMG Monroe I*, 93 F.4th at 601 (emphasis in original) (quoting *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 352 (2d Cir. 2005)); *see also Kleinknecht v. Ritter*, No. 21-2041, 2023 WL 380536, at *2 (2d Cir. Jan. 25, 2023) ("A decision is final when 'there is no question about how the regulations at issue apply to the particular land in question.'" (citing *Pakdel v. City & County of San Francisco*, 594 U.S. 474, 478 (2021)); *Thomas v. Town of Mamakating*, 792 F. App'x 24, 27 (2d Cir. 2019) ("The final decision requirement 'conditions federal review on a property owner submitting at least one meaningful application for a variance.'" (quoting *Murphy*, 402 F.3d at 348)); *see also Williamson County*, 473 U.S. at 190 (holding that developer's claim was unripe because of developer's failure to obtain a final decision by requesting a variance).

"A property owner will be excused from seeking a variance, however, if doing so would be futile." *Thomas*, 792 F. App'x at 27 (concluding that a town's actions in a case involving various delays, skepticism from the chairman of the zoning board, and interference from the building inspector did "not warrant application of the futility exception" because "'it d[id] not "ma[k]e clear that all [variance] applications will be denied'" (second and third alterations in original) (quoting *Murphy*, 402 F.3d at 349)); *see also BMG Monroe I*, 93 F.4th at 601 (explaining that, "under [the] futility exception, '[a] property owner [is] excused from obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile.'" (quoting *Murphy*, 402 F.3d at 349)).  Futility occurs "when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied." *Murphy*, 402 F.3d at 349; *see also Vill. Green at Sayville*, 43 F.4th at 287 (same); *cf. Murphy*, 402 F.3d at 352 (dismissing for lack of jurisdiction where the plaintiffs had not

"obtained a final, definitive position from local authorities as to how their property may be used").  An appeal is also futile when the agency's appellate body "sits purely as a remedial body." *Id.* at 349.  A "purely . . . remedial body" is one that is "empowered, at most, to review [a] rejection, not to participate in the . . . decisionmaking." *Id.* (alteration in original) (quoting *Williamson County*, 473 U.S. at 193).

As set forth below, the Court concludes that Plaintiffs' state law claims pertaining to the 2016 Application are ripe because Plaintiffs obtained a final decision on that application.

### 1. Plaintiffs appealed the DOB's denial of the 2016 Application to the Board

Plaintiffs applied to the DOB for a special use permit to operate a cabaret on May 20, 2016, which the DOB denied because Plaintiffs needed a new special use permit, in addition to variances for the parking, front yard portico, and rear fence violations.  (Pls.' 56.1 Resp. ¶ 114–15; *see also* 2016 Permit Application; Board Findings of Fact at 23.)  Plaintiffs then sought a determination from the Board that a new special use permit was not required, and alternatively applied for a new special use permit.  (Defs.' 56.1 ¶ 117; Pls.' 56.1 Resp. ¶ 117; *see also* Board Findings of Fact at 21–22.)  Finally, the Board denied all of Plaintiffs' requests after holding a public hearing that lasted nearly thirteen hours.  (Defs.' 56.1 ¶¶ 118–19, 122; Pls.' 56.1 Resp. ¶¶ 118–19, 122; *see also* Board Findings of Fact 72–75.)  Thus, Plaintiffs have satisfied the first prong of the finality analysis — that they "appeal an adverse planning-board decision to a zoning board of appeals." *BMG Monroe I*, 93 F.4th at 598.

Defendants' argument that the 2016 Application for a special use permit was "premature" or not "meaningful" because Plaintiffs failed to first obtain a Certificate of Occupancy for the Wantagh Property is contradicted by the evidence.  In a declaration submitted in support of Defendants' motion, the Chief Plan Examiner for the DOB avers that "[his] office has no

authority to issue a building permit or [Certificate of Occupancy] for a use or construction that violates the building or zoning codes *or in the absence of a required special use permit from the [Board]*." (Decl. of Louis Carnovale ¶ 29, Docket Entry No. 289-2 (emphasis added).) Defendants' submissions therefore demonstrate that a special use permit must be obtained before a Certificate of Occupancy, rather than the other way around. In addition, the Board denied Plaintiffs' application for a special use permit "in the absence of sufficient on-site parking and/or variance . . . and in view of the uncured violation of the front yard set back and/or a variance." (Board Findings of Fact at 75; *see also* Pls.' 56.1 Resp. ¶ 122.) The Board did not address Plaintiffs' lack of a Certificate of Occupancy, nor did the Board cite it as an additional basis for denying Plaintiffs' 2016 Application.

Thus, the evidence before the Court does not establish that the Board required Plaintiffs to obtain a Certificate of Occupancy before it could consider whether Plaintiffs were entitled to a special use permit.

### 2. Plaintiffs made at least one meaningful application for a variance

Plaintiffs' 2016 Application also included applications for variances for the three code violations identified by the DOB. (Defs.' 56.1 ¶ 117; Pls.' 56.1 Resp. ¶ 117; *see also* Board Findings of Fact at 21–22.) The Board granted one of the requested variances but denied the other two. (Defs.' 56.1 ¶ 122; Pl.'s 56.1 Resp. ¶ 122; *see also* Board Findings of Fact 75.) Thus, Plaintiffs have also satisfied the second prong of the finality analysis — that they "submit[] at least one meaningful application for a variance." *BMG Monroe I*, 93 F.4th at 598 (alteration in original) (citation omitted).

The Court is not persuaded by Defendants' argument that Plaintiffs cannot satisfy this prong because they did not seek a variance from "the denial of the special use permit." (Defs.'

Ripeness Letter 3.)  Contrary to Defendants' assertions, Plaintiffs appealed DOB's determination that a new special use permit was required and argued to the Board that they could operate a cabaret based on the 1969 Permit.  (Board Findings of Fact 72; *see also* Defs.' 56.1 ¶ 117; Pls.' 56.1 ¶ 117.)  Even if Plaintiffs' appeal does not constitute an application for a "variance," it is undisputed that Plaintiffs did seek variances for the three code violations that the DOB cited as its reasons for denying the special use permit.  (*See* Defs.' 56.1 ¶ 115; Pl.'s 56.1 Resp. ¶ 115; *see also* Board Findings of Fact at 21.)  Thus, the evidence establishes that Plaintiffs submitted "at least one meaningful application for a variance."  *BMG Monroe I*, 93 F.4th at 598.

Accordingly, Plaintiffs have established that their claims arising out of the 2016 Application are ripe.[47]  *See id.* at 601 ("We have made clear that 'appealing to the Zoning Board of Appeals and requesting variance relief' are both necessary prerequisites to ripeness." (emphasis and alterations omitted) (quoting *Murphy*, 402 F.3d at 352)).[48]

---

[47]  Because the Court concludes that Plaintiffs received a final decision on the 2016 Application, it "need not address [their] alternative claim that '[s]eeking a final decision would [have been] futile.'"  *Vill. Green at Sayville*, 43 F.4th at 299 n.9 (quoting *Sherman*, 752 F.3d at 563).

[48]  In opposing Defendants' motion, Plaintiffs also argue that their takings claims arising out of the 2010 Application "remain eligible for consideration under State law, which is more protective of constitutional rights."  (Pl.'s Opp'n 20.)  As set forth above, however, the same ripeness analysis applies to Plaintiffs' federal and state law takings claim, and Plaintiffs have not argued or established that their federal claims arising out of the 2010 Application are now ripe.  (*See supra* section II.d.ii and note 35); *see also Matter of Ward*, 79 N.Y.2d at 396 (applying the federal ripeness analysis to the plaintiffs' takings claims under the federal and state constitutions).  To the contrary, the available evidence demonstrates that the Board's determination of the 2010 Application was not final because it was based on a lack of credibility and not on the merits.  (*See supra* note 35.)  Accordingly, the Court concludes that Plaintiffs' state law claims arising out of the 2010 Application are also not ripe.

### iii. Res judicata

Defendants raise the Second Circuit's recent decision in *Whitfield v. City of New York*, 96 F.4th 504 (2d Cir. 2024), in a supplemental briefing, to support their argument that Plaintiffs' state claims are barred by *res judicata*.[49]  (Defs.' Res Judicata Letter.)  Defendants argue that under *Whitfield*, the 2012 Article 78 Proceeding was a hybrid proceeding because (1) Plaintiffs asserted claims in the 2012 Article 78 Proceeding that the Special Use Provision violated their First and Fifth Amendment constitutional rights and property interests, and (2) the state court considered those claims on the merits and rejected them.  (*Id.* at 2–4.)  Defendants also argue that, contrary to the Court's conclusion in its January 2021 Decision, the Town and the Board are in privity because the Board acted in an administrative capacity as agent of the Town.[50]  (*Id.* at 5.)

---

[49]  On April 24, 2024, Plaintiffs filed a letter to "advise the Court of recent authority from the Second Circuit relevant to Defendants'" argument that the 2012 Article 78 Proceeding was a "hybrid proceeding," *Whitfield v. City of New York*, 96 F.4th 504 (2d Cir. 2024).  (Pls.' Letter dated Apr. 24, 2024, Docket Entry No. 302.)  On April 30, 2024, the Court directed the parties to submit supplemental briefing on whether Plaintiffs' facial challenge to the Special Use Provision is barred by *res judicata* in light of the 2012 Article 78 Proceeding, and the impact of *Whitfield* on this analysis.  (Order dated Apr. 30, 2024.)  On May 6, 2024, the parties submitted supplemental briefing in support of their arguments.  (*See* Pls.' Suppl. Letter on Res Judicata ("Pls.' Res Judicata Letter"), Docket Entry No. 304; Defs.' Suppl. Letter on Res Judicata ("Defs.' Res Judicata Letter"), Docket Entry No. 305.)  The Court considers the parties' supplemental briefing in deciding this issue.

[50]  Defendants also argue that Plaintiffs claimed "both before the Board and the courts" that "the Town had properly required and granted a special use permit for a cabaret on the . . . Wantagh property," and are therefore judicially estopped from now claiming that the special use permit violates their constitutional rights.  (Defs.' Res Judicata Letter 5.)  Plaintiffs' statements that they had acquired a special use permit, however, are not "contrary to" their current position that the Special Use Provision violates their constitutional rights, such that they would be judicially estopped from making those claims.  *See Quinn v. City of New York*, 2023 WL 3909798, at *2 (2d Cir. 2023) ("Courts may apply judicial estoppel only if '(1) a party's later position is clearly inconsistent with its earlier position, and (2) the party's former position has been adopted in some way by the court in an earlier proceeding.'" (quoting *Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 272 (2d Cir. 2019))).

Plaintiffs argue in their supplemental briefing that *Whitfield* instead confirms that the 2012 Article 78 Proceeding was not a hybrid proceeding and as a result their claims are not barred by *res judicata*. (Pls.' Res Judicata Letter.) Plaintiffs contend that the 2012 Article 78 Proceeding was not a hybrid proceeding because (1) Plaintiffs sought only equitable relief and not damages, (2) the Town proceeded for most of this litigation treating the proceeding as solely an Article 78 proceeding, and (3) the issues raised in this action could not have been raised in the 2012 Article 78 Proceeding. (*Id.* at 2–5.)

"Article 78 [of New York State's Civil Practice Law and Rules ("CPLR")] 'provides the mechanism for challenging a specific decision of a state administrative agency.'" *Campo v. N.Y.C. Emps.' Ret. Sys.*, 843 F.2d 96, 101 (2d Cir. 1988) (quoting *Liotta v. Rent Guidelines Bd.*, 547 F. Supp. 800, 802 (S.D.N.Y. 1982)); *see also Orange Env't, Inc. v. Orange Cnty. Legislature*, 2 F.3d 1235, 1236 (2d Cir. 1993) (per curiam) (explaining that an "Article 78 proceeding is [an] appropriate vehicle to obtain judicial review of administrative implementation of legislatively imposed responsibilities" (citing *Town of Arietta v. State Bd. of Equalization*, 56 N.Y.2d 356, 361 (1982))). "Unlike an ordinary civil action (often referred to as a 'plenary action'), the substantive scope of an Article 78 proceeding is limited." *Whitfield*, 96 F.4th at 519 (footnote omitted). A "hybrid" Article 78 action, however, "is another procedural device available to state courts" that allows the court to "elect to address, in a single proceeding, claims that are properly brought under Article 78 *and* claims that may not be brought under Article 78, and to use a procedural approach suited to each." *Id.* at 521.

In *Whitfield*, the Second Circuit adopted and discussed in detail the framework for determining whether a New York State Article 78 proceeding is a hybrid proceeding that could establish claim preclusion. *Id.* at 526–27. The Court determined that "a prior proceeding

initiated under Article 78 will be deemed a hybrid proceeding only if: (1) the state court petitioner sought relief that is not available under Article 78; and (2) the state court treated the proceeding as a hybrid one." *Id.* (citing *Sheffield v. Sheriff of Rockland Cnty. Sherriff Dep't*, 393 F. App'x 808, 813 (2d Cir. 2010)).  The Court concluded that although the state court petitioner sought damages, which are not available under Article 78, in addition to equitable relief, the state court did not clearly indicate "through affirmative action or a statement" that it "ha[d] exercised its discretion to entertain plenary claims." *Id.* at 529–30.  In concluding that the state court had not treated the proceeding as a hybrid proceeding, the court in *Whitfield* noted that the state court (1) "consistently used the language of a pure Article 78 proceeding . . . [and] never used the term 'hybrid' or mentioned a 'conversion'" to a hybrid proceeding; and (2) "took pains to clarify that its analysis of [the petitioner's] claims was 'constrained' by the standard of review and summary procedures applicable in Article 78 proceedings." *Id.* at 530–31.

    In the January 2021 Decision, the Court determined that the claims asserted in this action were not precluded based on the Article 78 proceeding because this action includes (1) parties who were not parties to the prior Article 78 proceedings or their privies, and (2) claims that could not have been raised in Plaintiffs' 2011 Article 78 Proceeding.  (Jan. 2021 Decision 99–103.) The Second Circuit's decision in *Whitfield* reaffirms the Court's conclusion in the January 2021 Decision that Plaintiffs are not precluded from bringing the instant claims based on the determinations made in the 2012 Article 78 Proceeding.  First, Plaintiffs' Article 78 Petition (the "Petition") was entitled a "Verified Petition," and the Petition sought no damages, but rather to "annul the [Board's] 2011 Decision" that denied their application for a special use permit. (Article 78 Petition 1, 11–12, annexed as Ex. A to Defs.' Res Judicata Letter, Docket Entry No. 305-1.)  Plaintiffs did not seek any relief outside of that associated with a pure Article 78

proceeding and the court did not award any relief beyond that sought.  *Cf. Whitfield*, 96 F.4th at

526, 529 (noting that "even though [the petitioner] styled his amended petition as a "VERIFIED

PETITION" seeking relief under Article 78, in it he sought 'compensatory damages'" and

therefore "sought relief that is not available under Article 78").

Second, as in *Whitfield*, the state courts treated the Plaintiffs' proceeding as a pure Article

78 proceeding.  In its decision, the New York Supreme Court used the language of a pure Article

78 proceeding where it (1) described Plaintiffs' action as seeking "an order and judgment

pursuant to CPLR Article 78," (2) referred to Plaintiffs throughout as "petitioners" rather than

"plaintiffs," and (3) dismissed "the petition," not "the hybrid proceeding" or "action."  *Green

2009 I*, 2012 WL 1985817, at *1; *see also Whitfield*, 96 F.4th at 530 (concluding that the state

supreme court "consistently used the language of a pure Article 78 proceeding" where it

(1) "never used the term 'hybrid' or mentioned a 'conversion,'" but rather "described [the

petitioner's] proceeding simply as a 'CPLR article 78 proceeding,'" (2) "repeatedly referred to

[the petitioner] as 'petitioner' — never the 'petitioner/plaintiff' or 'plaintiff,'" and (3) "denied

the 'petition' and dismissed 'the proceeding,' not the 'hybrid proceeding' or 'action'").  The

Appellate Division in its opinion similarly appears to have treated the proceeding as a pure

Article 78 proceeding.  *See, e.g.*, *Green 2009 II*, 980 N.Y.S.2d at 511 (opening its decision by

noting the Supreme Court proceeding was "a proceeding pursuant to CPLR article 78"); *see also

Whitfield*, 96 F.4th at 530–31 (noting that "the Appellate Division seem[ed] also to have

understood the Supreme Court to have conducted a pure Article 78 proceeding" where "[i]t

opened by calling the case a 'proceeding brought pursuant to CPLR article 78'").

In addition, in considering Plaintiffs' claims, the New York Supreme Court referred

exclusively to standards associated with Article 78 proceedings.  *See, e.g.*, *Green 2009 I*, 2012

WL 1985817, at *1 ("[J]udicial review is limited to determining whether the action taken by the board was illegal, arbitrary and capricious, or an abuse of discretion." (citation omitted)); *see also id.* (determining that the court could not "conclude the respondents' denial of the petitioner's application for a special exception to use here was either an abuse of discretion, irrational or based upon generalized community objections under these circumstances"); *Whitfield*, 96 F.4th at 531 (concluding that "[t]he state court's repeated invocation of the Article 78 standard of review and summary procedure" indicated it considered the proceeding to be a pure Article 78 proceeding). Neither the New York State Supreme Court nor the State Appellate Division treated the proceeding as a hybrid proceeding.

The Court finds that Plaintiffs' claims are not barred by *res judicata* based on the 2012 Article 78 Proceeding.[51]

### iv. Free speech claims

Defendants argue that the Court should grant summary judgment as to Plaintiffs' facial and as-applied state law free speech claims because (1) the Challenged Ordinances are facially neutral and generally applicable, and (2) the Special Use Provision has "no nexus to First Amendment issues." (Defs.' Mem. 22–26; Defs.' Reply 8–9.)

Plaintiffs argue that the New York State Constitution "frequently accords greater protection to expression than the federal constitution." (Pls.' Opp'n 13–14.) Plaintiffs also contend that under New York law, "the Town bears the burden of proving that it has chosen a course no broader than necessary to achieve its objective," and has failed to do so where there

---

[51] To the extent Defendants argue that the Town and the Board Defendants were in privity such that Plaintiffs' claims are barred under the doctrine of claim preclusion, the Court declines to revisit its determination in the January 2021 Decision that they were not. (Jan. 2021 Decision 101–02.)

are less restrictive ways the Town could achieve its goal of "protecting public health and safety." (*Id.* at 14–15.)

Free speech claims made under Article 1 § 8 of the New York State Constitution are subject to the same analysis as First Amendment claims. *See Martinez v. Sanders*, 307 F. App'x 467, 468 & n.2 (2d Cir. 2008) (noting that the plaintiff's "freedom of speech, political freedom and affiliation, and freedom of association" claims under Article 1 § 8 of the New York State Constitution were "subject to the same standards as the First Amendment claims"); *Carter v. Incorporated Village of Ocean Beach*, 693 F. Supp. 2d 203, 212 (E.D.N.Y. 2010) ("[F]ree speech claims under Article 1, Section 8 of the New York State Constitution are subject to the same analysis as free speech claims under the First Amendment[.]"); *Hous. Works, Inc. v. Turner*, 179 F. Supp. 2d 177, 199 n.25 ("Free speech claims under the First Amendment and the New York State Constitution are subject to the same standards[.]").

As the Court determined above, the Cabaret Provision violates the First Amendment, and, as a result, it also violates Article 1 § 8 of the New York State Constitution.  The Court therefore denies summary judgment to Defendants on Plaintiffs' state law free speech claims as to the Cabaret Provision.  *See, e.g.*, *Civil Rights Corps v. Pestana*, No. 21-CV-9128, 2022 WL 2118191, at *10 (S.D.N.Y. June 13, 2022) (determining that the statute at issue violated the First Amendment as applied, and that "[b]ecause Article I, Section 8 of the New York Constitution is even more protective of free speech, such application of [the statute] also violate[d] the New York State Constitution"); *Hous. Works*, 179 F. Supp. 2d at 199 n.25 (applying the same free speech analysis to the plaintiff's First Amendment and New York State Constitution claims).[52]

---

[52]  The Court notes that other district courts within the Second Circuit have found that, where an "alternative remedy" exists "'under [section] 1983 for violations of parallel provisions

### v. Takings claim

Defendants argue that Plaintiffs' state takings claim related to their 2016 Application for the Wantagh property fails because they have not demonstrated that "every use permitted by the ordinance will fail to yield a reasonable return on the property." (Defs.' Mem. 27.) Plaintiffs do not respond to Defendants' arguments as to the 2016 Application. (*See* Pls.' Opp'n 20–23.)

New York State Courts apply the same analysis for regulatory taking claims under the Fifth Amendment of the United States Constitution and Article 1 § 7 of the New York State Constitution. *See, e.g.*, *DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 295–97 (S.D.N.Y. 2023) (noting that "[t]he guarantee against Takings provided by the New York Constitution is generally treated as coextensive to that of the U.S. Constitution" and applying the *Penn Central* analysis to the plaintiffs' claims under both the Fifth Amendment and Article 1 § 7); *Heidel v. Hochul*, No. 20-CV-10462, 2021 WL 4942823, at *8–9 (S.D.N.Y. Oct. 21, 2021) (same), *aff'd sub nom Heidel v. Governor of N.Y. State*, No. 21-2860, 2023 WL 1115926 (2d Cir. 2023); *Y.H. v. E.S.*, 173 N.Y.S.3d 837, 853 (Sup. Ct. 2022) (noting that Article 1 § 7 of the New York State Constitution is "essentially identical to [its] counterpart[] in the Fifth Amendment to

---

of the U.S. Constitution,' 'no implied right of action exists for violations of the New York State Constitution.'" *Barzilay v. City of New York*, 610 F. Supp. 3d 544, 619 (S.D.N.Y. 2022) (quoting *Radice v. Eastport S. Manor Cent. Sch. Dist.*, 437 F. Supp. 3d 198, 209 (E.D.N.Y. 2020)). As a result, these courts have concluded that "where a [section] 1983 claim is brought for a parallel constitutional right, a court will properly dismiss state constitutional claims." *Id.* This is true, however, only where "the theory of liability brought for those claims is duplicative of the theory of liability under the federal constitution." *Id.* Thus, where a plaintiff offers case law or other authority showing that the state constitution "offers broader protection than the federal constitution," if the plaintiff can show that "'the specific conduct alleged . . . falls within any of th[e] areas' for which there is broader protection," the state law claims may continue. *Id.* (quoting *Talarico v. Port Auth. N.Y. & N.J.*, 367 F. Supp. 3d 161, 172 (S.D.N.Y. 2019)). Because neither party addresses whether Plaintiffs' state constitutional claims may be pursued in tandem with their federal constitutional claims, or whether Plaintiffs' state constitutional rights differ in scope than their federal constitutional rights, the Court addresses the merits of Plaintiffs' state constitutional claims.

the United States Constitution"); *Stahl York Ave. Co. v. City of New York*, 77 N.Y.S.3d 57, 59, 65–67 (App. Div. 2018) (applying the *Penn Central* analysis to the plaintiffs' claims under both the Fifth Amendment and Article 1 § 7); *Consumers Union of U.S., Inc. v. New York*, 806 N.Y.S.2d 99, 115–16 (2005) (same).

Accordingly, for the reasons already discussed *supra* in section II.d, Plaintiffs have failed to establish that the *Penn Central* factors support the conclusion that the regulatory action at issue constitutes a regulatory taking in violation of Article 1 § 7 of the New York State Constitution.  The Court therefore grants summary judgment in favor of Defendants as to Plaintiffs' state regulatory takings claim.

### vi.  Equal protection claims

Defendants argue that Plaintiffs' claims that they were denied equal protection under Article 1 § 11 of the New York State Constitution fail because "there is no proof that other entities were similarly situated — in terms of obtaining [a] comparable permit — and received more favorable treatment."  (Defs.' Mem. 27–28.)

Plaintiffs argue that because Article 1 § 11 "may be violated by an unequal application of a facially neutral statute," if, as Defendants contend, the Special Use Provision is facially neutral then "cabarets are being treated differently than other types of uses."  (Pls.' Opp'n 23.)

New York State Courts apply the same analysis for equal protection claims under the Fourteenth Amendment of the United States Constitution and Article 1 § 11 of the New York State Constitution.  *See, e.g.*, *People v. Salazar*, 973 N.Y.S.2d 140, 143–45 (App. Div. 2013) (noting that "Article 1, section 11 of the New York State Constitution provides New York citizens with an equivalent constitutional safeguard" and applying the same analysis for the plaintiff's equal protection claims under both the United States and New York State Constitutions); *Hernandez v. Robles*, 821 N.Y.S.2d 770, 778 (2006) ("[W]e have held that our

Equal Protection Clause 'is no broader in coverage than the Federal provision.'" (quoting *Under 21 v. City of New York*, 65 N.Y.2d 344, 360 n.6 (1985)), *abrogated on other grounds by Obergefell v. Hodges*, 576 U.S. 644 (2015).

For the reasons already discussed in the Court's January 2021 Decision, (Jan. 2021 Decision 118–25),[53] the Court grants summary judgment in favor of Defendants as to Plaintiffs' equal protection claims. *See, e.g.*, *USA Baseball v. City of New York*, 509 F. Supp. 2d 285, 295 (S.D.N.Y. 2007) (concluding that "because the New York State Constitution's equal protection clause is 'no broader in coverage than the Federal provision,'" the ordinance in question "d[id] no violate the state equal protection clause" for the same reasons it did not violate the federal Equal Protection Clause (quoting *Hernandez*, 7 N.Y.3d at 362)).

### vii.  State immunities

The Individual Defendants, consisting of the Non-Board Defendants, together with Defendants who were members of the Board — Weiss, Marino, D'Amato, Ragano, Mistero, Pellegrini, Perry, and Fisher (the "Board Defendants") — and Rottkamp, raise several defenses in response to Plaintiffs' state law claims.  (Defs.' Mem. 28–29.)  They argue that claims against them in their official capacities must be dismissed as duplicative of the claims brought against the Town, and that claims against them in their individual capacities are precluded based on

---

[53]  In the January 2021 Decision, the Court dismissed Plaintiffs' federal equal protection claims because (1) Plaintiffs did not meet their burden of showing they were treated differently compared to others similarly situated and that there was no rational basis for the difference in treatment, and (2) even if they were treated differently from other similarly situated businesses, they failed to state a claim under the class-of-one theory because code violations, setback violations, and parking safety hazards at the Wantagh Property provided a rational basis for the Board's denial of Plaintiffs' application, and (3) Plaintiffs' selective enforcement claim failed because they had not shown that ill will or malice motivated Defendants to discriminate against them.  (Jan. 2021 Decision 122–25.)

several immunities.  (*Id.*)  The Board Defendants and Rottkamp assert that they are entitled to absolute and qualified immunities.[54]  (*Id.* at 29.)

Plaintiffs do not address the Individual Defendants' immunities under state law.

### 1.   Official capacity claims against the Individual Defendants

The Individual Defendants argue that the state law claims against them in their official capacities must be dismissed because "an action against a government official in [their] official capacity is functionally equivalent to an action against the municipality."  (Defs.' Mem. 28 (citing *Rosen & Bardunias v. County of Westchester*, 644 N.Y.S.2d 320 (App. Div. 1996)).)  Plaintiffs do not respond to the Individual Defendants' arguments.

The Court is not persuaded that Plaintiffs' state law claims against the Individual Defendants in their official capacities must be dismissed as duplicative of the state law claims against the Town.  The sole authority Defendants cite in support of their argument, *Rosen & Bardunias v. County of Westchester*, addresses only whether a plaintiffs' section 1983 claims against county officials in their official capacity were duplicative of the section 1983 claims against the municipality.  *See* 644 N.Y.S.2d at 320 (describing the action as one brought, "*inter alia*, to recover damages for violation of civil rights under 42 U.S.C. § 1983").  Defendants do not cite any authority, and the Court is not aware of any, holding that state law claims brought against local officials in their official capacities must be dismissed as duplicative of the state law claims brought against the municipality.  Thus, Defendants have not established that Plaintiffs'

---

[54]   The Non-Board Defendants also assert that they are entitled to absolute and qualified immunities.  (Defs.' Mem. 28–29.)  As set forth above, (*supra* note 40), Plaintiffs have failed to sufficiently allege that the Non-Board Defendants were personally involved in the alleged constitutional violations, and therefore have failed to state a claim against them under state law.  Accordingly, the Court declines to address whether the Non-Board Defendants are entitled to absolute or qualified immunity with respect to Plaintiffs' state law free speech claims.

state law claims against them in their official capacities are duplicative of the state law claims against the Town.

Accordingly, the Court declines to dismiss the state law claims brought against the Individual Defendants in their official capacities as duplicative of claims against the Town.

### 2.   The Board Defendants and Rottkamp are entitled to absolute immunity

The Board Defendants and Rottkamp argue that they are entitled to absolute immunity. (Defs.' Mem. 29.)  In support, they argue that: (1) the Board Defendants are immune because they "are charged merely for voting in their official capacities"; and (2) Rottkamp is immune because he "merely supervised the [DOB] which denied the requested building permit in view of the fence and set-back violations and want of a special use permit" and there "are no allegations of any actions by him as an individual."  (*Id.*)  Plaintiffs do not respond to Defendants' arguments.

The New York Court of Appeals has expressly stated that "a zoning board of appeals performs a quasi-judicial function when considering applications for variances and special exceptions."  *Knight v. Amelkin*, 68 N.Y.2d 975, 977 (1986); *see also Affrunti v. Zwirn*, 892 F. Supp. 451, 453, 456 (E.D.N.Y. 1995) (concluding that the North Hempstead Town Board of Zoning Appeals is a "quasi-judicial, autonomous body" and that Board membership is a "quasi-judicial, policymaking position"), *aff'd*, 100 F.3d 943, 1996 WL 53625 (2d Cir. 1996) (unpublished table decision); *Levine v. McCabe*, No. 03-CV-6420, 2007 WL 4441226, at *8–9 (E.D.N.Y. Dec. 17, 2007) (concluding that judicial hearing officers are policymakers (citing *Affrunti*, 892 F. Supp. at 451)), *aff'd*, 327 F. App'x 315 (2d Cir. 2009); *Real Holding Corp. v. Lehigh*, 2 N.Y.3d 297, 301–02 (2004) (noting that statutes and case law emphasize that zoning boards are vested with the exclusive power to grant variances from zoning ordinances); *Jewish*

96

*Reconstructionist Synagogue of N. Shore v. Incorporated Village of Roslyn Harbor*, 40 N.Y.2d 158, 162 (1976) ("[T]he board of zoning appeals is a quasi-judicial body created by [s]tate law."); *Moundroukas v. Foley*, 472 N.Y.S.2d 32, 33 (App. Div. 1984) ("We agree with [the lower court] that the challenged actions of the respondents in connection with the denial of [the] petitioner's application for a zoning variance were discretionary and quasi-judicial in nature . . . ."); *cf. Hurley v. Town of Southampton*, No. 17-CV-5543, 2018 WL 3941944, at *23 n.17 (E.D.N.Y. Aug. 13, 2018) (collecting cases for the proposition that "[m]ultiple cases in this Circuit have recognized that municipal bodies such as zoning boards of appeal operate in a quasi-judicial capacity and are entitled to absolute immunity under state law"), *report and recommendation adopted*, No. 17-CV-5543 (E.D.N.Y. Sept. 21, 2018).

Because a zoning board is tasked with "guarding against the growth of undesirable and destructive uses of property[,] . . . [the] power to issue a building permit should not be hampered . . . by the threat of suit for damages on behalf of an applicant." *Rottkamp v. Young*, 249 N.Y.S.2d 330, 335 (App. Div. 1964), *aff'd*, 15 N.Y.2d 831 (1965). Consequently, the "deliberative proceedings of a zoning board regarding a variance application [a]re quasi-judicial . . . [and] statements made during the course of the proceedings and which were material and relevant to the proceedings" are shielded by absolute immunity. *Allan & Allan Arts Ltd. v. Rosenblum*, 615 N.Y.S.2d 410, 413–14 (App. Div. 1994). "If the official acts adjudicatively, the official probably has absolute immunity. If the official acts executively, the official probably has qualified, good-faith immunity." *Stewart v. Lattanzi*, 832 F.2d 12, 13 (2d Cir. 1987) (per curiam); *see also Parent v. New York*, 786 F. Supp. 2d 516, 537 (N.D.N.Y. 2011) (holding that commissioner of the Department of Social Services was not entitled to absolute immunity because his "responsibilities [we]re not closely associated with the judicial process nor is [his]

agency a quasi-judicial body"), *aff'd*, 485 F. App'x 500 (2d Cir. 2012).

In the January 2021 Decision, the Court determined that the Board Defendants and Rottkamp were entitled to absolute immunity on Plaintiffs' federal constitutional claims.  (Jan. 2021 Decision 86–87.)  As to the Board Defendants, the Court concluded that, to the extent they were sued "based on their quasi-judicial functions," they were entitled to absolute immunity. (*Id.* at 86.)  The Court reaches the same conclusion with respect to Plaintiffs' state constitutional claims.  Plaintiffs do not produce evidence that the Board Defendants took any actions other than denying their applications for special use permits and variances, and "a zoning board of appeals performs a quasi-judicial function when considering applications for variances and special exceptions." *Knight*, 68 N.Y.2d at 977.  Accordingly, the Board Defendants are entitled to absolute immunity. *See Billeris v. Incorporated Village of Bayville*, 694 F. Supp. 3d 214, 232 (E.D.N.Y. 2023) (relying in part on the January 2021 Decision to conclude that the "[p]laintiff has identified no improper action that the . . . members of the Board of Appeals allegedly engaged in other than denying her application to install a fence, so her claims against them are precluded by their immunity." (citation omitted)).

In the January 2021 Decision, the Court concluded that Rottkamp's "actions based on his capacity as commissioner of the [DOB] [were] also quasi-judicial in nature and subject to absolute immunity because his determinations on Plaintiffs' applications 'necessarily involved . . . a consideration of the facts before him — an act which a building inspector must perform as part of his responsibilities.'"  (Jan. 2021 Decision 86 (quoting *Rottkamp*, 249 N.Y.S.2d at 334– 35).)  Plaintiffs have not presented any evidence that Rottkamp engaged in conduct outside of his role as supervisor of the DOB, which denied Plaintiffs' 2016 Application.  As a result, Rottkamp is entitled to absolute immunity. *See Rottkamp*, 249 N.Y.S.3d at 334–335; *see also Filmways*

*Commc'ns of Syracuse, Inc. v. Douglas*, 484 N.Y.S.2d 738, 739 (App. Div. 1985) (noting that "a building inspector, in determining whether an applicant is entitled to a building permit, enjoys absolute immunity from tort liability because the act is discretionary and quasi-judicial in nature" (citing *Rottkamp*, 249 N.Y.S.2d at 334)).

Accordingly, the Court dismisses Plaintiffs' state law claims against the Board Defendants and Rottkamp.[55]

### viii. Municipal liability

Defendants argue that municipal liability does not apply for state claims where the plaintiff does not allege the individual defendants were personally involved in the deprivation of the plaintiff's constitutional rights.  (Defs.' Mem. 30.)  Plaintiffs do not respond to Defendants' arguments.

"[U]nder New York law and basic agency principles, a municipal employer is vicariously liable for the wrongs of its employee, even when the employee is individually immune, so long as the wrong was committed within the scope of employment."  *Triolo v. Nassau County*, 24 F.4th 98, 110 (2d Cir. 2022); *see also Singh v. City of New York*, No. 23-24, 2024 WL 319117, at *7 (2d Cir. Jan. 29, 2024) (same).

---

[55]  Because the Court finds that the Board Defendants and Rottkamp are entitled to absolute immunity, it does not reach whether these defendants are entitled to qualified immunity under state law.  The Court also notes that the January 2021 Decision indicated that Plaintiffs' federal constitutional claims against these defendants were "barred by absolute immunity" "to the extent they are being sued in their official capacity."  (Jan. 2021 Decision 86.)  However, because "[i]mmunity, either absolute or qualified, is a personal defense that is available only when officials are sued in their individual capacities," *Almonte*, 478 F.3d at 106 (emphasis and citation omitted); *Napolitano*, 315 F. App'x at 351 (same), Plaintiffs' federal constitutional claims against the Board Defendants and Rottkamp were dismissed only in their individual capacities.  The January 2021 Decision did not address whether the claims against these defendants in their official capacities should be dismissed as duplicative of the claims against the Town, and the parties have not raised the issue on summary judgment.

As set forth above, the Court denies Defendants' motion for summary judgment as to Plaintiffs' free speech claims under Article I § 8 of the New York Constitution.  (*See supra* section II.g.iv.)  Because the Board Defendants and Rottkamp could still be found to have engaged in unlawful conduct based on their roles in denying the 2016 Application, the Town can be held vicariously liable for that conduct even if the Board Defendants and Rottkamp are entitled to certain individual immunities.  *See, e.g.*, *Triolo*, 24 F.4th at 110 (holding that "a municipal employer can be held vicariously liable for its individually immune employee under New York state law when that employee has been found liable for an underlying wrong").

Accordingly, the Court denies Defendants' motion for summary judgment as to Plaintiffs' vicarious liability claim against the Town.[56]

### III.  Conclusion

For the foregoing reasons, the Court grants in part and denies in part Plaintiffs' motion for partial summary judgment, and grants in part and denies in part Defendants' motion for summary judgment.

The Court concludes that (1) Defendants are equitably estopped from arguing Plaintiffs' state law claims should be dismissed for failure to serve a notice of claim, (2) Plaintiffs' state law claims as to the 2016 Application are ripe, (3) Plaintiffs' state law claims as to the 2010 Application are unripe, (4) Plaintiffs' state law claims are not barred by *res judicata*,

---

[56] Defendants focus their challenge to Plaintiffs' claim for municipal liability on whether Plaintiffs have adequately alleged that the Individual Defendants engaged in unlawful conduct. Plaintiffs do not make clear in the SAC whether they seek municipal liability for the Town under a direct theory of an implied cause of action under Article 1 § 8 or a vicarious liability theory dependent on the actions of the Individual Defendants.  Because Defendants challenge the municipal liability claim based on a theory of vicarious liability, and Plaintiffs do not raise an argument in their briefing that they are relying on a direct theory of liability, the Court addresses only a vicarious liability theory.

(5) Plaintiffs' federal constitutional claims against Defendants Murray, Santino, and Hudes in their official capacities are duplicative of Plaintiffs' claims against the Town; (6) Plaintiffs fail to establish that Defendants Murray, Santino, and Hudes were personally involved in the alleged federal and state constitutional violations, (7) Plaintiffs' state constitutional claims against Defendants Rottkamp, Weiss, Marino, D'Amato, Ragano, Mistero, Pellegrini, Perry, and Fisher in their individual capacities are barred by absolute immunity, and (8) Defendants have not established that Plaintiffs' state constitutional claims against Defendants Rottkamp, Weiss, Marino, D'Amato, Ragano, Mistero, Pellegrini, Perry, and Fisher in their official capacities are duplicative of their state claims against the Town.

The Court (1) grants summary judgment in favor of Plaintiffs as to their claims that (a) the Cabaret Provision is an unconstitutional prior restraint and (b) the Cabaret Provision is unconstitutionally overbroad, and (2) severs the Cabaret Provision from the remainder of the Special Use Provision.  The Court denies Plaintiffs' motion for summary judgment as to Plaintiffs' claims that the Special Use Provision and Temporal Limit Provision are unconstitutionally vague under both federal and state law.

The Court grants summary judgment in favor of (1) all Defendants as to Plaintiffs' (a) federal and state regulatory takings claims and (b) state equal protection claims, (2) Defendants Murray, Santino and Hudes in their official and individual capacities as to all of Plaintiffs' federal claims, and (3) all Individual Defendants in their individual capacities as to all of Plaintiffs' state law claims.  The Court denies Defendants' motion for summary judgment as to Plaintiffs' claims that (1) the Cabaret Provision is an unconstitutional prior restraint, (2) the Cabaret Provision is unconstitutionally overbroad, (3) the Cabaret Provision violates Plaintiffs' rights to free speech under Article 1 § 8 of the New York State Constitution, (4) the Town may

be held liable under *Monell*, 436 U.S. 658, with respect to Plaintiffs' First Amendment claims,

and (5) the Town may be held vicariously liable as to Plaintiffs' state law free speech claims.

Dated: August 16, 2024
      Brooklyn, New York

                            SO ORDERED:


                            _____s/ MKB_____
                            MARGO K. BRODIE
                            United States District Judge